# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

--------------------------------------------------------x
:
In re                             :     **Chapter 11**
:
**BASIC ENERGY**           :     **Case No. 16-_____ (___)**
**SERVICES, INC.,** *et al.,*    :
:     **Joint Administration Requested**
:
**Debtors.** [1]       :
:
:
--------------------------------------------------------x

## MOTION OF DEBTORS FOR
### ORDER (I) SCHEDULING COMBINED HEARING TO CONSIDER (A) APPROVAL OF DISCLOSURE STATEMENT, (B) APPROVAL OF SOLICITATION PROCEDURES AND FORMS OF BALLOTS, AND (C) CONFIRMATION OF PREPACKAGED PLAN; (II) ESTABLISHING AN OBJECTION DEADLINE TO OBJECT TO DISCLOSURE STATEMENT AND PLAN; (III) APPROVING THE FORM AND MANNER OF NOTICE OF COMBINED HEARING, OBJECTION DEADLINE, AND NOTICE OF COMMENCEMENT; (IV) CONDITIONALLY WAIVING REQUIREMENT OF FILING STATEMENT OF FINANCIAL AFFAIRS AND SCHEDULES OF ASSETS AND LIABILITIES; (V) CONDITIONALLY WAIVING REQUIREMENT TO CONVENE THE SECTION 341 MEETING OF CREDITORS; AND (VI) APPROVING (A) THE RIGHTS OFFERING PROCEDURES, (B) BACKSTOP AGREEMENT, AND (C) THE BACKSTOP PUT PREMIUM, TRANSACTION EXPENSES AND INDEMNIFICATION OBLIGATIONS IN CONNECTION THEREWITH PURSUANT TO SECTIONS 105(a), 363(b), 341, 521(a), 1126, AND 1128 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 1007, 3017, 6003, AND 6004

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Basic Energy Services, Inc. (1194); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Basic ESA, Inc. (2279); Chaparral Service, Inc. (6424); SCH Disposal, L.L.C. (8335); Sledge Drilling Corp. (3140); Admiral Well Service, Inc. (4899); Basic Marine Services, Inc. (4888); JS Acquisition LLC (9500); Permian Plaza, LLC (3425); Maverick Coil Tubing Services, LLC (3281); First Energy Services Company (4993); JetStar Holdings, Inc. (4248); Xterra Fishing & Rental Tools Co. (7818); Maverick Solutions, LLC (2876); LeBus Oil Field Service Co. (3125); Acid Services, LLC (0455); Taylor Industries, LLC (7037); Maverick Stimulation Company, LLC (4572); Globe Well Service, Inc. (4275); JetStar Energy Services, Inc. (5237); Platinum Pressure Services, Inc. (8379); Maverick Thru-Tubing Services, LLC (1902); MCM Holdings, LLC (0949); MSM Leasing, LLC (9182); The Maverick Companies, LLC (4170). The Debtors' mailing address is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

Basic Energy Services, Inc. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "***Debtors***"), respectfully represent as follows in support of this motion (this "***Motion***"):

### Relief Requested

1.      Pursuant to sections 105(a), 363(b), 341, 521(a), 1126 and 1128 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 1007, 3017, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 1001–1(c), 1007–1, and 1007–2 of the Local Rules of Bankruptcy Practice and Procedure of the United States District Court for the District of Delaware (the "***Local Rules***"), the Debtors request entry of an order:

    i.    scheduling a combined hearing (the "***Combined Hearing***") to (a) approve the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and Its Affiliated Debtors* (as may be amended, modified, or supplemented from time to time, the "***Disclosure Statement***") and (b) consider confirmation of the *Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and Its Affiliated Debtors* (as may be amended, modified, or supplemented from time to time, the "***Prepackaged Plan***[2]");

    ii.    establishing an objection deadline (the "***Objection Deadline***") to object to the adequacy of the Disclosure Statement or confirmation of the Prepackaged Plan;

    iii.    approving the Solicitation Procedures (as defined herein) with respect to the Prepackaged Plan, including the forms of Ballots (as defined herein);

    iv.    approving the form and manner of notice of the Combined Hearing, the Objection Deadline, and notice of commencement;

    v.    extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "***Schedules and Statements***") through and including December 23, 2016 (the "***SOAL/SOFA Deadline***"), and conditionally waiving the requirement that the Debtors file the Schedules and Statements upon confirmation of the Prepackaged Plan;

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Prepackaged Plan.

vi. conditionally waiving the requirement to convene the meeting of creditors under section 341 of the Bankruptcy Code if the Prepackaged Plan becomes effective on or before the SOAL/SOFA Deadline; and

vii. approving (a) the proposed procedures for the conduct of the Rights Offering annexed hereto as **Exhibit A** (the "***Rights Offering Procedures***"), (b) the Backstop Agreement (as defined herein), a copy of which is annexed hereto as **Exhibit B**, and (c) the payment by the Debtors of the Backstop Put Premium (as defined herein), the Transaction Expenses (as defined herein) and incurrence of the Indemnification Obligations (as defined herein).

2.    A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit C** (the "***Proposed Order***").

3.    The following table summarizes the relevant dates from the Solicitation Procedures and sets forth the Debtors' proposed dates for the mailing of the Combined Notice, the Combined Hearing, the Objection Deadline, the launch of the Rights Offering, and the Rights Expiration Time (as defined in the Rights Offering Procedures):

| Event | Deadline |
|---|---|
| Voting Record Date | October 11, 2016 |
| Commencement of Solicitation | October 24, 2016 |
| Petition Date | October 25, 2016 |
| Mailing of Combined Notice | October 27, 2016 |
| Rights Offering Record Date and Rights Offering Launch Date | October 27, 2016 |
| Plan Supplement Filing Deadline | November 22, 2016 |
| Plan and Disclosure Statement Objection Deadline | November 28, 2016, at 4:00 p.m. (Prevailing Eastern Time) |
| Plan Voting Deadline and Rights Expiration Time | November 29, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Reply Date | December 5, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Combined Hearing | December 7, 2016, at 10:00 a.m. (Prevailing Eastern Time) |

WEIL:\95834547\15\22010.0003

4. Also, summarized below are the attachments and exhibits cited throughout this Motion:

| Pleading | Exhibit |
|---|---|
| Rights Offering Procedures | Exhibit A to this Motion |
| Backstop Agreement | Exhibit B to this Motion |
| Proposed Order | Exhibit C to this Motion |
| Combined Notice | Exhibit C-1 to the Proposed Order |
| Form of Master Ballot for Unsecured Note Claims | Exhibits D-1- to this Motion |
| Form of Beneficial Ballot for Term Loan Claims and Unsecured Note Claims | Exhibits D-2 through D-3 to this Motion |

## Jurisdiction and Venue

5. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

6. On the date hereof (the "***Petition Date***"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Court***"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

8. Before the Petition Date, the Debtors began the solicitation of votes on their Prepackaged Plan through their Disclosure Statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code. The Debtors expect that the Prepackaged Plan will be accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

9. Additional information regarding the circumstances leading to the commencement of these chapter 11 cases and regarding the Debtors' businesses and capital structure is set forth in the *Declaration of David C. Johnston in Support of the Debtors' Chapter 11 Petitions and Related Requests for Relief* (the "***Johnston Declaration***"), filed contemporaneously herewith.

## The Prepackaged Plan

10. As described in more detail in the Johnston Declaration, during a seven month period immediately preceding the Petition Date, the Debtors engaged in extensive discussions on the terms of a financial restructuring with their secured term loan lenders (the "***Term Loan Lenders***"), an ad hoc group representing over 80% of the company's unsecured noteholders (the "***Ad Hoc Group***"), and other key stakeholders. As a result of these negotiations, on October 23, 2016, the Term Loan Lenders and the Ad Hoc Group entered into a restructuring support agreement (the "***Restructuring Support Agreement***") with the Debtors. Under the terms of the Restructuring Support Agreement, the Term Loan Lenders and the Ad Hoc Group agreed to enter into a deleveraging transaction to restructure the existing debt and other obligations of the Debtors through the Prepackaged Plan (the "***Restructuring***").

WEIL:\95834547\15\22010.0003

11.     In accordance with the terms of the Restructuring Support Agreement, on

October 24, 2016, the Debtors commenced a solicitation of votes from all classes entitled to vote

under the Bankruptcy Code.  The thirty-six (36) day solicitation will end on November 29, 2016

(the "**Solicitation Period**").  Pursuant to the terms of the Restructuring Support Agreement, the

Term Loan Lenders and the Ad Hoc Group agreed to vote in favor of, and otherwise support, the

Prepackaged Plan, provided that certain conditions and milestones are satisfied.

12.     Under the terms of the Prepackaged Plan, the Debtors are proposing a

restructuring, with the support of each of the voting classes of claims and interests and certain

other interested parties, that, among other things, provides the following:

> (i)     An agreement with the holders of claims (the "**Term Loan Claims**")
> arising under that certain Term Loan Agreement, dated as of February 17, 2016
> (the "**Term Loan Agreement**") and certain holders of claims (the "**Unsecured
> Notes Claims**") arising under the (i) 7.75% Senior Notes due February 15, 2019
> (the "**2019 Notes**") and (ii) 7.75% Senior Notes due October 15, 2022 (the "**2022
> Notes**," and together with the 2019 Notes, the "**Unsecured Notes**") to provide
> financing during the chapter 11 cases in the form of a $90 million debtor-in-
> possession financing facility (the "**DIP Facility**");

> (ii)     Amending and restating the Debtors' senior secured term loan in the
> aggregate principal amount of $164.175 million (minus any amounts paid under
> Section 2.07 of the Term Loan Agreement during the Chapter 11 Cases),
> including the waiver of the Term Loan Lenders' right to receive any Applicable
> Premium or Make-Whole Amount (as such terms are defined in the Term Loan
> Agreement) that is triggered as a result of the commencement of the Debtors'
> chapter 11 cases;

> (iii)     (x) Satisfaction in full of claims arising under that certain ABL credit
> agreement, dated as of November 26, 2014 (as amended)(the "**ABL Credit
> Agreement**") and termination of all letters of credit issued under the ABL Credit
> Agreement; (y) amending and restating the credit facility set forth in the ABL
> Credit Agreement; or (z) providing other consideration satisfactory to the holders
> of claims arising under the ABL Credit Agreement;

> (iv)     Conversion of the Unsecured Notes into (x) 99.5% of the total outstanding
> shares of the reorganized Debtors (subject to dilution) (the "**New Common
> Shares**") as of the effective date of the Prepackaged Plan (the "**Effective Date**");

WEIL:\95834547\15\22010.0003

(v)     Launching a $125 million Rights Offering (as defined herein) whereby eligible holders of Unsecured Notes Claims shall have the right to purchase their pro-rata share of 100% of 9% PIK convertible unsecured notes (the "***New Convertible Notes***") which will mandatorily convert into 46.21% (assuming such conversion occurs 36 months after the Effective Date) of the outstanding shares of the New Common Shares; and

(vi)     Full and final satisfaction of the Debtors' existing common equity for (i) 0.5% of the equity in the reorganized Debtors as of the Effective Date (subject to dilution by the New Common Shares issued upon conversion of the New Convertible Notes, the Debtors' post-Effective Date management incentive plan, and the New Common Shares issued upon exercise of the Warrants (as defined below)) to be distributed pro rata to the holders of such interests and (ii) seven (7) year warrants (the "***Warrants***") to purchase, on a pro rata basis, 6% of the total outstanding shares of the New Common Shares (after giving effect to the conversion of the New Convertible Notes); and

(vii)     Payment in full, in the ordinary course, of the Debtors' trade and other general unsecured creditors;

13.     The Restructuring will leave the Debtors' business intact and will substantially delever it by reducing its balance sheet liabilities from approximately $824.6 million in unsecured debt to $131.25 million in mandatorily convertible unsecured debt with no cash interest obligation.

### Basis for Relief Requested

## I.     Scheduling a Combined Hearing

14.     The Debtors seek a Combined Hearing to consider approval of the Disclosure Statement, the Solicitation Procedures, and the Prepackaged Plan.  Bankruptcy Rule 3017(a) provides, in part, that "the court shall hold a hearing on at least twenty-eight (28) days' notice . . . to consider the disclosure statement and any objections or modifications thereto." Section 1128(a) of the Bankruptcy Code provides, "After notice, the court shall hold a hearing on confirmation of a plan."  In addition, Bankruptcy Rule 3017(c) provides, "On or before approval of the disclosure statement, the court shall fix a time within which the holders of claims and interests may accept or reject the plan and may fix a date for the hearing on confirmation."

7

Section 105(d)(2)(B)(vi) of the Bankruptcy Code provides that the Court may combine the hearing on approval of a disclosure statement with the hearing on confirmation of the related plan.

15.    The most sensitive and difficult tasks required to effectuate a successful reorganization—the negotiation of consensual agreements with critical creditor constituencies, and the ultimate formulation of a chapter 11 plan of reorganization —have already been concluded in advance of the Petition Date.  As set forth in greater detail in the Johnston Declaration, the Debtors have begun soliciting votes on the Prepackaged Plan from all classes of holders of Claims entitled to vote to accept or reject the Prepackaged Plan.  It is anticipated that the votes tabulated and received from these classes will be sufficient to confirm the Prepackaged Plan.  A Combined Hearing would promote judicial economy and is in the best interests of the Debtors and their estates and creditors by enabling all parties in interest to proceed with the confirmation process as expeditiously as possible.

16.    Accordingly, the Debtors respectfully request that the Court schedule the Combined Hearing on December 7, 2016, or as soon thereafter as is practicable in light of the Court's calendar.  The relief sought herein is necessary to the efficient administration of these chapter 11 cases and will protect the rights of all of the Debtors' creditors and interest holders. In addition to the reasons set forth above, it is appropriate to enter the Proposed Order at this time so that parties in interest may be informed as promptly as possible of the anticipated schedule of events for confirmation of the Prepackaged Plan.

17.    The proposed schedule affords creditors and all other parties in interest ample notice of these chapter 11 cases and the Combined Hearing.  The proposed schedule provides a period of 41 days after service of notice of the Confirmation Hearing, during which

WEIL:\95834547\15\22010.0003

parties may evaluate the Prepackaged Plan prior to the proposed Combined Hearing thereon.

Consequently, no party in interest will be prejudiced by the requested relief.

**II.      Approval of the Disclosure Statement**

18.      The Debtors will also request, at the Confirmation Hearing, that the Court

find that the Disclosure Statement contains "adequate information" as defined in section 1125(a)

and required by section 1126(b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 1125(a), 1126(b).

The Disclosure Statement contains adequate information to permit holders of Impaired Claims

against the Debtors to make an informed judgment about the Prepackaged Plan.  In addition to

the Prepackaged Plan itself, the Disclosure Statement includes disclosures regarding (i) the

operation of the Debtors' businesses; (ii) key events leading to the commencement of these

chapter 11 cases; (iii) the Debtors' significant prepetition indebtedness; (iv) the proposed capital

structure of the Reorganized Debtors; (v) financial information and valuations that would be

relevant to creditors' determinations of whether to accept or reject the Prepackaged Plan; (vi) a

liquidation analysis setting forth the estimated return that holders of claims and interests would

receive in a hypothetical chapter 7 liquidation; (vii) risk factors affecting the Prepackaged Plan;

and (viii) federal tax law consequences of the Prepackaged Plan.

19.      The Disclosure Statement and the Solicitation Procedures instituted in

connection therewith, including the ballots, are in full compliance with applicable provisions of

the Bankruptcy Code and the Bankruptcy Rules as well as any applicable nonbankruptcy laws,

rules, or regulations governing the adequacy of disclosure in connection with such solicitation.

Accordingly, the Debtors will respectfully request that this Court find that the information

contained in the Disclosure Statement is "adequate information" as such term is defined in

section 1125(a) of the Bankruptcy Code.

### III.    Approval of Solicitation Procedures and Forms of Ballots

20.    The Debtors request that the Court approve the solicitation, balloting, tabulation, and related activities undertaken in connection with the Prepackaged Plan (collectively, the "***Solicitation Procedures***") at the Combined Hearing.

### A.  Classes Presumed to Accept or Deemed to Reject the Prepackaged Plan

21.    Section 1126(f) of the Bankruptcy Code provides that

> Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

11 U.S.C. § 1126(f).

22.    The Prepackaged Plan provides that each holder of a Claim or Interest in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (ABL Facility Claims), Class 6 (General Unsecured Claims), Class 7 (Intercompany Claims), and Class 10 (Intercompany Interests) are unimpaired.  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims or Interests in each of the foregoing Classes are conclusively presumed to have accepted the Prepackaged Plan and, thus, are not entitled to vote.  Accordingly, the Debtors have not solicited votes from such holders.

23.    Section 1126(g) of the Bankruptcy Code provides that

> Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the Prepackaged Plan on account of such claims or interests.

11 U.S.C. § 1126(g).

24.    The holders of claims in Class 8 (Subordinated Claims) are not entitled to any distribution or to retain any property pursuant to the Plan.  Additionally, although the holders

WEIL:\95834547\15\22010.0003

of Existing Equity Interests in Class 9 are receiving a small equity interest and warrants in the

Reorganized Debtors as a part of the settlement and compromises under the Plan, and as agreed

to and accepted by each of the impaired voting Classes under the Plan, the holders of such equity

interests are conclusively "out of the money" (*See* Disclosure Statement, Art. IX) and are not

entitled to any distribution or to retain any property pursuant to the Prepackaged Plan.

Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, such holders of claims or

interests are conclusively deemed to have rejected the Prepackaged Plan and, thus, are not

entitled to vote.  Accordingly, the Debtors have not solicited votes from such holders.

   25.  With respect to the specific Classes of Claims and Interests against the

Debtors that were presumed to accept or deemed to reject the Prepackaged Plan, the Solicitation

Procedures undertaken by the Debtors and described herein comply with the Bankruptcy Code

and should be approved.  The Debtors respectfully request that the Court consider approval of

the Solicitation Procedures with respect to these Classes at the Combined Hearing.

**B.  Solicitation of Classes Entitled to Vote to Accept or Reject the Prepackaged Plan**

   26.  Section 1126(b) of the Bankruptcy Code expressly permits a debtor to

solicit votes from holders of claims or interests prepetition and without a court-approved

disclosure statement if the solicitation complies with applicable non-bankruptcy law—including

generally applicable federal and state securities laws or regulations—or, if no such laws exist, the

solicited holders receive "adequate information" within the meaning of section 1125(a) of the

Bankruptcy Code.

   27.  The Solicitation Procedures comply with all applicable non-bankruptcy

laws governing the adequacy of disclosure in connection with the solicitation.  The Debtors'

prepetition Solicitation Procedures are exempt from registration pursuant to section 4(a)(2) and

Regulation D of the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa (as amended from time to

time, the "*Securities Act*") and under state "Blue Sky" laws, or any similar rules, regulations, or

statutes.  Specifically, Section 4(a)(2) and Regulation D of the Securities Act creates an

exemption from the registration requirements under the Securities Act for transactions not

involving a "public offering."  *See* Securities Act, 15 U.S.C. § 77(d)(a)(2); *see also* §

77(R)(a)(1)(a), (b)(4)(F) (exempting transactions covered by the public offering exception from

Blue Sky laws).  The Debtors have complied with the requirements of Section 4(a)(2) of the

Securities Act and Regulation D thereunder, as the prepetition solicitation of acceptances would

constitute a private placement of securities.  The solicitation on the Prepackaged Plan with

respect to the holders of Unsecured Note Claims was made only to those creditors who were

Accredited Investors as defined in Rule 501 of the Securities Act although all holders of allowed

Unsecured Notes Claims will be entitled to receive distributions under the Plan.  *See, e.g.*,

Regulation D, 17 C.F.R. § 230.506 (deeming a transaction a non-public offering under section

4(a)(2) of the Securities Act if the transaction only involves accredited investors, provided

certain other conditions are satisfied).  Accordingly, the Debtors' prepetition solicitation

complies with the requirements of section 1126(b)(1).

28.    Bankruptcy Rule 3018(b) provides, among other things, that prepetition

acceptances or rejections of a plan are valid only if the Prepackaged Plan was "transmitted to

substantially all creditors and equity security holders of the same class" and that the time for

voting was not "unreasonably short."  On October 24, 2016, the Disclosure Statement, the

Prepackaged Plan, and one or more of the forms of ballots (the "*Ballots*," and collectively with

the Disclosure Statement and the Prepackaged Plan, the "*Solicitation Package*") were served on

holders of Claims or Interests in Class 4 (Term Loan Claims), and Class 5 (Unsecured Notes

Claims).  The Solicitation Package established October 11, 2016 as the record date (the "*Record*

*Date*") for determining which creditors were entitled to vote on the Prepackaged Plan, and advised recipients that the voting period will end at 5:00 p.m. (Eastern Time) on November 29, 2016 (the "*Voting Deadline*").

29.     The Prepackaged Plan is the product of over seven months of extensive negotiations among the Debtors, the Term Loan Lenders, the Ad Hoc Group, and other key stakeholders.  As a result, the Debtors commenced solicitation shortly before commencing these chapter 11 cases and set the Voting Deadline 33 days after solicitation.  The Solicitation Period will provide a sufficient period within which the holders of Claims or Interests entitled to vote may make an informed decision to accept or reject on the Prepackaged Plan.

30.     Bankruptcy Rule 3017(d) requires that the Debtors use a form of ballot substantially conforming to Official Form No. 314.  The Ballots are based on Official Form No. 314, but were modified to address the particular aspects of these chapter 11 cases and to be relevant and appropriate for each Class of Impaired Claims and Interests entitled to vote on the Prepackaged Plan.  With respect to Class 5 (Unsecured Notes Claims), the Debtors distributed two forms of Ballots: (i) a form of Ballot for a beneficial owner holding Unsecured Notes Claims through a nominee or as record holder in its own name (the "*Beneficial Owner Ballot*") and (ii) a form of Ballot for a nominee that is the registered holder of Unsecured Notes Claims (or agent thereof) to transmit the votes of one or more beneficial owners (the "*Master Ballot*").  To be counted as votes to accept or reject the Prepackaged Plan, the Ballots must be properly executed, completed, and delivered to Epiq Bankruptcy Solutions, LLC ("*Epiq*"), 777 Third Avenue, 12th Floor, New York, New York 10017, so that they are received no later than the Voting Deadline; *provided, however*, that beneficial holders of Unsecured Notes Claims who receive a Beneficial Owner Ballot from a bank or brokerage firm (or its agent) have been advised to return the

13

Beneficial Owner Ballot to such intermediary firm (or its agent) with sufficient time for such

intermediary to complete and return the Master Ballot to Epiq prior to the Voting Deadline.

Additionally, each of the Ballots was specifically designed to conform to the Prepackaged Plan.

The Debtors submit that the Ballots satisfy the requirements of Bankruptcy Rule 3017(d).

31.     In consideration of the foregoing, the Solicitation Procedures and Ballots

are in full compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy

Rules, and all applicable nonbankruptcy laws, rules, and regulations.  Consequently, the Debtors

respectfully request that this Court approve the Solicitation Procedures and Ballots.

**C.  Continuation of the Debtors' Prepetition Solicitation After the Petition Date**

32.     The Debtors distributed the Disclosure Statement and Ballots prior to the

Petition Date in accordance with sections 1125 and 1126 of the Bankruptcy Code.  *See* 11 U.S.C.

§ 1125(g) ("[A]n acceptance or rejection of the plan may be solicited from a holder of a claim or

interest if such solicitation complies with applicable nonbankruptcy law and if such holder was

solicited before the commencement of the case in a manner complying with applicable

nonbankruptcy law.").  Although the Debtors do not believe that the Disclosure Statement must

be conditionally approved for the Debtors' prepetition solicitation to continue postpetition, the

Debtors, out of an abundance of caution, request that the Court conditionally approve the

Disclosure Statement if the Court deems it necessary to do so.

33.     Courts in this district have recognized that debtors may "straddle"

solicitation by commencing solicitation prior to the petition date and continuing postpetition.

*See, e.g. In re Dex Media, Inc.*, Ch. 11 Case No. 16-11200 (KG) (Bankr. D. Del. May 16, 2016)

(D.I. 52) (approving continued postpetition solicitation commenced prior to petition date); *In re*

*Offshore Grp. Inv. Ltd.*, Ch. 11 Case No. 15-12422 (BLS) (Bankr. D. Del. Dec. 4, 2015) (D.I. 37)

(same); *In re Allen Sys. Grp., Inc.*, Ch. 11 Case No. 15-10332 (KJC) (Bankr. D. Del. Feb. 20,

14

2015) (D.I. 63) (same); *In re Everyware Global, Inc.*, Ch. 11 Case No. 15-10743 (LSS) (Bankr. D. Del. Apr. 7, 2015) (D.I. 51) (same); *In re Sorenson Commc'ns, Inc.*, Ch. 11 Case No. 14-10454 (BLS) (Bankr. D. Del. Mar. 4, 2014) (D.I. 43) (same); *In re CHL, LTD.*, Ch. 11 Case No. 12-12437 (KJC) (Bankr. D. Del. Aug. 31, 2012) (D.I. 58) (same).  Courts in other districts have also approved "straddled" solicitations.  *See, e.g. In re Atlas Res. Partners, L.P.*, Ch. 11 Case No. 16-12149 (SHL) (Bankr. S.D.N.Y. July 25, 2016) (D.I.41) (approving continued postpetition solicitation commenced prior to petition date); *In re Fairway Grp. Holdings Corp.*, Ch. 11 Case No. 16-11241 (MEW) (Bankr. S.D.N.Y. May 5, 2016) (D.I. 51)(same); *In re Southcross Holdings LP*, Ch. 11 Case No. 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016) (D.I. 75) (same); *In re Revel AC, Inc.*, Ch. 11 Case No. 13-16253 (JHW) (Bankr. D.N.J. Mar. 28, 2013) (D.I. 69) (same); *In re CIT Grp.*, Inc., Ch. 11 Case No. 09-16565 (AG) (Bankr. S.D.N.Y. Nov. 3, 2009) (D.I. 45) (same); *In re Reddy Ice Holdings, Inc.*, Ch. 11 Case No. 12-32349 (Bankr. N.D. Tex. Apr. 12, 2012) (court approved solicitation commenced on the eve prior to filing and continued postpetition).  Furthermore, it is important that these chapter 11 cases proceed as expeditiously as possible..

## IV.    Deadline and Procedures for Objections to the Disclosure Statement and the Prepackaged Plan

34.    Bankruptcy Rule 3017(a) authorizes the Court to fix a time for filing objections to the adequacy of a disclosure statement and Bankruptcy Rule 3020(b)(1) authorizes the Court to fix a time for filing objections to a plan of reorganization.  Further, Bankruptcy Rule 2002(b) requires at least twenty-eight (28) days' notice be given by mail to all creditors of the time fixed for filing objections to approval of a disclosure statement and confirmation of a plan of reorganization.  Local Rule 3017-1 similarly provides that "the hearing date [to consider approval of the disclosure statement] shall be at least thirty-five (35) days following the service

of the disclosure statement and the objection deadline shall be at least twenty-eight (28) days

from service of the disclosure statement."

35.    The Debtors request that the Court set November 28, 2016 at 4:00 p.m.

(Prevailing Eastern Time) as the Objection Deadline.  This date will provide holders of Claims

no less than thirty-two (32) days' notice of the deadline for filing objections to the Disclosure

Statement and the Prepackaged Plan while still affording the Debtors and other parties in interest

time to file a responsive brief and, if possible, resolve any objections received.  The Debtors also

request that the Court set the reply deadline on December 5, 2016.

36.    The Debtors further request that the Court direct that any objections to the

Disclosure Statement and/or the Prepackaged Plan be: (i) in writing, (ii) filed with the Clerk of

Court together with proof of service thereof, (iii) set forth the name of the objecting party, and

the nature and amount of any claim or interest asserted by the objecting party against the estate

or property of the Debtors, and state the legal and factual basis for such objection, and

(iv) conform to the applicable Bankruptcy Rules and the Local Rules.  In addition to being filed

with the Clerk of the Court, any such objections should be served upon the following parties so

as to be received by the Objection Deadline:  (i) attorneys for the Debtors, Weil, Gotshal &

Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Ray C. Schrock P.C. and

Ronit J. Berkovich, Esq.); (ii) co-attorneys for the Debtors, Richards, Layton & Finger, P.A.,

One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899 (Attn:  Daniel J.

DeFranceschi,  Michael J. Merchant, and Zachary I. Shapiro); (iii) counsel for the Term Loan

Lenders and certain of the DIP Lenders, (x) Davis Polk & Wardwell LLP, 450 Lexington

Avenue, New York, New York 10017 (Attn: Marshall S. Huebner and Darren S. Klein), and

(y) Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington,

Delaware (Attn: Jeremy W. Ryan); (iv)  counsel to the Administrative Agent for the ABL

Lenders, (x) Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3700, Dallas, TX 75201-2975,

(Attn: James A. Markus and Paul E. Heath) and (y) Morris, Nichols, Arsht & Tunnell LLP, 1201

N. Market Street, Wilmington, DE 19801, (Attn: Robert J. Dehney and Eric D. Schwartz);

(v) counsel to the Ad Hoc Group, (x) Fried, Frank, Harris, Shriver & Jacobson LLP, One New

York Plaza, New York, NY 10004 (Attn: Brad Eric Scheler and Peter B. Siroka) and (y) Blank

Rome LLP, 1201 N. Market Street Suite 800, Wilmington, DE 1980 (Attn: Michael D.

DeBaecke); and (vi) the Office of the United States Trustee for the District of Delaware

(the "*U.S. Trustee*").

## V.    Form and Manner of Notice of the Combined Hearing and the Commencement of These Chapter 11 Cases

37.    The Debtors propose to serve a notice and summary of the Prepackaged

Plan (the "***Combined Notice***") immediately upon entry of the Proposed Order substantially in the

form annexed as **Exhibit 1** to the Proposed Order, upon all parties in interest.[3]  The Combined

Notice sets forth (i) the date, time, and place of the Combined Hearing, (ii) instructions for

obtaining copies of the Disclosure Statement and Prepackaged Plan, (iii) the Objection Deadline

and the procedures for filing objections to the Disclosure Statement and the confirmation of the

Prepackaged Plan, and (iv) notice of commencement of these chapter 11 cases.

---

[3] The Debtors propose to send the Combined Notice to holders of Unsecured Notes Claims as reflected in the records maintained by the Debtors' transfer agent(s) or trustee(s) as of the close of business on the Record Date. The Debtors realize, however, that the records maintained by such transfer agent(s) or trustee(s) reflect the brokers, dealers, commercial banks, trust companies, or other agents or nominees (collectively, the "*Nominees*") through which the beneficial owners hold the various securities.  Accordingly, the Debtors request that the Court authorize:

(i)      the Debtors to provide the Nominees with sufficient copies of the Combined Notice to forward to the beneficial holders; and

(ii)     the Nominees to forward the Combined Notice or copies thereof to the beneficial holders within five (5) business days of the receipt by such Nominee of the Combined Notice.

To the extent the Nominees incur out-of-pocket expenses in connection with distribution of the Combined Notice, the Debtors request authority to reimburse such entities for their reasonable and customary expenses incurred in this regard.

38.     In addition, Bankruptcy Rule 2002(*l*) permits a court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice."  The Debtors request that this Court authorize the Debtors, in their discretion, to give supplemental publication notice of the Combined Hearing on a date no less than twenty-eight (28) days prior to the Combined Hearing.  The proposed notice schedule, as described above, affords parties in interest ample notice of these proceedings.

39.     The Debtors request that the Court determine that they are not required to distribute copies of the Prepackaged Plan or the Disclosure Statement to any holder of a Claim against or Interest in the Debtors within a Class under the Prepackaged Plan that is deemed to accept or is deemed to reject the Prepackaged Plan, unless such party makes a specific request in writing for the same.  Bankruptcy Rule 3017(d) provides, in relevant part, as follows:

> If the court orders that the disclosure statement and the Prepackaged Plan or a summary of the Prepackaged Plan shall not be mailed to any unimpaired class, notice that the class is designated in the Prepackaged Plan as unimpaired and notice of the name and address of the person from whom the Prepackaged Plan or summary of the Prepackaged Plan and disclosure statement may be obtained upon request and at the Prepackaged Plan proponent's expense, shall be mailed to members of the unimpaired class together with the notice of the time fixed for filing objections to and the hearing on confirmation.

Fed. R. Bankr. P. 3017(d).

40.     The Debtors request that the Court apply the same rationale to Class 8 (Subordinated Claims) and Class 9 (Existing Equity Interests) that are deemed to reject the Prepackaged Plan and waive the requirement that the Debtors send a copy of the Prepackaged Plan and Disclosure Statement to members of such Classes.  In lieu of furnishing each such holder of a Claim against or Interest in the Debtors that is either deemed to accept or is deemed to reject the Prepackaged Plan with a copy of the Prepackaged Plan and the Disclosure

WEIL:\95834547\15\22010.0003

Statement, the Debtors propose to send to such holders the Combined Notice, which sets forth

the manner in which a copy of the Prepackaged Plan and the Disclosure Statement may be

obtained.  In addition, the Debtors have made the Disclosure Statement and the Prepackaged

Plan available at no cost on Epiq's website at http://dm.epiq11.com/BasicEnergy.  The Debtors

submit that such notice satisfies the requirements of Bankruptcy Rule 3017(d).

## VI.    Extensions and Conditional Waivers of the 341 Meeting and the Filing of the Schedules and Statements

41.    The Debtors also request that the Court grant an extension of time to file

the Schedules and Statements and to waive the requirement to file the Schedules and Statements

in the event the Prepackaged Plan is confirmed.  Section 521 of the Bankruptcy Code requires a

debtor to file schedules of assets and liabilities and statements of financial affairs unless the

Court orders otherwise.  11 U.S.C. § 521(a)(1)(A)–(B).  These schedules and statements must be

filed within 14 days after the petition date unless the bankruptcy court grants an extension of

time "on motion for cause shown."  Fed. R. Bankr. P. 1007(c).  As a matter of course, the

Debtors are already entitled to an extension to thirty (30) days from the Petition Date because the

Debtors' claims agent is maintaining the consolidated creditor matrix as of the Petition Date, and

the Debtors have over 200 creditors.  *See* Local Rule 1007-1(b).  The Court is authorized to grant

the Debtors' further extension "for cause" pursuant to Bankruptcy Rule 1007(c) and Local Rule

1007-1(b).

42.    Sufficient cause exists here for such further extension through and

including the SOAL/SOFA Deadline.  The purposes of filing the Schedules and Statements are

to provide notice to creditors and to disclose information about the debtor to holders of claims.

Here, however, the benefits of filing the Schedules and Statements are heavily outweighed by

their costs.  Requiring the Debtors to complete the Schedules and Statements would be time

WEIL:\95834547\15\22010.0003

consuming, distracting to the Debtors' advisers and management, and costly to the Debtors'

estates, while providing little benefit to most parties in interest in these chapter 11 cases at that

point.  No party in interest would be prejudiced by the Court granting the Debtors' request for an

extension through and including the SOAL/SOFA Deadline because the Debtors have proposed

the Prepackaged Plan, under which trade claims and other general unsecured claims will ride

through the bankruptcy unimpaired and be enforceable against the Reorganized Debtors.

Therefore, the Court should extend the deadline for filing the Schedules and Statements through

and including the SOAL/SOFA Deadline, and waive the requirement altogether if the

Prepackaged Plan is confirmed in accordance with the timetable proposed by the Debtors.

43.     Section 105(a) of the Bankruptcy Code, which codifies the equitable

powers of the bankruptcy court, authorizes the court to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of this title."  In light of the facts and

circumstances surrounding these prepackaged chapter 11 cases, this Court has authority,

consistent with section 521(a) of the Bankruptcy Code, to grant the requested relief.  *See, e.g.*, *In

re RCS Capital Corp.*, Ch. 11 Case No. 16-0223 (MFW) (Bankr. D. Del. Mar. 29, 2016) (D.I.

423); *In re Offshore Grp. Inv. Ltd.,* Ch. 11 Case No., 15-12422 (BLS) (Bankr. D. Del. Dec. 4,

2015) (D.I. 37); *In re Hercules Offshore, Inc.*, Ch. 11 Case No. 15-11685 (KJC) (Bankr. D. Del.

Aug. 14, 2015) (D.I. 42); *In re EveryWare Glob., Inc.*, Ch. 11 Case No. 15-10743 (LSS) (Bankr.

D. Del. Apr. 9, 2015) (D.I. 46); *In re The Dolan Co.*, Ch. 11 Case No. 14-10614 (BLS) (Bankr.

D. Del. Mar. 25, 2014) (D.I. 69); *In re Dex One Corp.*, Ch. 11 Case No. 13-10533 (KG) (Bankr.

D. Del. Mar. 19, 2013) (D.I. 54); *In re Sorenson Commc'ns, Inc.*, Ch. 11 Case No. 14-10454

(BLS) (Bankr. D. Del. Mar. 4, 2014) (D.I. 48); *In re Physiotherapy Holdings, Inc.*, Ch. 11 Case

No. 13-12965 (KG) (Bankr. D. Del. Dec. 6, 2013) (D.I. 103); *In re Maxcom*

*Telecomunicaciones, S.A.B. de C.V.*, Ch. 11 Case No. 13-11839 (PJW) (Bankr. D. Del. Aug. 15, 2013) (D.I. 115); *In re Dex One Corp.*, Ch. 11 Case No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013), (D.I. 54); *In re Hawkeye Renewables, LLC*, Ch. 11 Case No. 09-19961 (KK), 2010 WL 2745975, at *24 (Bankr. D. Del. June 2, 2010); *In re Elec. Components Int'l, Inc.*, 2010 WL 3350305, at *25 (Bankr. D. Del. May 11, 2010).

44.    Accordingly, the Debtors respectfully request that the Court extend the time for filing the Schedules and Statements to December 23, 2016, and, upon confirmation of the Prepackaged Plan, waive this requirement.

45.    Additionally, the Debtors request that the Court direct the U.S. Trustee not to convene a meeting of the creditors under section 341 of the Bankruptcy Code unless the Prepackaged Plan is not confirmed on or prior to the SOAL/SOFA Deadline.  Section 341(a) of the Bankruptcy Code requires the U.S. Trustee to convene and preside over a meeting of creditors (a "***Section 341(a) Meeting***"), and section 341(b) of the Bankruptcy Code authorizes the U.S. Trustee to convene a meeting of equity security holders (a "***Section 341(b) Meeting***" and collectively with a Section 341(a) Meeting, a "***Section 341 Meeting***").  However, Bankruptcy Code section 341(e) provides that

> Notwithstanding subsections (a) and (b), the court, on the request of a party in interest and after notice and a hearing, for cause may order that the United States trustee not convene a meeting of creditors or equity security holders if the debtor has filed a plan as to which the debtor solicited acceptances prior to the commencement of the case.

11 U.S.C. § 341(e).

46.    The purpose of the Section 341 Meeting is to provide parties in interest with a meaningful opportunity to obtain and examine important information about the debtor.  In these chapter 11 cases, however, the solicitation of the Prepackaged Plan was commenced prior

to the Petition Date, and the Debtors expect that the Prepackaged Plan will be accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.  The Debtors intend to proceed expeditiously to confirm the Prepackaged Plan and emerge from chapter 11 as quickly as possible.  Therefore, parties are not likely to receive any benefit from the Section 341 Meeting.

47.    This Court has granted the requested waiver in other prepackaged chapter 11 cases.  *See, e.g.*, *In re RCS Capital Corp.*, Ch. 11 Case No. 16-0223 (MFW) (Bankr. D. Del. Mar. 29, 2016) (D.I. 423); *In re Offshore Grp. Inv. Ltd.*, Ch. 11 Case No. 15-12422 (BLS) (Bankr. D. Del. Dec. 4, 2015) (D.I. 37); *In re Seegrid Corp.*, Ch. 11 Case No. 14-12391 (BLS) (Bankr. D. Del. Oct. 22, 2014) (D.I. 26); *In re The Dolan Co.*, Ch. 11 Case No. 14-10614 (BLS) (Bankr. D. Del. Mar. 25, 2014) (D.I. 80); *In re Sorenson Commc'ns, Inc.*, Ch. 11 Case No. 14-10454 (BLS) (Bankr. D. Del. Mar. 4, 2014) (D.I. 43); *In re Physiotherapy Holdings, Inc.*, Ch. 11 Case No. 13-12965 (KG) (Bankr. D. Del. Nov. 14, 2013) (D.I. 49).

48.    Accordingly, the Debtors respectfully request that the Court direct the U.S. Trustee not to convene a Section 341 Meeting unless the Prepackaged Plan is not confirmed on or prior to the SOAL/SOFA Deadline.

### VII.    Approval of the Rights Offering Procedures

49.    In connection with the Prepackaged Plan, the Debtors intend, upon approval of the Rights Offering Procedures by this Court, to launch a rights offering to Eligible Offerees (defined herein) (the "***Rights Offering***"), pursuant to which Eligible Offerees will be entitled to receive their pro rata share of non-transferable subscription rights to acquire up to $125 million of mandatorily convertible notes which upon conversion (assuming such conversion occurs 36 months after the Effective Date) will represent 46.21% (subject to dilution by the New Common Shares issued under the post-emergence management incentive plan and

22

the New Common Shares issued upon the exercise of the Warrants) of the aggregate number of shares of the newly issued stock of the Reorganized Debtors.  An "***Eligible Offeree***" is a holder of an Allowed Unsecured Notes Claim as of the Rights Offering Record Date (as defined in the Rights Offering Procedures).

50.     The Rights Offering is an integral part of the Prepackaged Plan and is expected to generate proceeds of $125 million.  These proceeds will be used to (i) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, (ii) fund distributions under the Prepackaged Plan, (iii) pay Allowed Administrative Expense Claims payable on or after the Effective Date, and (iv) pay in cash in full the DIP Facility Claims.  To fully exercise its right to participate in the Rights Offering (the "***Subscription Rights***"), an Eligible Offeree must (i) complete the Rights Exercise Form (as defined in the Rights Offering Procedures) entitling such holder to exercise its Subscription Rights and (ii) pay the purchase price, which is an amount equal to its pro rata share of $125 million, with such pro rata share to be calculated as the proportion that an Eligible Offeree's Unsecured Notes Claim bears to the aggregate of all Unsecured Notes Claims.

51.     Upon the Court's entry of the Proposed Order, the Debtors intend to commence the Rights Offering on October 27, 2016, and, in accordance with the Rights Offering Procedures, propose to set a Rights Expiration Time of November 29, 2016.  The proposed duration of the Rights Offering will afford Eligible Offerees thirty-three (33) days to participate in the Rights Offering, and is reasonable under the circumstances.

52.     Courts in this District have granted similar relief in approving rights offerings.  *See, e.g.*, *In re Offshore Grp. Inv. Ltd.*, Ch. 11 Case No. 15-12422 (BLS) (Bankr. D. Del. Dec. 4, 2015) (D.I. 37) (approving a 24-day rights offering period); *In re Allen Sys. Grp.*,

*Inc.*, Ch. 11 Case No. 15-10332 (KJC) (Bankr. D. Del. Feb. 20, 2005) (D.I. 63) (approving a 22-day rights offering period); *In re Satelites Mexicanos, S.A. De C.V.*, Ch. 11 Case No. 11-11035 (CSS) (Bankr. D. Del. Apr. 13, 2011) (D.I. 127) (approving a 12-day rights offering period); *In re Remy Worldwide Holdings, Inc.*, Ch. 11 Case No. 07-11481 (KJC) (Bankr. D. Del. Oct. 10, 2007) (D.I. 52) (approving rights offering procedures at the first day hearing).

53.      In most chapter 11 cases in which rights offerings are conducted, the rights offering is commenced after the bankruptcy court has approved the adequacy of the information contained in the debtors' disclosure statement.  Such a process is consistent with the principles underlying section 1145 of the Bankruptcy Code, *i.e.*, that a filing with the Securities and Exchange Commission in connection with the offer and sale of a security, in compliance with applicable securities laws, should not be required in chapter 11 cases, where the bankruptcy court has ruled that the contents of the offering document (the disclosure statement) contains "adequate information" as defined in section 1125(a)(1) of the Bankruptcy Code.  In this case, the Rights Offering will not be consummated—and the New Convertible Notes will not be issued—until after the Court approves the adequacy of the Disclosure Statement.  This ensures that all creditors entitled to participate in the Rights Offering will have received adequate information before they make their investment.

54.      Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act, the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to

24

subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right.  In reliance upon this exemption, the Subscription Rights and the New Convertible Notes, and the new common shares issued upon conversion thereof, issued to holders of Unsecured Notes Claims will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.

### VIII.    Approval of the Backstop Agreement

55.    The Rights Offering will be backstopped by certain of the Debtors' unsecured noteholders (collectively, the "**_Backstop Parties_**").  Each of the Backstop Parties, severally and not jointly, has agreed, pursuant to the Backstop Agreement, dated October 25, 2016, among Basic Energy Services, Inc. and the Backstop Parties (the "**_Backstop Agreement_**") to purchase all New Convertible Notes that are not purchased by other Eligible Offerees pursuant to the Rights Offering on a pro rata basis in accordance with the percentages set forth in the Backstop Agreement.  The Backstop Agreement is annexed hereto as **Exhibit B**.  As consideration for their commitment under the Backstop Agreement, the Backstop Parties will receive the Backstop Put Premium (as defined herein) in accordance with the terms of the Backstop Agreement.

56.    The Backstop Agreement is likewise integral to the Prepackaged Plan.  It ensures that capital required to fund the Prepackaged Plan is committed prior to the commencement of the Rights Offering.  Moreover, the entry of an order approving the Backstop Agreement and the Rights Offering Procedures shortly after the Petition Date is a key milestone

in the Restructuring Support Agreement, and the failure to meet such a milestone could result in the Term Loan Lenders and the Ad Hoc Group withdrawing their support of the Prepackaged Plan.

57.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary to carry out the provisions of this title." If a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g., In re Martin* (*Myers v. Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper* (*Fulton State Bank v. Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business purpose" test of *Lionel Corp.* and requiring good faith); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business purpose" test in the *Abbotts Dairies* decision).

58.    In determining whether a debtor's proposed use of assets is justified by a sound business purpose, courts examine a variety of factors, which "essentially represent a business judgment test." *Montgomery Ward*, 242 B.R. at 153 (internal quotation marks omitted). The business judgment rule is "a presumption that directors act in good faith, on an informed basis, honestly believing that their action in in the best interests of the company." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (characterizing overcoming the business judgment

rule as a "near-Herculean task"); *Bridgeport Holdings, Inc. v. Boyer* (*In re Bridgeport Holdings, Inc.*), 388 B.R. 548, 567 (Bankr. D. Del. 2008).  Courts will generally leave undisturbed corporate decisions "absent a showing of bad faith, self-interest, or gross negligence." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872–73 (Bankr. D. Del. 1985)).

59.     Application of the business judgment rule has vitality in the chapter 11 context and protects a debtor's decision-makers from judicial second-guessing.  *See, e.g.*, *Integrated Res.*, 147 B.R. at 656; *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

60.     The Debtors submit that sound business reasons exist to grant the relief requested herein.  The Rights Offering is a key component of the Prepackaged Plan because it will allow the Debtors to obtain funding that will enable the Debtors' reorganization.  The Debtors have determined, in the exercise of their reasonable business judgment, that conducting the Rights Offering as soon as reasonably practicable is the most efficient means of seeking to implement the Prepackaged Plan.  As described above, the Court's entry of the order approving the Backstop Agreement and the Rights Offering Procedures is a key milestone in the Restructuring Support Agreement.   Moreover, if the Court does not approve the Backstop Agreement and the Rights Offering Procedures, the Debtors will not be able to fund their Prepackaged Plan, thus requiring the Debtors and their creditors to begin negotiations anew.

WEIL:\95834547\15\22010.0003

61.     The Backstop Agreement requires a substantial investment by the Backstop Parties in the Debtors' reorganization.  The committed investment of the Backstop Parties ensures that all of the Subscription Rights offered pursuant to the Rights Offering are subscribed and exercised, and therefore ensures an infusion of the funds required for the Debtors to emerge from chapter 11.  If the Debtors did not enter into the Backstop Agreement, they would run the risk that not all the rights would be subscribed and exercised.  In the Prepackaged Plan, one of the conditions precedent to the Effective Date is that the Backstop Agreement is in full force and effect and binding on all parties thereto.  *See* Prepackaged Plan § 9.1(f) ("the conditions to effectiveness of the Backstop Agreement have been satisfied or waived in accordance with the terms thereof, and the Backstop Agreement is in full force and effect and binding on all parties thereto").  Accordingly, approval of the Debtors' entry into the Backstop Agreement is a necessary element in effectuating the terms of the Prepackaged Plan.

62.     In exchange for the commitments offered by the Backstop Parties, the Debtors have agreed to, among other things, pay a backstop put premium in an amount equal to 5% of the Rights Offering in the form of New Convertible Notes in an aggregate principal amount of $6.25 million (the "***Backstop Put Premium***") and to pay or reimburse the Backstop Parties for their reasonable out-of-pocket expenses and professional fees incurred by in connection with the Backstop Agreement (the "***Transaction Expenses***").  The Backstop Agreement also obligates the Debtors to indemnify the Backstop Parties for certain losses, claims, damages, liabilities, costs and expenses arising out of or in connection with, among other things, the Backstop Agreement, the Prepackaged Plan, and the Rights Offering (the "***Indemnification Obligations***").  Additionally, the Debtors may be required to pay a termination fee in the amount of $6.25 million (the "***Termination Fee***," and, together with the Backstop Put

WEIL:\95834547\15\22010.0003

Premium, the Indemnification Obligations, and the Transaction Expenses, the "***Backstop Obligations***") to non-defaulting Backstop Parties if the Backstop Agreement is terminated as a result of Basic Energy Services Inc.'s board of directors exercising its fiduciary duties and terminating the Restructuring Support Agreement, this court entering an order refusing to confirm the Prepackaged Plan, or an injunction being issued against consummation of the transaction.  The Backstop Obligations are an integral part of the Backstop Agreement, and without approval of the Backstop Obligations, the Backstop Parties would not have agreed to commit to purchase the Subscription Rights in the Rights Offering.  Moreover, a portion of the proceeds of the Rights Offering will be used to pay down the Debtors' DIP Facility Claims while the remainder will serve as exit financing upon emergence from chapter 11.  Without prompt approval of the Rights Offering Procedures and the Backstop Obligations, parties voting on the Prepackaged Plan will not have clarity with respect to these critical financing issues, potentially compromising the Debtors' ability to solicit votes on the Prepackaged Plan effectively.   More importantly, failure to approve the Rights Offering Procedures and Backstop Obligations will jeopardize both the creditors' agreement to a consensual restructuring, as well as the Debtors' ability to capitalize their businesses going forward.

   63. The Debtors have consulted their investment banker, Moelis & Company ("***Moelis***"), and have determined, in the exercise of their reasonable business judgment, that the Backstop Obligations are reasonable, and that the Backstop Put Premium is within the range of "backstop fees" that have been approved in connection with rights offerings in other chapter 11 cases.  Because the Backstop Obligations are reasonable, a key component of the consummation of the Backstop Agreement and the Prepackaged Plan, and are customary in connection with

rights offerings in chapter 11 cases, the Debtors submit that the Backstop Obligations should be approved.

64.     Moreover, payment of the Transaction Expenses is warranted.  The Backstop Parties already have invested significant time and effort in pursuing the transactions set forth in the Backstop Agreement, including conducting diligence on the Debtors' businesses and reviewing and negotiating the Prepackaged Plan, the Backstop Agreement, and various related documents and agreements.  Reimbursing such fees and expenses is customary in other similar transactions, and the Debtors submit that such reimbursement is reasonable here.

65.     The obligation of the Debtors with respect to the Backstop Obligations are reasonable and should be approved because they are part of the inducement to the Backstop Parties to backstop the Rights Offering and in so doing, benefit the Debtors' estates.

66.     It is customary to pay to parties that have committed to the Debtors' estates—whether in the form of DIP financing, exit financing, or, as here, backstopping a rights offering—a fee that represents a percentage of such commitment as well as reimbursement of the parties' expenses.  The Backstop Parties' participation in the negotiation of the Prepackaged Plan and their funding of the Rights Offering have been essential to the Debtors' reorganization and emergence from chapter 11, and therefore have conferred a benefit to the Debtors in the operation and restructuring of their businesses.

67.     The relief requested above is reasonable and is tailored to maximize the value that the Debtors will distribute to creditors under the Prepackaged Plan.  Accordingly, the Debtors submit that payment by the Debtors of the Backstop Put Premium, the Transaction Expenses, the Termination Fee, and the Indemnification Obligations under the Backstop Agreement should be approved in all respects.

68.     Bankruptcy courts in this District have approved similar protections to backstop purchasers.  *See, e.g.*, *UCI Int'l, LLC*, Ch. 11 Case No.16-11354 (MFW) (Bankr. D. Del. Oct. 14, 2016 (D.I. 727) (authorizing debtors to enter into backstop agreement and approving backstop fees and expenses); In *re Offshore Grp. Inv. Ltd.*, Ch. 11 Case No. 15-12422 (BLS) (Bankr. D. Del. Dec. 4, 2015) (D.I. 37) (authorizing debtors to enter into a backstop agreement and pay related fees and expenses); *In re Ablest, Inc.*, Ch. 11 Case No. 14-10717 (KJC) (Bankr. D. Del. Apr. 21, 2014) (D.I. 156) (authorizing assumption of backstop agreement and payment of related fees and expenses); *In re AbitibiBowater Inc.*, Ch. 11 Case No. 09-11296 (KJC) (Bankr. D. Del. May 25, 2010) (D.I. 2219) (authorizing debtors to enter into backstop agreement); *In re Spansion Inc.*, Ch. 11 Case No. 09-10690 (KJC) (Bankr. D. Del. Jan. 7, 2010) (D.I. 2198) (authorizing debtors to enter into backstop agreement and pay related expenses). *In re Accuride Corp.*, Ch. 11 Case No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (D.I. 167) (approving backstop fee equal to 4% of the rights offering amount, reimbursement of transaction expenses, and payment of a termination fee equal to approximately 7% of the rights offering amount upon certain events, including events related to the sale of assets in a competing transaction); *In re Dayton Superior Corp.*, Ch. 11 Case No. 09-11351 (BLS) (Bankr. D. Del. Aug. 24, 2009) (D.I. 480) (approving a backstop commitment fee equal to 3% of the rights offering amount, a break-up fee equal to 3% of the rights offering amount (but subtracting from such payment any amounts already paid for the backstop commitment fee), and expense reimbursement); *In re Dura Automotive Sys., Inc.*, Ch. 11 Case No. 06-11202 (KJC) (Bankr. D. Del. Aug. 17, 2007) (D.I. 1680) (approving backstop commitment fee equal to 4% of the rights offering amount, break-up fee equal to 3% of the rights offering amount, and reimbursement of expenses up to $1 million).

## Bankruptcy Rule 6003 Has Been Satisfied

69.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within twenty-one (21) days after the Petition Date.  Fed. R. Bankr. P. 6003.  The above requested relief, including, without limitation, the entry of the Proposed Order, the approval of the Rights Offering Procedures, the Backstop Agreement, the Backstop Put Premium, the Transaction Expenses, and the Indemnification Obligations are integral to the expeditious resolution of these chapter 11 cases and the successful consummation of the Debtors' reorganization.  Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

## Request for Bankruptcy Rule 6004 Waivers

70.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and a waiver of the fourteen-day stay of an order authorizing the use, sale, or lease of property pursuant to Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(a), certain interested parties must receive 21 days' notice by mail of the "proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice."  Fed. R. Bankr. P. 2002(a)(2).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As explained above and in the Johnston Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the

WEIL:\95834547\15\22010.0003

notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by

Bankruptcy Rule 6004(h), to the extent such stay applies.

### Notice

71.     No trustee, examiner, or statutory committee of creditors has been

appointed in these chapter 11 cases.  Notice of this Motion will be provided to (i) the Office of

the United States Trustee for the District of Delaware; (ii) each of the Debtors' thirty (30) largest

unsecured creditors on a consolidated basis; (iii) U.S. Bank National Association, as

administrative agent (the "***Term Loan Administrative Agent***") under that certain Term Loan

Credit Agreement, dated as of February 26, 2016, as amended ("***Term Loan***"); (iv) Lowenstein

Sandler LLP as counsel to the Term Loan Administrative Agent; (v) Bank of America, N.A., as

administrative agent (the "***ABL Administrative Agent***") under that certain Amended and

Restated Credit Agreement, dated as of November 26, 2014, as amended; (vi) Vinson & Elkins

LLP as counsel to the ABL Administrative Agent; (vii) Wilmington Trust, National Association,

as the indenture trustee for (a) the 7.75% Senior Notes due 2019, and (b) the 7.75% Senior Notes

due 2022; (viii) Fried, Frank, Harris, Shriver & Jacobson LLP and Blank Rome LLP as counsel

to the ad hoc committee of note holders; (ix) Davis Polk & Wardwell LLP as counsel for the

Lenders (as that term is defined in the Term Loan), and the lenders under the Debtors' proposed

debtor in possession financing facility; (x) the Securities and Exchange Commission; (xi) the

Internal Revenue Service; (xii) the United States Attorney's Office for the District of Delaware.

72.     Notice of this Motion and any order entered hereon will be served on all

parties required by Local Rule 9013-1(m).  Based on the urgency of the circumstances

surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully

submit that no further notice is required.

WEIL:\95834547\15\22010.0003

**No Previous Request**

73.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate.

Dated: October 25, 2016
       Wilmington, Delaware

/s/ *Zachary I. Shapiro*
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C.
Ronit J. Berkovich
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

WEIL:\95834547\15\22010.0003

**<u>Exhibit A</u>**

**Rights Offering Procedures**

## RIGHTS OFFERING PROCEDURES

### I.    Introduction

Basic Energy Services, Inc. (the "***Debtor***") and certain of its subsidiaries collectively, the "***Debtors***")[1] are pursuing a proposed financial restructuring of their existing debt and other obligations to be effectuated pursuant to a plan of reorganization (the "***Plan***") in connection with a chapter 11 bankruptcy case, in accordance with the terms and conditions set forth in the Restructuring Support Agreement, dated as of October 23, 2016 (the "***Restructuring Support Agreement***"), by and among the Debtors, the lenders party to the debtor's existing secured term loan agreement and certain holders of Unsecured Notes Claims.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth for such terms in the Plan or the Backstop Agreement (as hereinafter defined).

On [●], 2016, the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") entered an order (the "***Rights Offering Approval***") that approved, among other things, the form and manner of the Debtor's rights offering (the "***Rights Offering***").  In connection with the Plan, and in accordance with these procedures (the "***Rights Offering Procedures***"), the Debtor will launch the Rights Offering to Eligible Offerees (as defined below),  pursuant to which Eligible Offerees will be entitled to receive their pro rata portion of non-transferable subscription rights to acquire $125 million of 9% mandatorily convertible unsecured PIK notes (the "***New Convertible Notes***") issued by the Debtor, on the terms and conditions set forth in the Plan at a purchase price equal to 100% of the principal amount of such New Convertible Notes so acquired. An "***Eligible Offeree***" is a holder of an Allowed Unsecured Notes Claim as of the Rights Offering Record Date (as defined below).

Only Eligible Offerees may participate in the Rights Offering.  The Rights Offering Procedures will govern the ability of Eligible Offerees to participate in the Rights Offering.

All questions relating to these Rights Offering Procedures, other documents associated with the Rights Offering, or the requirements to participate in the Rights Offering should be directed to Epiq Systems, the subscription agent (the "***Subscription Agent***") retained by the Debtors at:

<div align="center">

**Epiq Corporate Restructuring**
**777 Third Avenue, 12th Floor**
**New York, New York, 10017**
**Attention: Basic Energy Processing**
**Tel: (866) 734-9393 or (646) 282-2500**

</div>

**Questions (but not documents) may be directed to tabulation@epiqsystems.com**

---

[1] The entities included in the definition of "Debtors" are as follows: Basic Energy Services, Inc.; Basic Energy Services GP, LLC; Basic Energy Services LP, LLC; Basic Energy Services, L.P.; Basic ESA, Inc.; Chaparral Service, Inc.; SCH Disposal, LLC; Sledge Drilling Corp.; Admiral Well Service, Inc.; Basic Marine Services, Inc.; JS Acquisition LLC; Permian Plaza, LLC; Maverick Coil Tubing Services, LLC; First Energy Services Company; JetStar Holding, Inc.; Xterra Fishing & Rental Tools Co.; Maverick Solutions, LLC; LeBus Oil Field Service Co.; Acid Services, LLC; Taylor Industries, LLC; Maverick Stimulation Company, LLC; Globe Well Service, Inc.; JetStar Energy Services, Inc.; Platinum Pressure Services, Inc.; Maverick Thru-Tubing Services, LLC; MCM Holdings, LLC; MSM Leasing, LLC; The Maverick Companies, LLC.

**(please reference "Basic Energy" in the subject line)**

*THE DISCLOSURE STATEMENT DISTRIBUTED IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN SETS FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH ELIGIBLE OFFEREE PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE RIGHTS OFFERING, INCLUDING THE SECTIONS ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," "VALUATION ANALYSIS," "RIGHTS OFFERING PROCEDURES" AND "FINANCIAL INFORMATION AND PROJECTIONS." THE DISCLOSURE STATEMENT IS AVAILABLE ON THE DEBTOR'S RESTRUCTURING WEBSITE AT HTTP://DM.EPIQ11.COM/BASICENERGY AND COPIES ARE ALSO AVAILABLE UPON REQUEST FROM THE SUBSCRIPTION AGENT.*

## II.     Rights Offering

To fully exercise its right to participate in the Rights Offering (the "**Subscription Rights**"), an Eligible Offeree must (i) complete the rights offering subscription exercise form (the "**Rights Exercise Form**"), which has been distributed with these Rights Offering Procedures to Eligible Offerees and (ii) pay the purchase price, which is an amount equal to its pro rata share of $125 million (the "**Rights Exercise Price**"), such pro rata share to be calculated as the proportion that an Eligible Offeree's Allowed Unsecured Notes Claim bears to the aggregate of all Allowed Unsecured Notes Claims as of October 27, 2016 (the "**Rights Offering Record Date**"), rounded down to the nearest dollar.

Each Eligible Offeree may exercise (in whole dollar increments) all, some, or none of such pro rata share, and the Rights Exercise Price for such Eligible Offeree will be adjusted accordingly (in whole dollar increments).  The portion of New Convertible Notes issued to an Eligible Offeree who elects to acquire such New Convertible Notes shall be rounded down to the nearest dollar.  No compensation shall be paid, whether in cash or otherwise, in respect of such rounded-down amounts.

The Subscription Rights shall not be transferable, assignable, or detachable.

## III.    The Backstop

The Rights Offering will be backstopped by the Backstop Parties.  Each of the Backstop Parties, severally and not jointly, has agreed, pursuant to the Backstop Agreement, to purchase all New Convertible Notes that are not purchased by other Eligible Offerees pursuant to the Rights Offering (the "**Unsubscribed Notes**") on a pro rata basis in accordance with the percentages set forth in Exhibit A to the Backstop Agreement.  As consideration for their undertakings in the Backstop Agreement, the Backstop Parties will receive the Backstop Put Premium set forth in the Backstop Agreement.  The Backstop Parties will be provided with a special form (the "**Backstop Addendum"**) to attach to their Rights Exercise Form(s).

2

There will be no over-subscription privilege in the Rights Offering.  The Unsubscribed Notes will not be offered to other Eligible Offerees but will be purchased by the Backstop Parties in accordance with the Backstop Agreement.

## IV.  Commencement/Expiration of the Rights Offering

The Rights Offering shall commence on the day upon which the Rights Exercise Form is first mailed or made available to Eligible Offerees (the "***Rights Commencement Date***"), which is expected to be the first Business Day after receipt of the Rights Offering Approval.  The Rights Offering shall expire at 5:00 p.m. New York City time on the date specified in the Rights Offering Approval, which is expected to be the 20th Business Day after the Rights Commencement Date, unless, if permitted by the Rights Offering Approval, extended by the Debtor with the consent of the Requisite Investors (as defined in the Backstop Agreement) (such time and date, as may be amended, the "***Rights Expiration Time***").  The Debtor shall promptly notify the Eligible Offerees of any extension and of the new Rights Expiration Time by press release or otherwise.

The Debtor will furnish, or cause to be furnished, Rights Exercise Forms to the Eligible Offerees and/or, to the extent applicable, their brokers, dealers, commercial banks, trust companies, or other agents or nominees (the "***Subscription Nominees***").  Each Subscription Nominee is entitled to receive sufficient copies of these Rights Offering Procedures and the Rights Exercise Form for distribution to the beneficial owners of the Unsecured Notes for whom such Subscription Nominee holds such Unsecured Notes.

## V.  Exercise of Subscription Rights

Each Eligible Offeree that elects to participate in the Rights Offering must affirmatively make a binding, irrevocable election to exercise its Subscription Rights (the "***Binding Rights Election***") before the Rights Expiration Time.

<div style="border:1px solid black; padding:10px; text-align:center;">

**<u>The Binding Rights Election, upon receipt by the Subscription Agent, cannot be withdrawn.</u>**

</div>

Each Eligible Offeree will be entitled to participate in the Rights Offering solely to the extent provided in these Rights Offering Procedures, except in the case of Eligible Offerees who are Backstop Parties, who are entitled to participate in the Rights Offering to the extent also provided in Backstop Agreement.  The Debtor will accept a Binding Rights Election by delivery of written notice to each participating Eligible Offeree and the Subscription Agent (the "***Acceptance Notice***").

### A.  Exercise by Eligible Offerees

To exercise the Subscription Rights, each Eligible Offeree must (i) return a duly completed Rights Exercise Form to the Subscription Agent so that the duly completed Rights Exercise Form is *actually received* by the Subscription Agent on or before the Rights Expiration Time and (ii)

WEIL:\95911279\1\22010.0003

pay to the Subscription Agent, by wire transfer of immediately available funds, the Rights Exercise Price, so that payment of the Rights Exercise Price is *actually received* by the Subscription Agent on or before the Rights Expiration Time; provided, that the Backstop Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective Rights Exercise Prices until the effective date of the Plan (the "***Effective Date***"), in accordance with these Rights Offering Procedures, and the Backstop Agreement.

In order to exercise its Subscription Rights, any Eligible Offeree who holds Allowed Unsecured Note Claims through a Subscription Nominee must return a duly completed Rights Exercise Form to its Subscription Nominee or otherwise instruct its Subscription Nominee as to its instructions for the Subscription Rights (in each case in sufficient time to allow such Subscription Nominee to deliver the Rights Exercise Form to the Subscription Agent prior to the Rights Expiration Time) in accordance with procedures established by its Subscription Nominee, which, in turn, must comply with clauses (i) and (ii) of the immediately preceding paragraph.

For purposes of this Rights Offering, Wilmington Trust, National Association, in its capacity as Indenture Trustee for the each of the series of Unsecured Notes, shall not constitute a Subscription Nominee and shall have no responsibility with respect to sending any Rights Offering information or collecting any Rights Exercise Forms.

      B.     Deemed Representations and Acknowledgements

Any Eligible Offeree that participates in the Rights Offering is deemed to have made the following representations and acknowledgements:

     (i)     Such Eligible Offeree recognizes and understands that the Subscription Rights are not transferable (see Section II above for details) and that the benefits of the Subscription Rights are not separable from the claim or securities with respect to which the Subscription Rights have been granted. Such creditor represents and warrants that it is an Eligible Offeree.

     (ii)    Such Eligible Offeree represents and warrants that it will not accept a distribution of New Convertible Notes if at such time, it does not hold all of the Allowed Unsecured Notes Claim associated with its Subscription Rights and, by accepting a distribution of New Convertible Notes, such Eligible Offeree will be deemed to be the owner thereof.

      C.     Failure to Exercise Subscription Rights

**Unexercised Subscription Rights will be relinquished at the Rights Expiration Time.** If, on or prior to the Rights Expiration Time, the Subscription Agent for any reason does not receive from an Eligible Offeree or its Subscription Nominee a duly completed Rights Exercise Form, such Eligible Offeree shall be deemed to have irrevocably relinquished and waived its right to participate in the Rights Offering.

Any attempt to exercise Subscription Rights after the Rights Expiration Time shall be null and void and the Debtor shall not be obligated to honor any such purported exercise received by the

WEIL:\95911279\1\22010.0003

Subscription Agent after the Rights Expiration Time regardless of when the documents relating thereto were sent.

**The method of delivery of the Rights Exercise Form and any other required documents is at each Eligible Offeree's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent. Delivery by reputable overnight courier is encouraged and strongly recommended. In all cases, you should allow sufficient time to ensure timely delivery prior to the Rights Expiration Time.**

**The risk of non-delivery of the Rights Exercise Form and any other required documents sent to the Subscription Agent in connection with the exercise of the Subscription Rights lies solely with the holders of the Allowed Unsecured Notes Claims, and none of the Debtors, the reorganized Debtors, the Backstop Parties, or any of their respective officers, directors, employees, agents or advisers, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

   D. <u>Payment for Subscription Rights</u>

If, on or prior to the Rights Expiration Time, the Subscription Agent for any reason does not receive on behalf of an Eligible Offeree immediately available funds by wire transfer in an amount equal to the total Rights Exercise Price for such Eligible Offeree's Subscription Rights, such Eligible Offeree shall be deemed to have relinquished and waived its Subscription Rights, subject to the next paragraph; *provided*, that the Backstop Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective Rights Exercise Prices until the Effective Date.

   E. <u>Disputes, Waivers, and Extensions</u>

Any and all disputes concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights shall be addressed in good faith by the Debtor in consultation with the Backstop Parties, the determinations of which shall be final and binding. The Debtor, with the approval of the Requisite Investors, may (i) waive any defect or irregularity, or permit a defect or irregularity to be corrected, within such times as it may determine in good faith to be appropriate or (ii) reject the purported exercise of any Subscription Rights for which the Rights Exercise Form and/or payment includes defects or irregularities. Rights Exercise Forms shall be deemed not to have been properly completed until all irregularities have been waived or cured. The Debtor reserves the right, with the approval of the Requisite Investors, to give notice to any Eligible Offeree regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Eligible Offeree and the Debtor may, with the approval of the Requisite Investors, permit such defect or irregularity to be cured; it being understood, that none of the Debtor, the Subscription Agent, or the Backstop Parties (or any of their respective officers, directors, employees, agents or advisors) shall incur any liability for failure to give such notification.

The Debtor, with the approval of the Bankruptcy Court (if applicable) and the Requisite Investors, may (i) extend the duration of the Rights Offering or adopt additional detailed procedures to more efficiently administer the distribution and exercise of the Subscription

WEIL:\95911279\1\22010.0003

Rights; and (ii) make such other changes to the Rights Offering, including changes that affect which parties constitute Eligible Offerees.

F.     Funds

The payments made to acquire New Convertible Notes pursuant to the Rights Offering (the "***Rights Offering Funds***") shall be deposited when made and held by the Subscription Agent pending the Effective Date in a segregated account or accounts (i) which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien, encumbrance, or cash collateral arrangements and (ii) which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date.  The Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the Debtor on the Effective Date or as otherwise set forth in these Rights Offering Procedures or in the Plan, and, until released in accordance with the foregoing, the Rights Offering Funds will not be deemed part of the Debtors' bankruptcy estate.  The Subscription Agent shall not permit the Rights Offering Funds to be encumbered by any lien, encumbrance, or cash collateral obligation.  No interest will be paid to participating Eligible Offerees on account of any amounts paid in connection with their exercise of Subscription Rights under any circumstances.

Notwithstanding anything to the contrary herein, each Backstop Party shall make all payments in connection with the Rights Offering directly to the Debtor on the Effective Date.

G.     Participating Eligible Offeree Release

See Section 10.7 of the Plan for important information regarding releases.

**VI.    Miscellaneous**

A.     Issuance

The New Convertible Notes to be issued pursuant to the Rights Offering are expected to be delivered to Eligible Offerees that have properly exercised their Subscription Rights on or as soon as practicable following the Effective Date.  See Section VII.  The New Convertible Notes will be issued in book-entry form.

B.     Securities Law and Related Matters

The New Convertible Notes issued to the Eligible Offerees participating in the Rights Offering will be exempt from registration under the Securities Act of 1933, as amended (the "***Securities Act***"), and any other applicable federal and state securities laws pursuant to Section 1145 of the Bankruptcy Code, and may be resold, without registration under the Securities Act or other applicable federal and state securities laws, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code.

There is not and there may not be a public market for the New Convertible Notes, and the Debtor does not intend to seek any listing of the New Convertible Notes on any stock exchange or other trading market of any type whatsoever. Accordingly, there can be no assurance that an active

WEIL:\95911279\1\22010.0003

trading market for the New Convertible Notes will ever develop or, if such a market does develop, that it will be maintained. The Company has agreed to use its reasonable best efforts to list its  common stock, for which the New Convertible Notes are convertible, on a nationally recognized exchange, as soon as practicable subject to meeting applicable listing requirements following the Effective Date. However, there can be no assurance that the existing New York Stock Exchange listing will be maintained or a new listing will be achieved or that an active trading market for the shares of common stock of the Debtor will ever develop or, if such a market does develop that it will be maintained.

**VII.    Rights Offering Conditioned Upon Effectiveness of the Plan; Reservation of Subscription Rights; Return of Rights Offering Amount**

All exercises of Subscription Rights are subject to and conditioned upon the effectiveness of the Plan.   The Debtor will accept a Binding Rights Election only upon the confirmation and effectiveness of the Plan.   Notwithstanding anything contained herein, in the Disclosure Statement or in the Plan to the contrary, the Debtor reserves the right, with the approval of the Requisite Investors, not to be unreasonably withheld, to modify these Rights Offering Procedures or adopt additional detailed procedures if necessary in the Debtor's business judgment to more efficiently administer the distribution and exercise of the Subscription Rights or comply with applicable law.

In the event that (i) the Rights Offering is terminated, (ii) the Debtor revokes or withdraws the Plan, or (iii) the Effective Date of the Plan does not occur on or before January 23, 2017 (which is the "Outside Date," as defined in the Restructuring Support Agreement, and may be extended in accordance with the terms thereof), the Subscription Agent shall, within five (5) Business Days of such event, return all amounts received from Eligible Offerees, without any interest, and, in the case of clauses (ii) and (iii) above, the Rights Offering shall automatically be terminated.

WEIL:\95911279\1\22010.0003

**<u>Exhibit B</u>**

**Backstop Agreement**

**Execution Version**

BACKSTOP AGREEMENT

AMONG

BASIC ENERGY SERVICES, INC.

AND

CERTAIN INVESTORS

_____

Dated as of October 25, 2016

# TABLE OF CONTENTS

**Page**

1.      The Rights Offering ...............................................................................................................2
2.      Call Option............................................................................................................................3
3.      Put Option.............................................................................................................................4
4.      The Backstop Commitments..................................................................................................4
5.      Investor Replacement Backstop.............................................................................................5
6.      Representations and Warranties of the Company ...................................................................7
7.      Representations and Warranties of the Investors.................................................................13
8.      Additional Covenants of the Company................................................................................15
9.      Additional Covenants of the Investors................................................................................17
10.     Conditions to the Obligations of the Investors ...................................................................17
11.     Conditions to the Obligations of the Company....................................................................19
12.     Survival of Representations and Warranties ........................................................................19
13.     Termination..........................................................................................................................19
14.     Indemnification Obligations ...............................................................................................22
15.     Notices .................................................................................................................................25
16.     Survival ...............................................................................................................................26
17.     Assignment; Third Party Beneficiaries................................................................................26
18.     Complete Agreement ...........................................................................................................27
19.     Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial
        by Jury..................................................................................................................................27
20.     Counterparts.........................................................................................................................27
21.     Action by, or Consent or Approval of, the Investors...........................................................27
22.     Amendments and Waivers ...................................................................................................28
23.     Specific Performance ...........................................................................................................28
24.     Other Interpretive Matters...................................................................................................28

## INDEX OF DEFINED TERMS

Agreement ..................................................... 1
Backstop Commitments ............................ 5
Backstop Put Premium .............................. 5
Backstop Put Premium Notes ................... 5
Bankruptcy Code ....................................... 1
Bankruptcy Court ...................................... 1
Business Day .............................................. 2
Call Option Exercise Period ...................... 3
Chapter 11 Cases ....................................... 1
Chosen Courts .......................................... 27
Company .................................................... 1
Company Replacement Notice ................. 6
Confirmation Date ................................... 20
Confirmation Order .................................... 1
Debtors ...................................................... 1
Defaulting Investor ................................... 6
Disclosure Statement .............................. 15
Disclosure Statement Order .................... 15
Environmental Law .................................. 10
Exchange Act .............................................. 9
Exchange Act Documents .......................... 9
Final Replacement Notice .......................... 6
Hazardous Materials ................................ 10
HSR Act .................................................... 16
Indemnified Claim ................................... 23
Indemnified Person .................................. 22
Indenture .................................................... 7
Intellectual Property Rights .................... 11
Investor Default ......................................... 5
Investor Percentages ................................. 1
Investor Replacement ................................ 6
Investor Replacement Funds ..................... 6

Investor Replacement Notice ..................... 6
Investor Termination .................................. 6
Investors .................................................... 1
Losses ...................................................... 22
Material Adverse Effect ............................. 8
Outside Date ............................................. 20
Participating Investor ................................ 6
Petition Date .............................................. 1
Plan ............................................................ 1
Plan Effective Date ................................... 1
Purchase Notice ......................................... 3
Purchase Price ........................................... 1
Put Option .................................................. 4
Put Option Exercise Period ........................ 4
Replacement Right ..................................... 6
Requisite Investors .................................... 1
Restructuring Support Agreement ............. 2
Right ........................................................... 1
Rights Expiration Time .............................. 2
Rights Offering .......................................... 1
Rights Offering Notes ................................ 1
Satisfaction Notice .................................... 3
SEC ............................................................ 8
Securities Act ........................................... 14
Subscription Agent .................................... 2
Subscription Form ..................................... 2
Taxes ....................................................... 12
Terminating Investor ................................. 6
Termination Fee ....................................... 22
Transaction Expenses ................................ 5
Unsubscribed Notes ................................... 1

WEIL:\95825283\20\22010.0003

BACKSTOP AGREEMENT

BACKSTOP AGREEMENT (the "*Agreement*"), dated as of October 25, 2016, among Basic Energy Services, Inc., a Delaware corporation (the "*Company*"), and each of the undersigned parties identified on the signature pages hereto (collectively, the "*Investors*"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

WHEREAS, the Company and certain of its subsidiaries (collectively, the "*Debtors*") will file voluntary petitions for relief (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "*Bankruptcy Code*") before the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") (the date of such filings being referred to herein as the "*Petition Date*");

WHEREAS, subject to the Bankruptcy Court's entry of an order confirming the Plan (the "*Confirmation Order*"), consummation of the Plan, and the other conditions specified in Section 10 and Section 11, the Company proposes to offer and sell convertible subordinated unsecured notes as part of a rights offering (the "*Rights Offering Notes*") with an aggregate exercise price of up to $125,000,000 (the "*Rights Offering*"), whereby Eligible Offerees (as defined in the Rights Offering Procedures) shall be offered a non-transferable right (each, a "*Right*") to purchase up to such Eligible Offeree's pro rata portion of the Rights Offering Notes at a purchase price equal to 100% of the principal amount of such Rights Offering Notes so acquired (the "*Purchase Price*");

WHEREAS, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, (A) each Investor, severally and not jointly, has agreed to (i) purchase, on the effective date of the Plan (the "*Plan Effective Date*"), and the Company agrees to sell to such Investor, at the Purchase Price, such Investor's percentage, as set forth on Exhibit A (the "*Investor Percentages*"), of the aggregate principal amount of Rights Offering Notes minus the aggregate principal amount of Rights Offering Notes purchased on or before the Expiration Time (as hereinafter defined) in the Rights Offering (such remaining Rights Offering Notes, in the aggregate, the "*Unsubscribed Notes*"), (ii) sell its Put Option to the Company, (iii) acquire its Call Option from the Company, and (iv) exercise its Call Option during the Call Option Exercise Period, and (B) the Company agrees to (i) grant a Call Option to each Investor, (ii) acquire a Put Option from each Investor, and (iii) in consideration for the Backstop Commitments, pay the Backstop Put Premium to the Investors on the Plan Effective Date;  and

WHEREAS, the Company will conduct the Rights Offering pursuant to a pre-packaged plan of reorganization, to be filed in connection with the Debtors' Chapter 11 Cases, attached as Exhibit A to the Restructuring Support Agreement (the "*Plan*"). For purposes of this Agreement, "*Requisite Investors*"  shall mean those Investors holding a majority of the Backstop Commitments (as hereinafter defined) held by all Investors; and

WHEREAS, certain creditors of the Company have entered into a Restructuring Support Agreement, dated as of the date hereof (the "*Restructuring Support Agreement*"), pursuant to which such parties have agreed to, among other things, vote in favor of the Plan.

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company and the Investors agree as follows:

1.    **The Rights Offering**.  The Rights Offering will be conducted in accordance with the Rights Offering Procedures attached hereto as <u>Exhibit B</u> and as follows:

(a)    Subject to the terms and conditions of this Agreement, the Company hereby undertakes to offer Rights Offering Notes for subscription by holders of Rights pursuant to the Plan as set forth in this Agreement.

(b)    In connection with the Plan, the Company shall issue Rights to purchase the Rights Offering Notes.  Each Eligible Offeree as of a record date to be determined by the Company will receive a Right to purchase, at the Purchase Price, up to its pro rata share (measured as the principal amount of Senior Notes Claims held by such Eligible Offeree as compared to the aggregate amount of Senior Notes Claims) against the Debtors.

(c)    Following the Petition Date, the Company will provide, or cause to be provided, to each Eligible Offeree a subscription form (the "***Subscription Form***"), whereby each Eligible Offeree may exercise its Right in whole or in part.  The Rights may be exercised during a period specified in the order approving the Rights Offering, which period will commence on the date the Subscription Forms are distributed and will end at the Rights Expiration Time.  For purposes of this Agreement, the "***Rights Expiration Time***" means 5:00 p.m. New York City time on such date that is specified in the order approving the Rights Offering, or, if by permitted by the order approving the Rights Offering, such other date as the Company, subject to the approval of the Requisite Investors, may specify in a notice provided to the Investors before 9:00 a.m. New York City time on the Business Day before the then-effective Rights Expiration Time.  For purposes of this Agreement, "***Business Day***" means any day of the year on which national banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.  The Plan shall provide that in order to exercise a Right, each Eligible Offeree shall, prior to the Rights Expiration Time, (x) return a duly executed Subscription Form to the subscription agent for the Rights Offering selected by the Company (the "***Subscription Agent***") and (y) pay an amount equal to the full Purchase Price of the Rights Offering Notes elected to be purchased by such Eligible Offeree by wire transfer of immediately available funds prior to the Rights Expiration Time to an account established by the Subscription Agent for the Rights Offering.

(d)    The Company will issue the Rights Offering Notes to the Eligible Offerees with respect to which Rights were validly exercised by such Eligible Offerees upon the Plan Effective Date.  The portion of Rights Offering Notes issued to an Eligible Offeree who elects to acquire such Rights Offering Notes shall be rounded down to the nearest dollar.

(e)    If the Subscription Agent for any reason does not receive from an Eligible Offeree both a timely and duly completed Subscription Form and timely payment for the

Rights Offering Notes being purchased by such Eligible Offeree, the Plan shall provide that, unless otherwise approved by the Company and the Requisite Investors, such Eligible Offeree shall be deemed to have relinquished and waived its right to participate in the Rights Offering.

(f)     The Company hereby agrees and undertakes to give the Investors by email and facsimile transmission the certification by an authorized signatory of the Company conforming to the requirements specified herein for such certification of either (i) a true and accurate calculation of the amount of Unsubscribed Notes, and the aggregate Purchase Price therefor (a "***Purchase Notice***") or (ii) in the absence of any Unsubscribed Notes, the fact that there are no Unsubscribed Notes and that the Backstop Commitments are terminated (a "***Satisfaction Notice***") as soon as practicable after the Rights Expiration Time but in no event less than three (3) Business Days before the Plan Effective Date. The Company agrees to promptly provide any written backup, information and documentation relating to the information contained in the applicable Purchase Notice as any Investor may reasonably request.

2.   **Call Option**.

(a)     <u>Grant of Option</u>. The Company hereby grants to each Investor, and each Investor hereby accepts from the Company, an irrevocable call option (each, a "***Call Option***") to acquire, on the Plan Effective Date, its Investor Percentage of the Unsubscribed Notes, if any, as of the Rights Expiration Time at the Purchase Price.

(b)     <u>Call Option Exercise Period</u>. Each Call Option is exercisable during the time between (i) the date hereof and (ii) ten (10) Business Days prior to the Confirmation Hearing (the "***Call Option Exercise Period***").

(c)     <u>Exercise of Call Option</u>. Upon the exercise of its Call Option by an Investor, this Agreement shall become a contract for the sale of such Investor's Investor Percentage of the Unsubscribed Notes, if any, at the Purchase Price, and the Company shall sell, and such Investor shall purchase, on the Plan Effective Date, subject to the terms and conditions as set forth herein, its Investor Percentage of the Unsubscribed Notes, if any, at the Purchase Price.  Each Investor shall be deemed to have exercised its Call Option in full at the end of the Call Option Exercise Period, unless such Investor shall have given written notice to the Company on or prior to such date that it has elected not to exercise its Call Option.

(d)     <u>Call Option Termination</u>. Each Investor's Call Option shall terminate automatically, without any further action by either the Company or such Investor, if (i) the Call Option Exercise Period expires without such Call Option having been exercised or deemed exercised, (ii) in the event of an Investor Default or Investor Termination with respect to such Investor, no other Investor has assumed the Call Option in accordance with the terms of <u>Section 5</u>, or (iii) upon termination of this Agreement with respect to such Party in accordance with its terms.

3

3.      **Put Option**.

        (a)      <u>Sale of Put Option</u>. The Company hereby agrees to purchase from each Investor, and each Investor hereby agrees to sell to the Company, an irrevocable put option (the "***Put Option***") requiring such Investor to purchase from the Company, on the Plan Effective Date its Investor Percentage of the Unsubscribed Notes, if any, as of the Rights Expiration Time at the Purchase Price.

        (b)      <u>Put Option Exercise Period</u>. Each Put Option is exercisable during the time between the Rights Expiration Time and five (5) Business Days thereafter (the "***Put Option Exercise Period***").

        (c)      <u>Exercise of Put Option</u>. Upon the exercise of a Put Option by the Company with respect to an Investor, this Agreement shall become a contract for the purchase by such Investor of such Investor's Investor Percentage of the Unsubscribed Notes, if any, at the Purchase Price, and such Investor shall purchase, and the Company shall sell, on the Plan Effective Date, subject to the terms and conditions as set forth herein, such Investor's Investor Percentage of the Unsubscribed Notes, if any, at the Purchase Price.  The Company shall be deemed to have exercised each Put Option in full at the end of the Put Option Exercise Period unless the Company shall have given written notice to such Investor on or prior to such date that it has elected not to exercise a Put Option.  Any such election by the Company not to exercise a Put Option shall not be effective and shall be void *ab initio* unless consented to in writing by the Requisite Investors.

        (d)      <u>Put Option Termination</u>. Each Investor's obligations with respect to its Put Option shall terminate automatically, without any further action by the Company or any Investor, if (i) the Company has given written notice, with the prior written consent of the Requisite Investors, to the Investors that it has elected not to exercise its Put Options pursuant to <u>Section 3(a)</u> hereof, or (ii) upon valid termination of this Agreement by all Parties hereto pursuant to its terms, or (iii) this Agreement has been terminated by an Investor in accordance with its terms, in which case only the obligations of such Terminating Investor shall automatically terminate.

4.      **The Backstop Commitments**.

        (a)      On the basis of the representations and warranties contained herein, but subject to the conditions set forth in <u>Section 10</u>, each of the Investors, severally and not jointly, agrees to:

                (i)      subscribe for and purchase, on the Plan Effective Date, at the aggregate Purchase Price therefor, its Investor Percentage of the Unsubscribed Notes as of the Rights Expiration Time;

                (ii)      duly exercise its Call Option during the Call Option Exercise Period; and

4

(iii)    purchase, on the Plan Effective Date, the Unsubscribed Notes, if any, it is required to purchase pursuant to a duly exercised Call Option or Put Option pursuant to the terms hereof (together, the "***Backstop Commitments***").

(b)    On the basis of the representations and warranties herein contained, but subject to the entry of the Confirmation Order, as consideration for the Put Options, the Backstop Commitments and the other undertakings of the Investors herein, the Company will pay to the Investors, in the aggregate, on the Plan Effective Date, a nonrefundable aggregate premium in an amount equal to five (5)% of the aggregate offering amount of the Rights Offering (the "***Backstop Put Premium***"), in the form of $6,250,000 aggregate principal amount of Rights Offering Notes (the "***Backstop Put Premium Notes***"), which shall be allocated among the Investors based on the Investor Percentages (as set forth on Exhibit A) of the Unsubscribed Notes that each Investor has agreed to backstop.  The Backstop Put Premium shall be delivered by the Company on the Plan Effective Date whether or not the Put Options are exercised.

(c)    Subject to the entry of the Confirmation Order, which order shall approve this Section 4(c), upon consummation of the Plan, the Company will reimburse or pay, as the case may be, the out-of-pocket expenses reasonably incurred by the Investors whether prior to or after the date hereof (collectively, "***Transaction Expenses***"), including all reasonable fees with respect to the negotiation, documentation and execution of the transactions and agreements contemplated herein, and including, but not limited to all reasonable fees, expenses and costs relating to the Company's Chapter 11 Cases and including all reasonable fees  and expenses of Fried, Frank, Harris, Shriver & Jacobson LLP and Blank Rome LLP, counsel to the Investors (but no other counsel), in connection with the transactions and agreements contemplated hereby.

(d)    On the Plan Effective Date, the Investors will purchase, and the Company will sell, only such amount of Unsubscribed Notes as is listed in the Purchase Notice, without prejudice to the rights of the Company or the Investors to seek later an upward or downward adjustment if the amount of Unsubscribed Notes in such Purchase Notice is inaccurate.

(e)    Delivery of the Unsubscribed Notes will be made by the Company to the respective Investors on the Plan Effective Date against payment of the aggregate Purchase Price for the Unsubscribed Notes by wire transfer of immediately available funds to the account specified by the Company to the Investors at least twenty four (24) hours in advance.

5.    **Investor Replacement Backstop**.

(a) Replacement Right. If any Investor (x) defaults on any of its Backstop Commitment obligations under this Agreement (such default, an "***Investor Default***", and such Investor a "***Defaulting Investor***"), or (y) validly terminates this Agreement, (such termination, an "***Investor Termination***" and such Investor, a "***Terminating Investor***"), the Company shall, within one (1) Business Day thereof, provide written notice (a "***Company Replacement Notice***") to each Non-Defaulting or Non-Terminating Investor (as applicable) of such Investor Default or

Investor Termination (as applicable).  Each Non-Defaulting or Non-Terminating Investor (as applicable) shall then have the right (the "***Replacement Right***"), but not the obligation, to, within five (5) Business Days of receipt of a Company Replacement Notice to provide written notice (a "***Investor Replacement Notice***") to the Company and the other Investors that such Investor wishes to assume and exercise up to 100% of the Defaulting Investors or the Terminating Investors (as applicable) Backstop Commitment (an "***Investor Replacement***", and such Investor, a "***Participating Investor***"), to be allocated to each Participating Investor based on its Investor Percentage in the event of oversubscription (adjusted, as applicable, for the removal of any Terminating Investor, any Defaulting Investor and any Investor not wishing to exercise its Replacement Right) on the terms and subject to the conditions set forth in this Agreement.

(b) In the event the Participating Investors, in the aggregate, elect to assume and exercise more than 100% of the Defaulting Investors or the Terminating Investors (as applicable) rights and obligations under this Agreement, the allocation of such rights and obligations to each Participating Investor shall be adjusted down proportionate to their respective Investor Percentage, so that the aggregate allocation to the Participating Investors equals 100% of the Defaulting Investors or Terminating Investors (as applicable) rights and obligations under this Agreement.  Within two (2) Business Days following of the deadline for submission of Investor Replacement Notices to the Company, the Company shall provide written notice (a "***Final Replacement Notice***") to each Participating Investor, if any, informing it of the total number of Unsubscribed Notes and the aggregate purchase price thereof (the "***Investor Replacement Funds***") that the Participating Investor is obligated to purchase pursuant to the Investor Replacement.  Each Participating Investor must deliver the Investor Replacement Funds by wire transfer of immediately available funds to the account specified by the Company to the Investors within two (2) Business Days following receipt of the Final Replacement Notice.

(c) For the avoidance of doubt, the assumption by any Participating Investor of any Defaulting Investors obligations under this Agreement shall not relieve such Defaulting Investor of its liability for breach of this Agreement.

WEIL:\95825283\20\22010.0003

6.    **Representations and Warranties of the Company**.  The Company represents and warrants to, and agrees with, the Investors as set forth below, except as set forth in the Schedules.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof.

(a)    Organization and Qualification.  The Company is duly organized, validly existing and in good standing under the laws of the state of Delaware and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  The Company is duly qualified or authorized to do business and is in good standing under the laws of each jurisdiction in which it owns or leases real property or in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing in each non-Delaware jurisdiction would not be reasonably likely to result in a Material Adverse Effect (as defined in Section 6(e) hereof).

(b)    Power and Authority.

(i)    The Company has the requisite corporate power and authority to enter into, execute and deliver this Agreement and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations hereunder, including the issuance of the Rights and the Rights Offering Notes.  The Company has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and the Rights Offering Notes.

(ii)    The Company has the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations thereunder, and will have taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of the Plan.

(c)    Execution and Delivery; Enforceability.

(i)    This Agreement has been and, upon the execution and delivery of the indenture for the Rights Offering Notes (the "***Indenture***"), the Indenture and the Rights Offering Notes will be, duly and validly executed and delivered by the Company, and, subject to entry of the Confirmation Order and consummation of the Plan, constitutes or will constitute the valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

(ii)    The Plan will be duly and validly filed with the Bankruptcy Court by the Company in accordance with Section 8(a) and, upon entry of the Confirmation Order and consummation of the Plan, will constitute the valid and binding obligation of the Company, enforceable against it in accordance with its terms.

(d)    Authorized Capital.  Upon the Plan Effective Date, the authorized capital of the Company will conform to the authorized capital set forth in the Plan and Disclosure Statement and the issued and outstanding Rights Offering Notes of the Company will conform to the description set forth in the Plan and Disclosure Statement.

(e)　　Issuance.  The distribution of the Rights and, subject to entry of the Confirmation Order and consummation of the Plan, the issuance of the Rights Offering Notes, including the Unsubscribed Notes to be issued and sold by the Company to the Investors hereunder, will have been duly and validly authorized and, when the Rights Offering Notes are issued and delivered against payment therefor in the Rights Offering or to the Investors hereunder, will be duly and validly issued and outstanding, and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights. Upon the conversion of the Rights Offering Notes to shares of common stock in accordance with the terms of the Indenture and the Rights Offering Notes, such shares, when issued, shall be duly authorized, validly issued, fully-paid and non-assessable.

(f)　　No Conflict.  The distribution of the Rights, and, subject to entry of the Confirmation Order and consummation of the Plan, the sale, issuance and delivery of the Rights Offering Notes upon exercise of the Rights, the consummation of the Rights Offering by the Company, the sale, issuance and delivery of the Unsubscribed Notes pursuant to the terms hereof, and the execution and delivery (or, with respect to the Plan, the filing with the Bankruptcy Court) by the Company of this Agreement and the Plan and compliance by it with all of the provisions hereof and thereof and the consummation of the transactions contemplated hereby and thereby: (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent expressly provided in or contemplated by the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of their properties or assets is subject; (ii) will not result in any violation of the provisions of the organizational documents of the Company; and (iii) assuming the accuracy of the Investors' representations and warranties in Section 7, will not result in any violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of their properties, except in any such case described in clause (i) or clause (iii), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  For purposes of this Agreement, "*Material Adverse Effect*" means a material adverse effect on (i) the business, assets, properties, results of operations or financial condition of the Company or (ii) the ability of the Debtors, subject to the approvals and other authorizations set forth in Section 6(g), to consummate the transactions contemplated by this Agreement or the Plan, other than, with respect to clauses (i) and (ii), the effect: (A) of any change in the United States or foreign economies or securities or financial markets in general; (B) of any change that generally affects any industry in which Debtors operate; (C) of any change arising in connection with any natural disaster; (D) of any change arising in connection with hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions; (E) of any matter disclosed in any filings by the Company with the Securities and Exchange Commission (the "*SEC*"); (F) of any changes in applicable laws or accounting rules; (G) resulting from the filing of the Chapter 11 Cases, any reasonably anticipated effects thereof or from any action approved by the Bankruptcy Court; (H) resulting from the public announcement of

8

this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated hereby; or (I) resulting from any act or omission of any of the Company taken with the prior written consent of the Requisite Investors.

(g)     Consents and Approvals.  Assuming the accuracy of the Investors' representations and warranties in Section 7, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of the Rights Offering Notes upon exercise of the Rights, the issuance, sale and delivery of Unsubscribed Notes to the Investors hereunder, the consummation of the Rights Offering by the Company and the execution and delivery by the Company of this Agreement or the Plan and performance of and compliance by them with all of the provisions hereof and thereof (including payment of the Backstop Put Premium and Transaction Expenses of the Investors as required hereby) and the consummation of the transactions contemplated hereby and thereby, except (i) the entry of the Confirmation Order and (ii) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h)     Financial Statements.  The financial statements and the related notes thereto of the Company and its consolidated subsidiaries included or incorporated by reference in the documents filed by the Company with the SEC under the Securities Exchange Act of 1934 and the rules and regulations of the SEC thereunder (the "***Exchange Act***") since January 1, 2016 and prior to the date of this Agreement (the "***Exchange Act Documents***") present fairly in all material respects the consolidated financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods specified.  Such financial statements have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Exchange Act Documents).

(i)     Exchange Act Documents.  The Exchange Act Documents, when they became effective or were filed with the SEC, as the case may be, conformed in all material respects to the requirements of the Exchange Act, and none of such Exchange Act Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and any further documents so filed and incorporated by reference when such documents are filed with the SEC, will conform in all material respects to the requirements of the Exchange Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(j)     No Violation.  The Company is not, except as a result of the Chapter 11 Cases or as disclosed prior to the date of this Agreement in the Exchange Act Documents, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such default or violation

9

that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(k)    <u>Legal Proceedings</u>.  Except as disclosed prior to the date of this Agreement in the Exchange Act Documents, there are no legal, governmental or regulatory investigations, actions, suits or proceedings pending or, to the knowledge of the Company, threatened, in each case, to which the Company is or may be a party or to which any property of the Company is or may be the subject that, individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect.

(l)    <u>No Broker's Fees</u>.  Except for Moelis & Company, the Company is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against it or the Investors for a brokerage commission, finder's fee or like payment in connection with the offering and sale of the Rights or the Rights Offering Notes.

(m)    <u>Absence of Certain Changes</u>. Since January 1, 2016, no change, event, circumstance effect, development, occurrence or state of facts has occurred or exists that have had or are reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(n)    <u>Environmental</u>.  Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice, claim, demand, request for information, order, complaint or penalty has been received by the Company, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Company, (ii) the Company is in compliance with Environmental Law and has obtained, maintains in full force and effect, and is in compliance with all permits, licenses and other approvals currently required under any Environmental Law for conduct of its business as presently conducted by the Company, and (iii) no Hazardous Materials have been released by the Company at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company under any Environmental Laws. For purposes of this Agreement, "***Environmental Law***" means all applicable foreign, federal, state and local conventions, treaties, protocols, laws, statutes, rules, regulations, ordinances, orders and decrees relating in any manner to contamination, pollution or protection of the environment or exposure to hazardous or toxic substances, materials or wastes, and "***Hazardous Materials***" means all materials, substances, chemicals, or wastes (or combination thereof) that is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Environmental Law.

(o)    <u>Insurance</u>.  The Company has insured its respective properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses. All premiums due and payable in respect of material insurance policies maintained by the Company have been paid. As of the date hereof, to the knowledge of the Company, the Company has not received notice from any insurer or agent of such

10

insurer with respect to any material insurance policies of the Company of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

(p)    <u>Intellectual Property</u>. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, licenses, domain names, and any and all applications or registrations for any of the foregoing (collectively, "***Intellectual Property Rights***") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other person, (ii) to the knowledge of the Company, neither the Company nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by the Company, is infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any person, and (iii) no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Company, threatened.

(q)    <u>No Undisclosed Relationship</u>. No relationship, direct or indirect, exists between or among the Company, on the one hand, and the directors, officers and 10% stockholders of the Company, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that are not so described in such filings, except for the transactions contemplated by this Agreement.

(r)    <u>Money Laundering Laws.</u> The operations of the Company are and have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company operates (and the rules and regulations promulgated thereunder) and any related or similar laws and no material legal proceeding by or before any governmental entity or any arbitrator involving the Company with respect to such laws is pending or, to the knowledge of the Company, threatened.

(s)    <u>Sanctions Laws.</u> Neither the Company nor, to the knowledge of the Company, any of its respective directors, officers, employees or other persons acting on its behalf with express authority to so act are currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. The Company will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person, for the purpose of financing the activities of any person that, to the knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

(t)    <u>Foreign Corrupt Practices Act.</u> The Company has no knowledge of any actual or alleged material violations of the Foreign Corrupt Practices Act of 1977, as amended, or any applicable anti-corruption or anti-bribery laws in any jurisdiction other than the United States, by the Company or any of its respective officers, directors, agents, distributors, employees or any other person acting on behalf of the Company.

11

(u)     Taxes.

(i)     The Company and each of its subsidiaries have paid, or will pay in full pursuant to the Plan, all material income, gross receipts, license, payroll, employment, excise, severance, occupation, premium, windfalls profits, customs duties, capital stock, franchise, profits, withholding, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other taxes levied by a governmental authority, including interest and penalties thereon ("*Taxes*") imposed on it or its assets, business or properties, or, to the extent not yet due, such Taxes have been accrued and fully provided for in accordance with generally accepted accounting principles. The Company and each of its subsidiaries has timely filed all returns, information statements or reports required to be filed with any governmental authority with respect to Taxes.

(ii)     There are no material Liens for Taxes on any asset of the Company or its subsidiaries other than liens for Taxes not yet delinquent or for Taxes contested in good faith by appropriate proceedings.

(iii)     The Company and its subsidiaries have no liability for any material amount of Taxes of any other person or entity, either by operation of law, by contract or as a transferee or successor. The Company and its subsidiaries are not a party to any material Tax allocation or Tax sharing agreement with any third party (other than an agreement entered into in the ordinary course of business consistent with past practice (such as a lease or a license) the principal purpose of which is not the sharing, assumption or indemnification of Tax).

(iv)     As of the date hereof, there is no outstanding audit, assessment, dispute or claim concerning any material Tax liability of the Company and its subsidiaries (taken as a whole), and the Company and its subsidiaries have not received from any governmental authority any written notice regarding any contemplated or pending audit, examination or other administrative proceeding or court proceeding concerning any material amount of Taxes imposed thereon.

(v)     All material Taxes that the Company and its subsidiaries (taken as a whole) were (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable.

(vi)     None of the Company and any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under any law with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its current or past Subsidiaries are or were the only members).

(vii)     None of the Company and any of its subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the

12

last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the Internal Revenue Code of 1986, as amended (the "Code"), is applicable.

(viii)    None of the Company and any of its subsidiaries has been requested in writing, and, to the knowledge of the Company, there are no claims against the Company or any of its subsidiaries, to pay any liability for Taxes of any person (other than the Company or its subsidiaries) that are material to the Company and its subsidiaries taken as a whole, arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor.

(ix)    The Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five (5) year period ending on the date hereof.

(v)    <u>Title to Property</u>.

(i)    <u>Personal Property</u>. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (A) the Company has good title to, free and clear of any and all Liens, or a valid leasehold interest in, all personal properties, machinery, equipment and other tangible assets of the business necessary for the conduct of the business as presently conducted by the Company and (B) such properties, (x) are in the possession or control of the Company; and (y) are in good and operable condition and repair, reasonable wear and tear excepted.

(ii)    <u>Leased Real Property</u>. The Company has complied with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Company enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

7.    **Representations and Warranties of the Investors**. Each of the Investors severally represents and warrants to, and agrees with, the Company as set forth below. Each representation, warranty and agreement is made as of the date hereof.

(a)    <u>Formation</u>.  Such Investor has been duly organized or formed, as applicable, and is validly existing as a corporation or other entity in good standing under the applicable laws of its jurisdiction of organization or formation.

(b)    <u>Power and Authority</u>.  Such Investor has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

13

(c)    Execution and Delivery.  This Agreement has been duly and validly executed and delivered by such Investor and constitutes its valid and binding obligation, enforceable against such Investor in accordance with its terms.

(d)    Securities Laws Compliance.  The Unsubscribed Notes and Backstop Put Premium Notes will not be offered for sale, sold or otherwise transferred by such Investor except pursuant to an effective registration statement under the Securities Act of 1933 and the rules and regulations of the SEC thereunder (the "***Securities Act***") or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(e)    Purchase Intent.  Such Investor is acquiring Unsubscribed Notes and Backstop Put Premium Notes for its own account or for the accounts for which it is acting as investment advisors or manager, and not with a view to distributing or reselling such Unsubscribed Notes or Backstop Put Premium Notes or any part thereof or the shares of common stock issuable upon the conversion thereof.  Such Investor understands that such Investor must bear the economic risk of this investment indefinitely, unless the Unsubscribed Notes and Backstop Put Premium Notes are registered pursuant to the Securities Act and any applicable state securities or Blue Sky laws or an exemption from such registration is available, and further understands that the Company has no present intention of registering the resale of any Unsubscribed Notes or Backstop Put Premium Notes.

(f)    Investor Status.  Such Investor is an "accredited investor" as defined in Rule 501(a) under the Securities Act.

(g)    Reliance on Exemptions.  Such Investor understands that the Unsubscribed Notes and Backstop Put Premium Notes are being offered and sold to such Investor in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Investor's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Investor set forth herein in order to determine the availability of such exemptions and the eligibility of such Investor to acquire Unsubscribed Notes and Backstop Put Premium Notes.

(h)    Sophistication.  Such Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Rights Offering Notes and Backstop Put Premium Notes.  Such Investor understands and is able to bear any economic risks associated with such investment (including the necessity of holding the Rights Offering Notes and Backstop Put Premium Notes for an indefinite period of time) and is able to afford a loss of its investment in the Rights Offering Notes.

(i)    Access to Information.  Such Investor acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Company and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

14

(j)    Legend.  Such Investor understands that the Unsubscribed Notes and the Backstop Put Premium Notes acquired by it under this Agreement (to the extent certificated) shall bear a customary Securities Act legend.

8.    **Additional Covenants of the Company**.  The Company agrees with the Investors as follows:

(a)    Plan and Disclosure Statement.  The Company shall: (i) file as soon as practicable after the Petition Date, the Plan and a related disclosure statement (the "***Disclosure Statement***") with the Bankruptcy Court, each in form and substance acceptable to the Requisite Investors, and that is consistent in all material respects with the Plan or as otherwise approved by the Requisite Investors, it being understood that the form of Plan and the form of the Disclosure Statement attached as Exhibit A and Exhibit F, respectively, to the Restructuring Support Agreement are acceptable to the Requisite Investors; (ii) seek the entry of an order by the Bankruptcy Court, in form and substance reasonably acceptable to the Requisite Investors, approving the Disclosure Statement (the "***Disclosure Statement Order***") as soon as practicable after the Petition Date; and (iii) seek the entry of a Confirmation Order by the Bankruptcy Court, in form and substance acceptable to the Requisite Investors, as soon as practicable.  The Company will, not later than four (4) days prior to the filing thereof, provide to the Investors and their counsel a draft copy of the Plan and the Disclosure Statement and any other filing with the Bankruptcy Court to be made pursuant to this Agreement and shall afford the Investors and their counsel a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court.  In addition, the Company will provide to the Investors and their counsel a draft copy of the Disclosure Statement Order and Confirmation Order and a reasonable opportunity to review and comment on such orders prior to such orders being filed with the Bankruptcy Court.

(b)    Rights Offering.  The Company shall effectuate the Rights Offering in accordance with the Plan.

(c)    Unsubscribed Notes.  The Company, in consultation with counsel for the Investors, shall determine the amount of Unsubscribed Notes, if any, and, in good faith, provide a Purchase Notice or a Satisfaction Notice that accurately reflects the amount of Unsubscribed Notes as so determined and to provide to the Investors a certification by the Subscription Agent of the Unsubscribed Notes or, if such certification is not available, such written backup to the determination of the Unsubscribed Notes as the Investors may reasonably request.

(d)    Approvals. Except as set forth in this Agreement or with the prior written consent of the Requisite Investors, during the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Company shall use reasonable best efforts to reasonably promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Investors as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary or advisable in connection with seeking any governmental approval, exemption or

15

authorization from any governmental authority, including under any Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement. The Company shall reasonably promptly notify the Investors (and furnish to them copies of, if requested) any communications from governmental authorities and shall not participate in any meeting with any such authority unless it consults with the Investors in advance to the extent permitted by applicable law and gives the Investors a reasonable opportunity to attend and participate thereat. The Company shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties hereto to obtain any necessary approvals required for the transactions contemplated by this Agreement. For purposes of this Agreement, "Antitrust Laws" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "**HSR Act**") and any similar law enforced by any governmental antitrust entity of any jurisdiction regarding pre-acquisition notifications for the purpose of competition reviews of mergers and acquisitions, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and all other applicable laws that are designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition or effectuating foreign investment.

(e)     Conduct of Business.  The Company shall carry on its business in the ordinary course and use its commercially reasonable efforts to (i) preserve intact its business, (ii) keep available the services of its officers and employees and (iii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company in connection with its business. The Company shall not enter into (A) any transaction that is material to its business other than transactions in the ordinary course of business and (B) other transactions after prior notice to the Investors to implement tax planning which transactions are not reasonably expected to materially adversely affect any Investor.

(f)     Access to Information.   The Company shall (i) afford the Investors and their respective representatives upon request and reasonable notice, from the period commencing on the date hereof and through the Plan Effective Date, reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's business or operations, to the Company's employees, properties, books, contracts and records and (ii) during such period, furnish promptly to such parties all reasonable information concerning the Company's business, properties and personnel as may reasonably be requested by any such party, provided that the foregoing shall not require the Company (x) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the shall have used its reasonable best efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (y) to disclose any legally privileged information of the Company or (z) to violate any applicable laws or orders.

(g)     Further Assurances.  Without in any way limiting any other obligation of the Company in this Agreement, the Company shall use commercially reasonable efforts

WEIL:\95825283\20\22010.0003

to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, and as any Investor may reasonably request, in order to consummate and make effective the transactions contemplated by this Agreement.  The Company furthermore agrees that it shall perform any and all of its covenants, agreements and obligations under this Agreement and not take any actions that would be inconsistent with such obligations

       (h)    <u>Tax Treatment of Call Options and Put Options</u>. The Company agrees to treat its Put Options and its corresponding Call Options as forward contracts for U.S. federal income  tax purposes, and to treat the Backstop Put Premium as an adjustment to the number of Rights Offering Notes acquired pursuant to the transactions contemplated by this Agreement.

9.     **Additional Covenants of the Investors**.  Each of the Investors agrees, severally and not jointly, with the Company:

       (a)    <u>Approvals</u>. Except as set forth in this Agreement or with the prior written consent of the Company, during the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Requisite Investors shall use reasonable best efforts to promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Company as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary or advisable in connection with seeking any governmental approval, exemption or authorization from any governmental authority, including under any Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement.

       (b)    <u>Tax Treatment of Call Options and Put Options</u>.  Each Investor agrees to treat its Call Option and its corresponding Put Option as a single forward contract for U.S. federal income tax purposes, and to treat the Backstop Put Premium as an adjustment to the number of Rights Offering Notes acquired pursuant to the transactions contemplated by this Agreement.

10.    **Conditions to the Obligations of the Investors**.  The obligations of the Investors to purchase Unsubscribed Notes pursuant to their respective Backstop Commitments (including obligations to fund amounts due in respect of the Call Options or the Put Options) on the Plan Effective Date are subject to the satisfaction of the following conditions (unless waived by the Requisite Investors):

       (a)    <u>Plan and Confirmation Order</u>.  The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court and which shall have become a Final Order, shall each be in the form and substance approved by the Requisite Investors, with only such amendments, modifications or changes that are satisfactory to the Requisite Investors.

(b)     Conditions to Plan Effective Date.  The conditions to the Plan Effective Date set forth in the Plan shall have been satisfied (or waived by the Requisite Investors) in accordance with the Plan and the Plan Effective Date shall have occurred.

(c)     Rights Offering.  The Company shall have commenced the Rights Offering, the Rights Offering shall have been conducted in all material respects in accordance with this Agreement, and the Rights Expiration Time shall have occurred.

(d)     Purchase Notice or Satisfaction Notice.  The Investors shall have received a Purchase Notice or Satisfaction Notice from the Company, as applicable, in accordance with Section 1(f).

(e)     Valid Issuance.  The Rights Offering Notes shall be, upon (i) payment of the aggregate Purchase Price as provided herein and (ii) the Plan Effective Date, validly issued and outstanding, and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights.

(f)     No Restraint.  No judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan, the Rights Offering or the transactions contemplated hereby.

(g)     Representations and Warranties.  The representations and warranties of the Company set forth in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, shall be true and correct at and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent given as of a specific date, as of such date), except for such failures to be true and correct that, individually and in the aggregate, would not be reasonably likely to result in a Material Adverse Effect.

(h)     Covenants.  The Company shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Plan Effective Date.

(i)     Option Exercise.  Either a Call Option or a Put Option shall have been exercised with respect to the Unsubscribed Notes, if any.

(j)     Backstop Put Premium, etc.  All premiums and other amounts, including the Backstop Put Premium, required to be paid or reimbursed by the Company to the Investors as of the Plan Effective Date shall have been so paid or reimbursed.

(k)     Material Adverse Effect.  Since January 1, 2016, there shall not have occurred, and there shall not exist, any change, event, circumstance, effect, development, occurrence or state of facts that constitutes, individually or in the aggregate, a Material Adverse Effect.

(l)     Officer's Certificate.  The Investors shall have received on and as of the Plan Effective Date a certificate of the chief executive officer or chief financial officer of

18

the Company, in their capacity as such and not in their individual capacity, confirming that the conditions set forth in Sections 10(g) and 10(h) have been satisfied.

11.    **Conditions to the Obligations of the Company**.  The obligations of the Company to sell Unsubscribed Notes pursuant to this Agreement on the Plan Effective Date are subject to satisfaction of the following conditions (unless waived by the Company), except where the failure to satisfy any such condition is the result of a failure by the Company to comply with this Agreement:

(a)    Confirmation Order.  The Confirmation Order, in form and substance acceptable to each of the Company and the Requisite Investors, shall have been entered by the Bankruptcy Court, and such order shall have become final.

(b)    Conditions to Confirmation.  The conditions to confirmation and the conditions to the Plan Effective Date set forth in the Plan shall have been satisfied (or waived by the Company) in accordance with the Plan and the Plan Effective Date shall have occurred.

(c)    No Restraint.  No judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan, the Rights Offering or the transactions contemplated hereby.

(d)    Representations and Warranties.  The representations and warranties of the Investors set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent given as of a specific date, as of such date).

(e)    Covenants.  The Investors shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Investors on or prior to the Plan Effective Date.

12.    **Survival of Representations and Warranties**.  The representations and warranties made in this Agreement will not survive the Plan Effective Date.  Covenants and agreements that by their terms are to be satisfied after the Plan Effective Date shall survive until satisfied in accordance with their terms.

13.    **Termination**.

(a)    Mutual Termination. The Company and the Requisite Investors may terminate this Agreement by mutual written consent.

(b)    Investor Termination. At 11:59 p.m. prevailing Eastern Time on the date that is 365 days after the effective date of the Restructuring Support Agreement, each Investor may terminate this Agreement, solely as to such terminating Investor, by written notice to the Company.

WEIL:\95825283\20\22010.0003

(c)      Termination by the Requisite Investors.  The Requisite Investors may terminate this Agreement by written notice to the Company upon the occurrence and during the continuance of any of the following:

(i)      upon the breach in any material respect by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach from any of the Requisite Investors pursuant to this Section 13 and in accordance with Section 12 (as applicable), which notice period shall run concurrently with the notice of termination of this Agreement set forth above;

(ii)      at 11:59 p.m. prevailing Eastern Time on October 25,  2016, unless the Debtors  have filed with the Bankruptcy Court a motion seeking approval of this Agreement and the procedures related to the Rights Offering;

(iii)      at 11:59 p.m. prevailing Eastern Time on November 2, 2016, if the order approving this Agreement and procedures with respect to the Rights Offering shall not have been entered by the Bankruptcy Court;

(iv)      at 11:59 p.m. prevailing Eastern Time on January 8, 2017(the "**Confirmation Date**"), if the Bankruptcy Court shall not have entered an order in form and substance satisfactory to the Company and the Requisite Investors confirming the Plan and approving the Disclosure Statement;

(v)      at 11:59 p.m. prevailing Eastern Time on January 23, 2017 (the "**Outside Date**"), if the Plan Effective Date shall not have occurred;

(vi)      at 11:59 p.m. prevailing Eastern Time on the date that is eight (8) Business Days after issuance of Company Replacement Notice, if Investor Terminations or Investor Defaults (as applicable) representing more than 33% of the Backstop Commitments in the aggregate, have not been assumed by Participating Investors pursuant to Section 5;

(vii)      at 11:59 p.m. prevailing Eastern Time on the date that is eight (8) Business Days after issuance of Company Replacement Notice, if the other Investors have failed to assume 100% of the rights and obligations of the Defaulting Investors or the Terminating Investors, as applicable, pursuant to Section 5, unless the Company provides evidence reasonably satisfactory to the Non Defaulting Investors that such Investor Defaults or Investor Terminations, as applicable, would not otherwise prevent consummation of the Plan in accordance with the milestones set forth in the Restructuring Support Agreement;

(viii)    if an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases or if the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or have been dismissed by order of the Bankruptcy Court;

(ix)      if the Debtors file, propound or otherwise support any plan of reorganization other than the Plan;

WEIL:\95825283\20\22010.0003

(x)    on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement, provided that the Requisite Investors shall not have the right to terminate this Agreement pursuant to this clause (x) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or Disclosure Statement which (i) are not inconsistent with the Plan (as same may be modified, amended or supplemented in accordance with the terms of this Agreement), (ii) do not create any new material obligation on any Party, and (iii) do not adversely affect the agreed treatment or rights of such Party (it being agreed that, for the avoidance of doubt, any change to the Plan that results in a diminution of the value of the property to be received by a Requisite Investor under the Plan shall be deemed to adversely affect such Investors);

(xi)    upon the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment or order has not been not stayed, reversed or vacated within twenty (20) business days after such issuance;

(xii)    upon the failure of any of the conditions set forth in Section 10 to be satisfied when required to be satisfied; or

(xiii)    upon the termination of the Restructuring Support Agreement.

(d)    Termination by the Company.  The Company may terminate this Agreement by written notice to the Investors upon the occurrence of any of the following:

(i)    upon the breach in any material respect by one or more of the Investors of any of the undertakings, representations, warranties or covenants of the Investors set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Company pursuant to this Section 13 and in accordance with Section 14 (as applicable), which notice period shall run concurrently with the notice of termination of this Agreement set forth above;

(ii)    upon the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment or order has not been not stayed, reversed or vacated within twenty (20) business days after such issuance;

(iii)    at 11:59 p.m. prevailing Eastern Time on the Confirmation Date, if the Bankruptcy Court shall not have entered an order in form and substance satisfactory to the Company and the Requisite Investors confirming the Plan and approving the Disclosure Statement;

(iv)    at 11:59 p.m. prevailing Eastern Time on the Outside Date, if the Plan Effective Date shall not have occurred;

21

(v)     upon the failure of any of the conditions set forth in Section 10 to be satisfied when required to be satisfied;

(vi)    upon the termination of the Restructuring Support Agreement; or

(vii)   on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement, provided that the Requisite Investors shall not have the right to terminate this Agreement pursuant to this Section 13(d)(vii) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or Disclosure Statement which (i) are not inconsistent with the Plan (as same may be modified, amended or supplemented in accordance with the terms of this Agreement), (ii) do not create any new material obligation on any Party, and (iii) do not adversely affect the agreed treatment or rights of such Party (it being agreed that, for the avoidance of doubt, any change to the Plan that results in a diminution of the value of the property to be received by a Requisite Investor under the Plan shall be deemed to adversely affect such Investors).

(e)     Effect of Termination.  Subject to Section 16, upon termination of this Agreement, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the transactions contemplated hereby or otherwise, that it would have been entitled to take had it not entered into this Agreement.  Notwithstanding anything contained herein, if this Agreement is terminated as a result of a breach of this Agreement by a party hereto, such party shall not be released and shall remain liable for any damages resulting from such termination.

(f)     Termination Fee.  To the extent this Agreement is terminated in accordance with (x) Sections 13(c)(xi) or 13(d)(ii) or (y) 13(c)(xiii) or 13(d)(vi) hereof (but solely if the Restructuring Support Agreement was terminated pursuant to sections 6(b)(xix) (but solely upon entry of an order denying confirmation of the Basic Plan), 6(b)(xxv), 6(c)(ii), 6(c)(iii) or (6)(c)(vii) (but solely upon entry of an order denying confirmation of the Basic Plan) thereof), the Company shall pay or cause to be paid to the Investors that are not Defaulting Investors (pro rata in accordance with their Investor Percentages) a non-refundable cash fee in an aggregate amount equal to $6,250,000 (the "*Termination Fee*"). The claim of the Investors that are not Defaulting Investors for the Termination Fee shall be subordinated in right of payment to the Allowed Claims of the ABL Facility Lenders, the DIP Facility Lenders and the Term Loan Lenders and shall not be paid by the Company unless the ABL Facility Claims, the DIP Facility Claims and the Term Loan Claims have been paid in full in cash or have otherwise been satisfied in full.

14.   **Indemnification Obligations.**

(a)     Following the entry of the Backstop Order, the Company shall indemnify and hold harmless each Investor and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling

22

persons (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Investors except to the extent otherwise provided for in this Agreement) (collectively, "***Losses***") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the Plan and the transactions contemplated hereby and thereby, including the Backstop Commitments, the Rights Offering, the payment of the Backstop Put Premium or the use of the proceeds of the Rights Offering, the Transaction Expenses or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, its equity holders, Affiliates, creditors or any other person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Investor that has defaulted on its obligation to exercise its Rights under the Rights Offering or to pay the Purchase Price for such Investor's Backstop Commitment of any Unsubscribed Notes or any Indemnified Person related thereto, caused by such default by such Investor, or (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

(b)       Indemnification Procedure.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "***Indemnified Claim***"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided, that (A) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (B) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Section 14.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of

23

such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person. Notwithstanding anything herein to the contrary, the Company shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company.

(c)      Settlement of Indemnified Claims. The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed). If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Section 14.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)      Contribution. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject

24

to indemnification pursuant to <u>Section 14(a),</u> then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the Unsubscribed Notes in the Rights Offering contemplated by this Agreement and the Plan, bears to (ii) the Backstop Premium paid or proposed to be paid to the Investors. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other person in connection with an Indemnified Claim.

(e)    <u>Treatment of Indemnification Payments.</u> All amounts paid by an Indemnifying Party to an Indemnified Person under this <u>Section 14</u> shall, to the extent permitted by applicable law, be treated as adjustments to the Purchase Price for the Unsubscribed Notes purchased by such Indemnified Person for all Tax purposes. The provisions of this <u>Section 14</u> are an integral part of the transactions contemplated by this Agreement and without these provisions the Investors would not have entered into this Agreement, and the obligations of the Company under this <u>Section 14</u> shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further order of the Bankruptcy Court, and the Company may comply with the requirements of this <u>Section 14</u> without further order of the Bankruptcy Court.

15.    **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission), (c) five (5) days after being deposited with the United States Post Office, by registered or certified mail, postage prepaid, (d) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (e) when sent by electronic mail (with acknowledgment received), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party hereto may have specified by like notice):

If to Investors, to each of the undersigned Investors at the addresses listed on the signatures pages hereto,

with a copy to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention:      Brad Eric Scheler, Peter Siroka and Josh Wechsler
Facsimile:      (212) 299-6650
Email:          Brad.Eric.Scheler@friedfrank.com and
                Peter.Siroka@friedfrank.com
                Joshua.Wechsler@friedfrank.com


If to the Company, to:

Basic Energy Services, Inc.
801 Cherry Street, Suite 2100
Fort Worth, Texas 76102
Attention:    T. M. "Roe" Patterson, President, Chief Executive Officer and Alan
Krenek, Senior Vice President, Chief Financial Officer, Treasurer and Secretary
Facsimile: (817) 344-4101
Email:  Roe.Patterson@basicenergyservices.com  and
            Alan.Krenek@basicenergyservices.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:      Ray C. Schrock, P.C.
                Ronit J. Berkovich, Esq.
Facsimile:      (212) 310-8007
Email:          ray.schrock@weil.com
                ronit.berkovich@weil.com

16.    **Survival**.  Notwithstanding the termination of this Agreement, the agreements and obligations of the parties hereto in Section 13(e) and Sections 14 through 22 shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof.

17.    **Assignment; Third Party Beneficiaries**.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any of the parties hereto without the prior written consent of the other parties hereto.  Notwithstanding the previous sentence, the Investors' obligations hereunder may be assigned, delegated or transferred, in whole or in part, by any Investor to any Affiliate (as defined in Rule 12b-2 under the Exchange Act) of such Investor over which such Investor or any of its Affiliates exercises investment authority, including with respect to voting and dispositive rights; provided that any such assignee assumes the obligations of the assigning Investor hereunder and agrees in writing prior to such

WEIL:\95825283\20\22010.0003

assignment to be bound by the terms of this Agreement in the same manner as the assigning Investor. Notwithstanding the foregoing or any other provisions herein, no such assignment will relieve the assigning Investor of its obligations hereunder if such assignee fails to perform such obligations. This Agreement (including the documents and instruments referred to herein) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

18.    **Complete Agreement**. This Agreement (including the Exhibits, the Schedules, and the other documents and instruments referred to herein constitutes the entire agreement of the parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties hereto will continue in full force and effect.

19.    **Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury**. This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement (including the exhibits and schedules hereto), or the negotiation, execution, termination, performance or nonperformance of this Agreement (including the exhibits and schedules hereto), shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without regard to any conflict of laws principles thereof. Each party hereto agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this agreement, any provision hereof or any of the transactions contemplated hereby, in the United States District Court for the Southern District of New York or any New York State court sitting in the Borough of Manhattan of New York City (the "*Chosen Courts*"), and solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto; provided that upon the commencement of the Chapter 11 Cases, the Bankruptcy Court shall be the sole Chosen Court. Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT, ANY PROVISION HEREOF OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

20.    **Counterparts**. This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties hereto (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

21.    **Action by, or Consent or Approval of, the Investors**. Whenever this Agreement refers to any action to be taken by, or any consent or approval to be given by, the Investors, unless otherwise expressly provided in any particular instance, such reference shall be deemed to require the action, consent or approval of the Requisite Investors.

22.    **Amendments and Waivers**.

(a)    This Agreement may be amended, modified or supplemented and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Company and the Requisite Investors and subject, to the extent required after the Petition Date, to the approval of the Bankruptcy Court; provided that any modification of, or amendment or supplement to, this Agreement that would (i) have the effect of materially and adversely affecting any Investor in a manner that is disproportionate to any other Investor or the Investors as a whole, or increasing or decreasing an Investor's Investor Percentage (as set forth on Exhibit A) shall require the prior written consent of such Investor, or (ii) be inconsistent with the Plan or would have the effect of modifying this sentence shall require the prior written consent of all of the Investors; provided, further, that any modification of, or amendment or supplement to Section 13(b) hereof shall require the prior written consent of each such Investor affected thereby.

(b)    No delay on the part of any party hereto in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party hereto of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party hereto otherwise may have at law or in equity.

23.    **Specific Performance**.  The parties hereto acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the parties hereto agree that in addition to any other remedies, each party hereto will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.

24.    **Other Interpretive Matters**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) any reference in this Agreement to $ shall mean U.S. dollars; (iii) all exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement; (iv) words imparting the singular number only shall include the plural and vice versa; (v) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (vi) the word "including" or any variation thereof means "including, without limitation" and shall

28

not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vii) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (viii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

[Signature Page Follows]

WEIL:\95825283\20\22010.0003

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

BASIC ENERGY SERVICES, INC.

By: _____

Name: David C. Johnston

Title: Chief Restructuring Officer

[Signature Page to Backstop Agreement]

**ASCRIBE CAPITAL LLC**
**(ON BEHALF OF ITSELF AND CERTAIN**
**FUNDS)**

By: _____
Name: Lawrence A. First
Title: Managing Director


Address:    299 Park Avenue, 34th Floor
            New York, NY 10171
Attention:  Lawrence First
Facsimile:  (212) 697-5524
email:      lfirst@ascribecapital.com

*[Signature page to Backstop Agreement]*

**ATLAS MASTER FUND, LTD.**

By: _____
Name: Scott Schroeder
Title: Director


Address: c/o Balyasny Asset Management L.P.
        181 W. Madison St., Suite 3600
        Chicago, IL 60602 USA
Attention: Legal
Facsimile:  312-499-2998
email: legal@bamfunds.com


**ATLAS ENHANCED MASTER FUND, LTD.**

By: _____
Name: Scott Schroeder
Title: Director


Address: c/o Balyasny Asset Management L.P.
        181 W. Madison St., Suite 3600
        Chicago, IL 60602 USA
Attention: Legal
Facsimile:  312-499-2998
email: legal@bamfunds.com

*[Signature page to Backstop Agreement]*

BlackGold Opportunity Fund LP

By: _____
Name:   PRAVIN KANNEGANTI
Title:   COO/CCO


Address:   109 North Post Oak Lane, Suite 520
           Houston, TX 77024
Attention: Jim Rollyson
Facsimile: 713-400-6810
email:     jrollyson@blackgoldcap.com

*[Signature page to Backstop Agreement]*

**Brigade Capital Management LLC**

By: _____

Name:   Scott Hoffman

Title:   Senior Analyst

Address:   399 Park Avenue, 16th Floor
           New York, NY 10022
Attention:  Scott Hoffman
Facsimile:  212-745-9701
email:      SH@brigadecapital.com

Covalent Capital Partners Master Fund, L.P. by
and through Covalent Partners LLC, in its
capacity as investment advisor

By: _____

Name: _____

Title: _____

| Address: | 930 Winter Street, Suite 2800 |
| | Waltham, MA 02451 |
| Attention: | William Stone |
| Facsimile: | 617-658-5550 |
| email: | wcs@covalentpartnersllc.com |

*[Signature page to Backstop Agreement]*

**CVI Opportunities Fund I, LLLP**

**By: Susquehanna Advisors Group, Inc., its authorized agent**

By: _____
Name: Kathy Harley
Title: Assistant Vice President


Address:   CVI Opportunities Fund I, LLLP
               c/o Susquehanna Advisors Group, Inc.
               401 City Avenue, Suite 220
               Bala Cynwyd, PA 19004
Attention:  Converts Operations
Facsimile:  610-617-2910
email:      convertsops@sig.com

*[Signature page to Backstop Agreement]*

**GOLDMAN, SACHS & CO.,**
solely with respect to
the Multi-Strategy Investing Desk of the
Americas Special Situations Group

By: _____

Name: DANIEL S. ONEGLIA

Title: AUTHORIZED SIGNATORY

Address:    200 West Street, 15th Floor
            New York, NY 10282
Attention:  Luke C. Dixon
Facsimile:  917-977-3305
email:      luke.dixon@gs.com

*[Signature page to Backstop Agreement]*

**JLP Credit Opportunity Master Fund Ltd**

By: _____
Name: Jeffrey Peskind
Title: Director

Address:   420 Lexington Avenue, Suite 2040
           New York, NY 10170
Attention: Lance Friedler
Facsimile: 212-359-6200
email:     lfriedler@phoenixinvadv.com

**Mercer QIF Fund PLC - Mercer Investment Fund 1**

By: _____
Name: Jeffrey Peskind
Title: Managing Member

By: Phoenix Investment Adviser LLC, Sub-Investment Manager

Address:   420 Lexington Avenue, Suite 2040
           New York, NY 10170
Attention: Lance Friedler
Facsimile: 212-359-6200
email:     lfriedler@phoenixinvadv.com

[Signature page to Backstop Agreement]

**Silver Point Capital Fund, L.P.**

By: _____

Name:    Michael A. Gatto

Title:    Authorized Signatory


Address:    Two Greenwich Plaza
            Greenwich, CT 06830
Attention:  General Counsel
Facsimile:  203-542-4300
email:      mehmer@silverpointcapital.com

**Silver Point Capital Offshore Master Fund, L.P.**

By: _____

Name:    Michael A. Gatto

Title:    Authorized Signatory


Address:    Two Greenwich Plaza
            Greenwich, CT 06830
Attention:  General Counsel
Facsimile:  203-542-4300
email:      mehmer@silverpointcapital.com

[*Signature page to Backstop Agreement*]

DocuSign Envelope ID: B96711C6-4D57-432A-9EFA-437AD5409020

**Whitebox Relative Value Partners, LP**

10/21/2016 | 10:22 PDT

By: _____
Name: Mark Strefling
Title: Chief Operating Officer and General Counsel


Address:   3033 Excelsior Boulevard, Suite 300
                   Minneapolis, MN 55416
Attention: Cindy Chen Delano
Phone: 612-355-2004
email:      Cdelano@whiteboxadvisors.com

Address:   3033 Excelsior Boulevard, Suite 300
                   Minneapolis, MN 55416
Attention: Jacob Mercer
Phone: 612-253-6049
email:      jmercer@whiteboxadvisors.com


**Whitebox Credit Partners, LP**

10/21/2016 | 10:22 PDT

By: _____
Name: Mark Strefling
Title: Chief Operating Officer and General Counsel


Address:   3033 Excelsior Boulevard, Suite 300
                   Minneapolis, MN 55416
Attention: Cindy Chen Delano
Facsimile: 612-355-2004
email:      Cdelano@whiteboxadvisors.com

Address:   3033 Excelsior Boulevard, Suite 300
                   Minneapolis, MN 55416
Attention: Jacob Mercer
Phone: 612-253-6049
email:      jmercer@whiteboxadvisors.com


[*Signature page to Backstop Agreement*]

DocuSign Envelope ID: B96711C6-4D57-432A-9EFA-437AD5409020

**Whitebox GT Fund, LP**

10/21/2016 | 10:22 PDT

By: _____
Name: Mark Strefling
Title: Chief Operating Officer and General Counsel


Address:   3033 Excelsior Boulevard, Suite 300
               Minneapolis, MN 55416
Attention: Cindy Chen Delano
Facsimile: 612-355-2004
email:      Cdelano@whiteboxadvisors.com

Address:   3033 Excelsior Boulevard, Suite 300
               Minneapolis, MN 55416
Attention: Jacob Mercer
Phone: 612-253-6049
email:      jmercer@whiteboxadvisors.com


**Whitebox Multi-Strategy Partners, LP**

10/21/2016 | 10:22 PDT

By: _____
Name: Mark Strefling
Title: Chief Operating Officer and General Counsel


Address:   3033 Excelsior Boulevard, Suite 300
               Minneapolis, MN 55416
Attention: Cindy Chen Delano
Facsimile: 612-355-2004
email:      Cdelano@whiteboxadvisors.com

Address:   3033 Excelsior Boulevard, Suite 300
               Minneapolis, MN 55416
Attention: Jacob Mercer
Phone: 612-253-6049
email:      jmercer@whiteboxadvisors.com


*[Signature page to Backstop Agreement]*

**Exhibit C**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------x
                                        :

In re                                :

                                :      Chapter 11

BASIC ENERGY           :

SERVICES, INC., *et al.*,    :      Case No. 16-_____ (___)

                                :

            Debtors.[1]      :      Jointly Administered

                                :

-------------------------------------------------------x

**ORDER (I) SCHEDULING COMBINED HEARING
TO CONSIDER (A) APPROVAL OF DISCLOSURE STATEMENT,
(B) APPROVAL OF SOLICITATION PROCEDURES AND FORMS OF
BALLOTS, AND (C) CONFIRMATION OF PREPACKAGED PLAN;
(II) ESTABLISHING AN OBJECTION DEADLINE TO OBJECT TO DISCLOSURE
STATEMENT AND PLAN; (III) APPROVING THE FORM AND MANNER OF
NOTICE OF COMBINED HEARING, OBJECTION DEADLINE,
AND NOTICE OF COMMENCEMENT; (IV) CONDITIONALLY
WAIVING REQUIREMENT OF FILING STATEMENT OF FINANCIAL
AFFAIRS AND SCHEDULES OF ASSETS AND LIABILITIES;
(V) CONDITIONALLY WAIVING REQUIREMENT TO CONVENE THE SECTION
341 MEETING OF CREDITORS; AND (VI) APPROVING (A) THE RIGHTS
OFFERING PROCEDURES, (B) BACKSTOP AGREEMENT,
AND (C) THE BACKSTOP PUT PREMIUM, TRANSACTION EXPENSES
AND INDEMNIFICATION OBLIGATIONS IN CONNECTION THEREWITH
PURSUANT TO SECTIONS 105(a), 363(b), 341, 521(a), 1126, AND 1128 OF
<u>THE BANKRUPTCY CODE AND BANKRUPTCY RULES 1007, 3017, 6003, AND 6004</u>**

Upon the motion, dated October 25, 2016 (the "***Motion***"),[2] of Basic Energy

Services, Inc. and its affiliated debtors, as debtors and debtors in possession (collectively,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Basic Energy Services, Inc. (1194);  Basic Energy Services G.P., LLC (1197); Basic Energy Services L.P., LLC (1195);  Basic Energy Services L.P. (1819);  Basic ESA, Inc. (2279);  Chaparral Service, Inc. (6424); SCH Disposal, LLC (8335);  Sledge Drilling Corp. (3140);  Admiral Well Service, Inc. (4899);  Basic Marine Services, Inc. (4888);  JS Acquisition, LLC (9500);  Permian Plaza, LLC (3425);  Maverick Coil Tubing Services, LLC (3281);  First Energy Services Company (4993);  JetStar Holdings, Inc. (4248);  Xterra Fishing & Rental Tools Co. (7818);  Maverick Solutions, LLC (2876);  LeBus Oil Field Service Co. (3125);  Acid Services, LLC (0455); Taylor Industries, LLC (7037);  Maverick Stimulation Company, LLC (4572);  Globe Well Service, Inc. (4275); JetStar Energy Services, Inc. (5237);  Platinum Pressure Services, Inc. (8379);  Maverick Thru-Tubing Services, LLC (1902);  MCM Holdings, LLC (0949);  MSM Leasing, LLC (9182);  The Maverick Companies, LLC (4170). The Debtors' mailing address is 801 Cherry Street, Suite 2100, Fort Worth Texas.

the "*Debtors*"), for entry of an order (i) scheduling a combined hearing to consider (a) approval

of the Disclosure Statement (b) the Solicitation Procedures, and (c) confirmation of the

Prepackaged Plan, (ii) establishing an objection deadline to object to the adequacy of the

Disclosure Statement or confirmation of the Prepackaged Plan, (iii) approving the form and

manner of notice of the Combined Hearing, the Objection Deadline, and notice of

commencement, (iv) extending the deadline for the Debtors to file schedules of assets and

liabilities and statements of financial affairs (collectively, the "*Schedules and Statements*")

through and including December 23, 2016 (the "*SOAL/SOFA Deadline*"), and conditionally

waiving the requirement that the Debtors file the Schedules and Statements upon confirmation of

the Prepackaged Plan, (v) conditionally waiving the requirement to convene the Section 341

Meeting, and (vi) approving (a) the proposed procedures for the conduct of the Rights Offering

annexed as **<u>Exhibit A</u>** to the Motion (the "*Rights Offering Procedures*"), (b) the Backstop

Agreement, and (c) payment by the Debtors of the Backstop Put Premium and the Transaction

Expenses, all as more fully set forth in the Motion; and the Court having jurisdiction to consider

the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the

*Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware* dated February 29, 2012; and consideration of the Motion and the requested relief

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having

been provided to the parties listed therein, and it appearing that no other or further notice need be

provided; and the Court having reviewed the Motion; and the Court having held a hearing on the

Motion; and the Court having determined that the legal and factual bases set forth in the Motion

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

establish just cause for the relief granted herein; and it appearing that the relief requested in the

Motion is in the best interests of the Debtors and their respective estates and creditors; and upon

all of the proceedings had before the Court and after due deliberation and sufficient cause

appearing therefor,

<p style="text-align:center"><strong>IT IS HEREBY ORDERED THAT</strong>:</p>

1.      The Motion is granted as set forth herein.

2.      A hearing to consider compliance with disclosure and solicitation

requirements and confirmation of the Debtors' Plan (the "***Combined Hearing***") is hereby

scheduled to be held before this Court on _____, 2016 at ____:_____ (Prevailing

Eastern Time) or as soon thereafter as counsel may be heard.

3.      Any objections to the Disclosure Statement and/or the Prepackaged Plan

shall be in writing, filed with the Clerk of the United States Bankruptcy Court for the District of

Delaware together with proof of service thereof, set forth the name of the objecting party, and the

nature and amount of any Claim or Interest asserted by the objecting party against the estate or

property of the Debtors, state the legal and factual basis for such objection, conform to the

applicable Bankruptcy Rules and Local Rules, and be served upon the following so as to be

received no later than 4:00 p.m. (Prevailing Eastern Time) on December ___, 2016

(the "***Objection Deadline***"): (i) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767

Fifth Avenue, New York, New York 10153 (Attn:  Ray C. Schrock P.C. and Ronit J. Berkovich,

Esq.); (ii) co-attorneys for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square,

P.O. Box 551, Wilmington, Delaware 19899 (Attn:  Daniel J. DeFranceschi,  Michael J.

Merchant, and Zachary I. Shapiro); (iii) counsel for the Term Loan Lenders and certain of the

DIP Lenders, (x) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York

10017 (Attn: Marshall S. Huebner and Darren S. Klein), and (y) Potter Anderson & Corroon

LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware, (Attn: Jeremy W. Ryan);

(iv)  counsel to the Administrative Agent for the ABL Lenders, (x) Vinson & Elkins LLP, 2001

Ross Avenue, Suite 3700, Dallas, TX 75201-2975 (Attn: James A. Markus and Paul E. Heath)

and (y) Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, Wilmington, DE 19801,

Attn: Robert J. Dehney and Eric D. Schwartz; (v) counsel to the Ad Hoc Group, (x) Fried, Frank,

Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn: Brad Eric

Scheler and Peter Siroka) and (y) Blank Rome LLP, 1201 N. Market Street Suite 800,

Wilmington, DE 19801 (Attn: Michael D. DeBaecke); and (vi) the Office of the United States

Trustee for the District of Delaware (the "*U.S. Trustee*").

       4.     Any objections not timely filed and served in the manner set forth in this

Order may, in the Court's discretion, not be considered and may be overruled.

       5.     Notice of the Combined Hearing as proposed in the Motion and the form

of notice annexed hereto as **Exhibit 1** shall be deemed good and sufficient notice of the

Combined Hearing and no further notice need be given; *provided*, *however*, that any provision of

Bankruptcy Rule 3017(d) requiring the Debtors to distribute the Disclosure Statement and the

Prepackaged Plan to parties not entitled to vote, whether because they are unimpaired or because

they are deemed to reject the Prepackaged Plan, or any parties in interest other than as prescribed

in this Order, shall be waived; *provided further*, *however*, the Disclosure Statement and

Prepackaged Plan shall be remain posted in .PDF format to the following page at

http://dm.epiq11.com/BasicEnergy and shall be provided in either electronic or paper form to

any parties in interest upon written request to the Debtors.  The Debtors shall also serve a copy

of the Combined Notice on all known creditors, interest holders, and interested parties.

4

6.      Service of the Combined Notice as set forth in the Motion and herein is sufficient notice of the Petition Date, the Combined Hearing, the Objection Deadline, and procedures for objecting to the adequacy of the Disclosure Statement and to confirmation of the Prepackaged Plan.

7.      To the extent that section 1125(b) of the Bankruptcy Code requires the Debtors' prepetition solicitation of acceptances for the Prepackaged Plan to be pursuant to an approved disclosure statement in order to continue on a postpetition basis, the Court conditionally approves the Disclosure Statement as having adequate information as required by section 1125 of the Bankruptcy Code without prejudice to any party in interest objecting to the Disclosure Statement at the Confirmation Hearing.

8.      The Debtors are authorized, pursuant to Bankruptcy Rule 2002(*l*), to give supplemental publication notice of the Combined Hearing by publication in a newspaper designated by the Debtors in their sole discretion and on a date no less than twenty-eight days prior to the Combined Hearing.

9.      The time within which the Debtors shall file the Schedules and Statements is extended through and including December 23, 2016 without prejudice to the Debtors' right to seek further extensions of the time within which to file the Schedules and Statements or to seek additional relief from this Court regarding the filing of, or waiver of the requirement to file, the Schedules and Statements.

10.     The requirement that the Debtors file the Schedules and Statements is permanently waived effective upon the date of confirmation of the Prepackaged Plan, provided confirmation occurs on or before the SOAL/SOFA Deadline.

WEIL:\95834547\15\22010.0003

11.     The Rights Offering to be conducted in accordance with and as described in the Prepackaged Plan, the Disclosure Statement, and the Rights Offering Procedures is approved.

12.     The Debtors are authorized to make non-substantive modifications to the Rights Offering, subject to the consent requirements of the Restructuring Support Agreement.

13.     The Backstop Agreement, including the Backstop Put Premium, the Termination Fee, the Indemnification Obligations, and the Transaction Fees, annexed as **Exhibit B** to the Motion, is approved on a final basis.

14.     The Debtors are authorized to execute, deliver, and implement the Backstop Agreement, as amended from time to time in accordance with the terms thereof, the terms of which are hereby approved, and to take all actions necessary to perform their obligations thereunder.  The Backstop Agreement will be binding and enforceable against the Debtors and the Backstop Parties in accordance with its terms.

15.     The Debtors are further authorized to (i) pay the Backstop Put Premium, (ii) pay the Transaction Expenses, and (iii) incur the Indemnification Obligations, each in accordance with its terms and as and when required by the Backstop Agreement, without further application to or order of the Court.

16.     The Debtors are authorized to execute, deliver, and perform one or more amendments, waivers, consents, or other modifications to and under the Backstop Agreement, in each case in accordance with the terms of the Backstop Agreement, and no further approval of the Court shall be required for any amendment, waiver, consent, or other modification to and under the Backstop Agreement that does not have a material adverse effect on the Debtors' estates.

17.     To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to effectuate all of the terms and provisions of the Backstop Agreement and this Order, including, without limitation, permitting the Backstop Parties to exercise all rights and remedies under the Backstop Agreement in accordance with its terms, terminate the Backstop Agreement in accordance with its terms, and deliver any notice contemplated thereunder, in each case, without further order of the Court.

18.     For the avoidance of doubt, the Backstop Put Premium, the Transaction Expenses, the Indemnification Obligations, and the Termination Fee shall survive any termination of the Backstop Agreement in accordance with the terms specified in the Backstop Agreement and constitute valid, binding, and enforceable obligations against the Debtors and their estates.

19.     The Backstop Agreement and the provisions of this Order, including all findings herein, shall be effective and binding upon all parties in interest in the chapter 11 cases, including, without limitation, all creditors of any of the Debtors, any committee appointed in the Debtors' chapter 11 cases, and the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, a responsible person, officer, or any other party appointed as a legal representative or designee of any of the Debtors or with respect to the property of the estate of any of the Debtors) whether in the chapter 11 cases, in any successor chapter 11 or chapter 7 cases (the "*Successor Cases*"), or upon any dismissal of any chapter 11 cases or Successor Cases, and shall inure to the benefit of the Backstop Parties and the Debtors and their respective successors and assigns.

WEIL:\95834547\15\22010.0003

20.     The Debtors are authorized to take all steps necessary or appropriate to carry out the relief granted pursuant to this Order in accordance with the Motion.

21.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2016
          Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit C-1**

## **Combined Notice**

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

</div>

```
------------------------------------------------------x
                                           :
In re                                      :    Chapter 11
                                           :
BASIC ENERGY                               :    Case No. 16-_____ (___)
SERVICES, INC., et al.,¹                   :
                                           :    Joint Administration Requested
              Debtors.                     :
                                           :
------------------------------------------------------x
```

<div align="center">

**NOTICE OF COMMENCEMENT OF CASES**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**-AND-**

**SUMMARY OF JOINT PREPACKAGED CHAPTER 11 PLAN AND NOTICE OF**
**HEARING TO CONSIDER (A) DEBTORS' COMPLIANCE WITH DISCLOSURE**
**REQUIREMENTS AND (B) CONFIRMATION OF PLAN OF REORGANIZATION**

</div>

**NOTICE IS HEREBY GIVEN** as follows:

       1.      On October 25, 2016 (the "**Petition Date**") Basic Energy Services, Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), each commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

       2.      On the Petition Date, the Debtors filed a "prepackaged" plan of reorganization (the "**Prepackaged Plan**") and a proposed disclosure statement (the "**Disclosure Statement**") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.  Copies of the Prepackaged Plan and the Disclosure Statement may be obtained free of charge by visiting the website maintained by the Debtors' voting agent, Epiq Bankruptcy Solutions, LLC (the "**Voting Agent**"), at http://dm.epiq11.com/BasicEnergy.

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Basic Energy Services, Inc. (1194); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Basic ESA, Inc. (2279); Chaparral Service, Inc. (6424); SCH Disposal, L.L.C. (8335); Sledge Drilling Corp. (3140); Admiral Well Service, Inc. (4899); Basic Marine Services, Inc. (4888); JS Acquisition, LLC (9500); Permian Plaza, LLC (3425); Maverick Coil Tubing Services, LLC (3281); First Energy Services Company (4993); JetStar Holdings, Inc. (4248); Xterra Fishing & Rental Tools Co. (7818); Maverick Solutions, LLC (2876); LeBus Oil Field Service Co. (3125); Acid Services, LLC (0455); Taylor Industries, LLC (7037); Maverick Stimulation Company, LLC (4572); Globe Well Service, Inc. (4275); JetStar Energy Services, Inc. (5237); Platinum Pressure Services, Inc. (8379); Maverick Thru-Tubing Services, LLC (1902); MCM Holdings, LLC (0949); MSM Leasing, LLC (9182); The Maverick Companies, LLC (4170). The Debtors' mailing address is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

Copies of the Prepackaged Plan and Disclosure Statement may also be obtained by calling the Voting Agent at (646) 282-2400 or (866) 734-9393 (toll free), emailing    the Voting Agent at tabulation@epiqsystems.com with "Basic Energy" in the subject line, or emailing Debtors' counsel at shapiro@rlf.com.

On October 24, 2016, the Debtors commenced solicitation of votes to accept the Prepackaged Plan from the holders of Class 4 Claims (Term Loan Claims) and Class 5 Claims (Unsecured Notes Claims) of record as of October 11, 2016.  Only holders of Class 4 Claims and Class 5 Claims, are entitled to vote to accept or reject the Prepackaged Plan.  All other classes of claims were either deemed to accept or reject the Prepackaged Plan and, therefore, are not entitled to vote.  **The deadline for the submission of votes to accept or reject the Prepackaged Plan is November 29, 2016 at 5:00 p.m. (Prevailing Eastern Time).**

The Debtors are proposing a Restructuring that, pursuant to the Prepackaged Plan, will provide substantial benefits to the Debtors and all of their stakeholders.  The Restructuring will leave the Debtors' business intact and substantially de-levered, providing for the reduction of $775 million of the Debtors' existing debt.  The Prepackaged Plan also enhances the Debtors' near-term liquidity through a $125 million rights offering backstopped by a group of the Debtors' unsecured noteholders.  This deleveraging and recapitalization will enhance the Debtors' long-term growth prospects and competitive position and allow the Debtors to emerge from their chapter 11 cases (the "**Chapter 11 Cases**") as reorganized entities better positioned to withstand any ongoing instability in the oil and natural gas services sector.  The Restructuring will allow the Debtors' management team to focus on operational performance and value creation.

## Summary of the Prepackaged Plan[2]

3.    Solicitation of votes on the Prepackaged Plan commenced prior to the Petition Date.  The following chart summarizes the treatment provided by the Prepackaged Plan to each class of Claims and Interests:

---

[2] The statements contained herein are summaries of the provisions contained in the Disclosure Statement and the Prepackaged Plan and do not purport to be precise or complete statements of all the terms and provisions of the Prepackaged Plan or documents referred to therein.  For a more detailed description of the Prepackaged Plan, please refer to the Disclosure Statement.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Prepackaged Plan.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[3] |
|-------|--------------------------|-----------|------------------------|---------------------------------|-------------------------------|
| 1 | Other Priority Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | No (Presumed to accept) | 100% |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors:  (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired | No (Presumed to accept) | 100% |
| 3 | ABL Facility Claims | On the Effective Date, on account of its Allowed ABL Facility Claim, each holder of an Allowed ABL Facility Claim shall receive, in full and final satisfaction of its Allowed ABL Facility Claim, (i) payment in full of its Claim and termination of all letters of credit issued under the ABL Credit Agreement, (ii) its Pro Rata share of the Amended and Restated ABL Facility (if each of the  ABL Lenders consents to enter into the Amended and Restated  ABL  Facility),  or  (iii)  such  other consideration satisfactory to each holder of an Allowed ABL Facility Claim. | Unimpaired | No (Presumed to accept) | 100% |
| 4 | Term Loan Claims | The Term Loan Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $164,175,000, plus any accrued and unpaid interest thereon payable through the Effective Date, | Impaired | Yes | 100% |

[3] The ranges set forth under Approximate Percentage Recovery are based on the range of reorganized equity value of the Debtors as described in the Valuation Analysis set forth in the Disclosure Statement.

3

| | | | | | |
|---|---|---|---|---|---|
| | | plus any fees, charges, and other amounts payable under the Term Loan Agreement. On the Effective Date, (i) each holder of an Allowed Term Loan Claim shall receive on account of the principal amount outstanding on such Claim, its Pro Rata share of the principal amount of the Amended and Restated Term Loan Facility subject to the terms set forth in the Amended and Restated Term Loan Agreement and (ii) amounts due as of the Effective Date to each holder of an Allowed Term Loan Claim on account of accrued and unpaid interest shall be deemed to be accrued and unpaid interest under the Amended and Restated Term Loan Agreement payable on first interest payment date thereunder and (iii) amounts due as of the Effective Date to each holder of an Allowed Term Loan Claim on account of fees, charges, or other amounts payable under the Term Loan Agreement shall be paid in Cash in full on the Effective Date, which, for the avoidance of doubt, shall not include payment of any Make-Whole Amount or the Applicable Premium (as such terms are defined in the Term Loan Agreement). | | | |
| 5 | Unsecured Notes Claims | The Unsecured Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $775,000,000, plus any accrued and unpaid interest thereon payable through the Petition Date. On the Effective Date, all of the Unsecured Notes shall be cancelled and discharged. Each holder of an Allowed Unsecured Notes Claim shall receive, on account of its Allowed Unsecured Notes Claims, its Pro Rata share of (i) New Common Shares representing, in the aggregate, 99.5% of the New Common Shares issued on the Effective Date (subject to dilution by the New Common Shares issued upon conversion of the New Convertible Notes, the Management Incentive Plan, and the New Common Shares issued upon exercise of the Warrants) and (ii) 100% of the Subscription Rights to acquire $125,000,000 in New Convertible Notes in accordance with the Rights Offering Procedures. Upon conversion of the New Convertible Notes (assuming such conversion occurs 36 months after the Effective Date), the New Common Shares issued to holders of Unsecured Notes Claims under (i) will comprise 51.22% of the total outstanding New Common Shares (subject to dilution by the Management Incentive Plan and the New Common Shares issued upon exercise of the Warrants). | Impaired | Yes | 27.8% |
| 6 | General Unsecured Claims | The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Prepackaged Plan. Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, on and after the Effective Date, | Unimpaired | No | 100% |

WEIL:\95903892\5\22010.0003

| | | | | | |
|---|---|---|---|---|---|
| | | the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.. | | | |
| 7 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their sole discretion.  All Intercompany Claims between any Debtor and a nondebtor affiliate shall be Unimpaired under the Prepackaged Plan. | Unimpaired | No | 100% |
| 8 | Subordinated Claims | Subordinated Claims are subordinated pursuant to the Prepackaged Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims shall not receive or retain any property under the Prepackaged Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged. | Unimpaired | No (Deemed to reject) | N/A |
| 9 | Existing Equity Interests | On the Effective Date, the Existing Equity Interests shall be cancelled without further action by or order of the Bankruptcy Court.   Notwithstanding the foregoing, each holder of an Allowed Existing Equity Interest shall receive its Pro Rata share of (i) New Common Shares representing, in the aggregate, 0.5% of the New Common Shares issued on the Effective Date (subject to dilution by the New Common Shares issued upon conversion of the New Convertible Notes, the Management Incentive Plan, and the New Common Shares issued upon exercise of the Warrants) and (ii) the Warrants. Upon conversion of the New Convertible Notes (assuming such conversion occurs 36 months after the Effective Date), the New Common Shares issued to Allowed Existing Equity Interests will comprise 0.26% of the total outstanding New Common Shares (subject to dilution by the Management Incentive Plan and the New Common Shares issued upon exercise of the Warrants). | Impaired | No (Deemed to reject) | 0% |
| 10 | Intercompany Interests | On the Effective Date and without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect. | Unimpaired | No (Presumed to accept) | 100% |

5

**NOTICE REGARDING CERTAIN RELEASE,
EXCULPATION AND INJUNCTION PROVISIONS IN THE PREPACKAGED PLAN**

PLEASE BE ADVISED THAT THE PREPACKAGED PLAN CONTAINS CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, INCLUDING:

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Prepackaged Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Prepackaged Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the (i) the holders of all Claims and Interests who vote to accept the Prepackaged Plan, (ii) holders of Claims or Interests that are Unimpaired under the Prepackaged Plan, (iii) holders of Claims or Interests whose vote to accept or reject the Prepackaged Plan is solicited but who do not vote either to accept or to reject the Prepackaged Plan, (iv) holders of Claims or Interests who vote to reject the Prepackaged Plan but do not opt out of granting the releases set forth herein, (v) Basic Parent (to the fullest extent permitted by applicable law), (vi) the Term Loan Agent, (vii) the 2019 Notes Indenture Trustee,(viii) the 2022 Notes Indenture Trustee, (ix) the ABL Facility Agent, and (x) the DIP Facility Agent from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, the Prepackaged Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Prepackaged Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.**

**OTHER RELEASE, EXCULPATION AND INJUNCTION PROVISIONS ARE FOUND IN SECTION X OF THE PREPACKAGED PLAN. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PREPACKAGED PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Hearing to Consider Compliance with Disclosure
Requirements and Confirmation of the Prepackaged Plan**

4.      A combined hearing to consider compliance with the Bankruptcy Code's disclosure requirements and any objections thereto and to consider confirmation of the Prepackaged Plan and any objections thereto will be held before the Honorable _____, United States Bankruptcy Judge, in Room _____ of the United States Bankruptcy Court, 824 Market Street, _____

Floor, Wilmington, Delaware 19801, on , November __, 2016 at __:__ _.m. (Prevailing Eastern Time) or as soon thereafter as counsel may be heard (the "**Combined Hearing**"). The Combined Hearing may be adjourned from time to time without further notice other than by filing a notice on the Bankruptcy Court's docket indicating such adjournment and/or an announcement of the adjourned date or dates at the Combined Hearing. The adjourned date or dates will be available on the electronic case filing docket and the Voting Agent's website at http://dm.epiq11.com/BasicEnergy.

     5.    Any objections to the Disclosure Statement and/or the Prepackaged Plan must (i) be in writing, filed with the Clerk of the United States Bankruptcy for the District of Delaware together with proof of service thereof, (ii) set forth the name of the objecting party, and the nature and amount of any claim or interest asserted by the objecting party against the estate or property of the Debtors, (iii) state the legal and factual basis for such objection, and (iv) **be served upon the following so as to be received no later than 5:00 p.m. (Eastern Time) on November __, 2016:**

    (i)    Basic Energy Services, Inc., 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102, (Attn: Mike Dye, Vice President, Financial Services and Assistant Treasurer);

    (ii)    proposed counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Ray C. Schrock P.C. and Ronit J. Berkovich, Esq.);

    (iii)    proposed co-counsel to the Debtors, Richard, Layton & Finger, P.A., 920 N. King Street, One Rodney Square, Wilmington, Delaware 19807 (Attn: Daniel J. DeFranceschi, Esq., Michael J. Merchant, Esq., and Zachary I. Shapiro, Esq.);

    (iv)    the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Hannah Mufson McCollum, Esq.);

    (v)    counsel to the Lenders under the Term Loan Credit Agreement, dated as of February 26, 2016, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Marshall S. Huebner, Esq. and Darren Klein, Esq.);

    (vi)    counsel to Bank of America, N.A., as administrative agent under the Amended and Restated Credit Agreement, dated as of November 26, 2014, Vinson & Elkins LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201 (Attn: James Markus, Esq.);

    (vii)    counsel to certain holders of the 7.75% Senior Notes due 2019 and the 7.75% Senior Notes due 2022, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Attn: Brad Eric Scheler, Esq. and Peter B. Siroka, Esq.)

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AT THE COMBINED HEARING.**

### Section 341(a) Meeting

A meeting of creditors pursuant to section 341(a) of the Bankruptcy Code (the "**Section 341(a) Meeting**") will be deferred until confirmation of the Prepackaged Plan.  **The Section 341(a) Meeting will not be convened if the Prepackaged Plan is confirmed within sixty (60) days after the Petition Date.**  If the Section 341(a) Meeting will be convened, the Debtors will file, serve on the

parties on whom it served this notice and any other parties entitled to notice pursuant to the Bankruptcy Rules, and post on the Website at http://dm.epiq11.com/BasicEnergy not less than twenty-one (21) days before the date scheduled for such meeting, a notice of, among other things, the date, time, and place of the Section 341(a) Meeting.  .

Dated:  Wilmington, Delaware
        _____, 2016                             BY ORDER OF THE COURT


WEIL, GOTSHAL & MANGES LLP          RICHARDS, LAYTON & FINGER, P.A
Ray C. Schrock, P.C.                Daniel J. DeFranceschi, Esq. (No. 2732)
Ronit J. Berkovich, Esq.            Michael J. Merchant, Esq. (3854)
767 Fifth Avenue                    Zachary I. Shapiro, Esq. (No. 5103)
New York, New York  10153           One Rodney Square
Telephone:  (212) 310-8000          920 North King Street
Facsimile:  (212) 310-8007          Wilmington, Delaware 19801
                                    Telephone:  (302) 651-7700
*Attorneys for Debtors and*          Facsimile:  (302) 651-7701
*Debtors in Possession*

                                    *Attorneys for Debtors and*
                                    *Debtors in Possession*

## Exhibit D-1

**Master Ballot for Unsecured Notes Claims**

WEIL:\95834547\15\22010.0003

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**BASIC ENERGY SERVICES, INC.,** *et. al.,* [1]

Debtors.

**Chapter 11 (Voluntary)**

**IMPORTANT:** No chapter 11 case has been commenced as of the date of distribution of this ballot.  This ballot is a prepetition solicitation of your vote on a prepackaged plan of reorganization.
If chapter 11 cases are commenced, the Debtors will request joint administration of such cases.

### MASTER BALLOT FOR ACCEPTING OR REJECTING THE PLAN

### CLASS 5: UNSECURED NOTES CLAIMS

**Only Eligible Holders holding Unsecured Notes Claims may vote to accept or reject the Plan using this Ballot.**

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON NOVEMBER 29, 2016 (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS.  THIS MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE VOTING DEADLINE.**

This master ballot (the "**Master Ballot**") is being submitted to brokers, dealers, commercial banks, trust companies, or other agents or nominees ("**Nominees**") of a beneficial holder of a Claim (a "**Beneficial Holder**") against Basic Energy Services, Inc. ("**Basic Parent**"), and certain of its subsidiaries (such subsidiaries, together with Basic Parent, the "**Debtors**")

---

[1] The Debtors in these potential chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Basic Energy Services, Inc. (1194); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Basic ESA, Inc. (2279); Chaparral Service, Inc. (6424); SCH Disposal, L.L.C. (8335); Sledge Drilling Corp. (3140); Admiral Well Service, Inc. (4899); Basic Marine Services, Inc. (4888); JS Acquisition LLC (9500); Permian Plaza, LLC (3425); Maverick Coil Tubing Services, LLC (3281); First Energy Services Company (4993); JetStar Holdings, Inc. (4248); Xterra Fishing & Rental Tools Co. (7818); Maverick Solutions, LLC (2876); LeBus Oil Field Service Co. (3125); Acid Services, LLC (0455); Taylor Industries, LLC (7037); Maverick Stimulation Company, LLC (4572); Globe Well Service, Inc. (4275); JetStar Energy Services, Inc. (5237); Platinum Pressure Services, Inc. (8379); Maverick Thru-Tubing Services, LLC (1902); MCM Holdings, LLC (0949); MSM Leasing, LLC (9182); The Maverick Companies, LLC (4170). The Debtors' mailing address is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

**MB - A**                    **-**                    **Unsecured Notes Claim**
                                                       **[CUSIP No.]**

arising under either (i) that certain Indenture, dated as of February 15, 2011, by and among Basic Parent, as issuer, each of the guarantors named therein, and Wells Fargo Bank, N.A., as trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time) (the "*2019 Indenture*"), or (ii) that certain Indenture, dated as of October 16, 2012, by and among Basic Parent, as issuer, each of the guarantors named therein, and Wells Fargo Bank, N.A., as trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time) (the "*2022 Indenture,*" and such claims against the Debtors arising under the 2019 Indenture or the 2022 Indenture, the "*Unsecured Notes Claims*").

Nominees should use this Master Ballot to tabulate votes on behalf of holders to accept or reject the Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and its Affiliated Debtors (the "*Plan*") proposed by the Debtors.  Unless otherwise defined in this Master Ballot, capitalized terms used in this Master Ballot or the attached instructions shall have the meanings given to them in the Plan.

Nominees may pre-validate ballots for beneficial holders (the "*Beneficial Holder Ballots*") by (i) signing the Beneficial Holder Ballot and indicating on the Beneficial Holder Ballot the name of the Nominee and DTC Participant Number, (ii) the amount and the account number of the Unsecured Notes Claims held by the Nominee for the Beneficial Holder, and (iii) forwarding such Beneficial Holder Ballot, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Voting Agent, and other materials requested to be forwarded, to the Beneficial Holder for voting.  The Beneficial Holder must then complete the information requested in Item 2 and Item 3 of the Beneficial Holder Ballot, and return the Beneficial Holder Ballot directly to the Voting Agent in the pre-addressed, postage-paid return envelope so that it is RECEIVED by the Voting Agent on or before the Voting Deadline.  A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Voting Deadline.

If the Nominee elects not to pre-validate Beneficial Holder Ballots, the Nominee may obtain the votes of Beneficial Holders by forwarding to the Beneficial Holders the unsigned Beneficial Holder Ballots, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such Beneficial Holder must then indicate his, her, or its vote on the Beneficial Holder Ballot, complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, execute the Beneficial Holder Ballot, and return the Beneficial Holder Ballot to the Nominee.  After collecting the Beneficial Holder Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holder Ballots, execute the Master Ballot, and deliver the Master Ballot to the Voting Agent so that it is RECEIVED by the Voting Agent on or before the Voting Deadline.  All Beneficial Holder Ballots returned by Eligible Holders should either be forwarded to the Voting Agent (along with the Master Ballot) or retained by Nominees for inspection for at least one year from the Voting Deadline.

**[MB – A]**                                    2                              **Unsecured Notes Claim**
**[CUSIP No.]**

The only holders of Unsecured Notes Claims entitled to cast a vote on the Plan through this Master Ballot are those holders that are "accredited investors" within the meaning of rule 501(a) of Regulation D of the Securities Act of 1933, as amended, and are the beneficial owners of Claims, as of October 11, 2016 (the "***Voting Record Date***"), as reflected in the records maintained by Nominees holding through The Depository Trust Company, or other relevant security depositor or the Trustee.

The Plan is attached as **Exhibit A** to the Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and Its Affiliated Debtors (the "***Disclosure Statement***"), which accompanies this Master Ballot.  The Disclosure Statement provides information to assist holders in deciding whether to accept or reject the Plan.  If you or a holder do not have a Disclosure Statement, you may obtain a copy from Epiq Corporate Restructuring (the "***Voting Agent***") by visiting the Voting Agent's website at http://dm.epiq11.com/BasicServices, calling (646) 282-2500 or (866) 734-9393 (toll free), or sending an email to tabulation@epiqsystems.com with "Basic" in the subject line.  Upon receipt of these materials, you should underline immediately forward to the beneficial holders the Disclosure Statement, and the Beneficial Holder Ballot with a return envelope addressed to you, as provided in the attached instructions.  EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE VOTING AGENT SO THAT IT IS RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.

**PLEASE READ THE ATTACHED VOTING INFORMATION AND INSTRUCTIONS BEFORE COMPLETING THIS MASTER BALLOT.**

**[MB – A]**                                     3                        **Unsecured Notes Claim**
**[CUSIP No.]**

> PLEASE COMPLETE ALL OF THE ITEMS BELOW.  IF THIS MASTER BALLOT HAS
> NOT BEEN PROPERLY COMPLETED, THE VOTES OF THE BENEFICIAL HOLDERS
> MAY NOT BE COUNTED.

**Item 1.  Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐  is a Nominee for the beneficial holders in the principal amount of the Unsecured Notes listed in Item 2 below, and is the registered holder of such Class 5 Unsecured Notes Claims, respectively;

☐  is acting under a power of attorney and/or agency (a copy of which must be provided upon request) granted by a Nominee that is the registered holder of the Unsecured Notes in the principal amount listed in Item 2 below; or

☐  has been granted a proxy (an original of which is annexed hereto) from a Nominee, or a beneficial holder, that is the registered holder of the principal amount of the Unsecured Notes listed in Item 2 below, and accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the beneficial holders of the Class 5 Unsecured Notes Claims described in Item 2 below.

**Items 2.  Vote on Plan.**

The undersigned transmits the following votes of beneficial holders in respect of their Class 5 Unsecured Notes Claims, and certifies that the following beneficial holders, as identified by their respective customer account numbers set forth below, are beneficial holders as of the Voting Record Date and have delivered to the undersigned, as Nominee, Beneficial Holder Ballots casting such votes.[2]

| Your Customer Account Number for Each Beneficial Holder of Class 5 Unsecured Notes Claims that Voted | Principal Amount of Unsecured Notes Claims Held by Your Customer | Vote on Plan Class 5 Vote | | Opt-Out Election\n\nIf the box in Item 3 of the Beneficial Holder Ballot was completed, place an "x" in the column below | Accredited Investor Status\n\nIf the box in Item 4 of the Beneficial Holder Ballot was completed, place an "x" in the column below |
|---|---|---|---|---|---|
| | | ACCEPT | REJECT | | |
| 1. | $ | ☐ | ☐ | | |
| 2. | $ | ☐ | ☐ | | |
| 3. | $ | ☐ | ☐ | | |
| 4. | $ | ☐ | ☐ | | |
| 5. | $ | ☐ | ☐ | | |
| 6. | $ | ☐ | ☐ | | |
| 7. | $ | ☐ | ☐ | | |
| 8. | $ | ☐ | ☐ | | |
| 9. | $ | ☐ | ☐ | | |
| 10. | $ | ☐ | ☐ | | |

---

[2] Indicate in the appropriate column the principal amount of the Unsecured Notes Claims voted for each account, or attach such information to this Master Ballot in the form of the following table.  Please note each beneficial holder must vote all of such beneficial holder's Class 5 Unsecured Notes Claims to accept or to reject the Plan and may not split such vote.  Any ballot executed by a beneficial holder that does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and a rejection of the Plan, and that has not been corrected by the Voting Deadline, shall not be counted.  If a holder submits ballots for multiple Class 5 Unsecured Notes Claims, whether held in other accounts or other record names, and such ballots indicate different votes to accept or reject the Plan, then all such ballots will not be counted.

**[MB – A]**                     5                     **Unsecured Notes Claim**
                                                       **[CUSIP No.]**

**Item 3.   Certification as to Transcription of Information from Item 5 of the Beneficial Owner Ballots as to Class 5 Unsecured Notes Claims Voted Through Other Ballots.**

The undersigned certifies that the undersigned has transcribed in the following table the information, if any, beneficial holders have provided in Item 5 of the Beneficial Holder Ballot, identifying any Class 5 Unsecured Notes Claims for which such beneficial holders have submitted other ballots:

| Your Customer Account Number for Each Beneficial Holder That Completed Item 5 of the Beneficial Holder Ballot | TRANSCRIBE FROM ITEM 5 OF THE BALLOTS: | | | |
|---|---|---|---|---|
| | Account Number | Name of Beneficial Holder | Principal Amount of Other Unsecured Notes Claims Voted | CUSIP No. of Unsecured Notes Claim |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Item 4.  Certification.**

By signing this Master Ballot, the undersigned certifies that:

(a)     (i) the undersigned has received a copy of the Disclosure Statement, Master Ballot and Beneficial Holder Ballot, and has delivered the Disclosure Statement and Beneficial Holder Ballot to beneficial holders holding Class 5 Unsecured Notes Claims through the undersigned with a return envelope; (ii) the undersigned has received a completed and signed Beneficial Holder Ballot from each such beneficial holder as provided in this Master Ballot; (iii) the undersigned is the registered holder of the securities being voted or agent thereof; and (iv) the undersigned has been authorized by each such beneficial holder to vote on the Plan and to make applicable elections;

(b)     the undersigned has properly disclosed: (i) the number of beneficial holders voting Class 5 Unsecured Notes Claims through the undersigned; (ii) the respective amounts of Class 5 Unsecured Notes Claims owned by each such beneficial holder; (iii) each such beneficial holder's respective vote concerning the Plan; and (iv) the customer account or other identification number for each such beneficial holder;

(c)     if the undersigned is a beneficial holder and uses this Master Ballot to vote the undersigned's Class 5 Unsecured Notes Claims, the undersigned confirms and attests to each of the certifications in Item 6 of the Beneficial Holder Ballot;

(d)     each such beneficial holder has certified to the undersigned that such beneficial holder is a beneficial holder and is otherwise eligible to vote on the Plan; and

(e)     the undersigned will maintain Beneficial Holder Ballots and evidence of separate transactions returned by beneficial holders (whether properly completed or defective) for at least one year after the Voting Deadline, and disclose all such information to the Bankruptcy Court or the Debtors, as the case may be, if so ordered.

**Item 5.  Nominee Information and Signature.**

_____

Name of Bank, Broker, or Other Nominee
(Print or Type)

_____

Participant Number

_____

Name of Proxy Holder or Agent for Bank, Broker,
or Other Nominee (if applicable) (Print or Type)

_____

Signature

_____

Name of Signatory

_____

Title

_____

Street Address

_____

City, State, Zip Code

_____

Telephone Number

_____

Date Completed

**YOUR COMPLETED MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE
VOTING AGENT BY THE VOTING DEADLINE AT THE FOLLOWING ADDRESS:**

> **Epiq Corporate Restructuring
> 777 Third Avenue, 12th Floor
> New York, New York 10017
> Attention: Basic Energy Processing**

**BALLOTS RECEIVED VIA EMAIL OR FACSIMILE WILL NOT BE COUNTED.**

**[MB – A]**                    8                    **Unsecured Notes Claim
[CUSIP No.]**

**TELEPHONE: (646) 282-2500 or (866) 734-9393 (toll free)**

**THE VOTING DEADLINE IS 5:00 P.M., EASTERN TIME, ON NOVEMBER 29, 2016.**

IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY (646) 282-2500 OR (866) 734-9393 (TOLL FREE) OR BY SENDING AN EMAIL TO TABULATION@EPIQSYSTEMS.COM WITH "BASIC" IN THE SUBJECT LINE.

## <u>MASTER BALLOT INSTRUCTIONS</u>

1.    To have the votes of your beneficial holders count, you should already have delivered to each such holder a copy of the Disclosure Statement, along with a Beneficial Holder Ballot with a return envelope addressed to you, so such holder may return the ballot to you in sufficient time for you to complete and return the Master Ballot to the Voting Agent, so that the Voting Agent *actually receives* the Master Ballot before the Voting Deadline.

2.    The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you and the beneficial holders if it is accepted by the holders of two-thirds of the aggregate principal amount and more than one-half in number of Claims that vote on the Plan in each Impaired Class, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not discriminate unfairly against, the Class or Classes rejecting it, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

3.    With regard to any Beneficial Holder Ballots returned to you, to have the vote of your beneficial holders count, you must: (a) retain such Beneficial Holder Ballots in your files and transfer the requested information from each such Beneficial Holder Ballot onto the Master Ballot; (b) execute the Master Ballot; and (c) deliver the Master Ballot to the Voting Agent in accordance with these instructions.

4.    Please keep any records of Beneficial Holder Ballots for at least one year after the Voting Deadline (or such other date as is set by subsequent Bankruptcy Court order).  You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

5.    If you are both the Nominee and beneficial holder, and you wish to vote such Class 5 Unsecured Notes Claims for which you are a beneficial holder, you may return either a Beneficial Holder Ballot or the Master Ballot for such Class 5 Unsecured Notes Claims.

6.    The Master Ballot may not be used for any purpose other than to vote to accept or reject the Plan.

7.    The Master Ballot does not constitute, and shall not be deemed to be, a proof of claim or interest or an assertion or admission of a Claim or Interest.

8.    The following ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any ballot that is illegible or contains insufficient information to permit the identification of the beneficial holder's customer account or other identification number for the beneficial holder, (b) any ballot cast by a Person that does not hold a Claim or Interest in a Class entitled to vote on the Plan, (c) any unsigned ballot, (d) any ballot that

**Unsecured Notes Claim**
**CUSIP No. 03841XAB0**

does not contain an original signature, (e) any ballot not marked to accept or reject the Plan, and (f) any ballot indicating both acceptance and rejection of the Plan.

9.  If a holder submits ballots for multiple Class 5 Unsecured Notes Claims, whether held in other accounts or other record names, and such ballots indicate <u>different</u> votes to accept or reject the Plan, then all such ballots will not be counted.

10. If the Master Ballot is received after the Voting Deadline, it will not be counted, unless otherwise determined by the Debtors.  The method of delivery of the Master Ballot to the Voting Agent is at your election and risk.

11. The Master Ballot should not be sent to the Debtors, the Trustee, or the Debtors' financial or legal advisors.

12. There may be changes made to the Plan that do not cause material adverse effects on an accepting Class.  If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

WEIL:\95911592\1\22010.0003

## Exhibit D-2

**Beneficial Holder Ballot for Term Loan Claims**

WEIL:\95834547\15\22010.0003

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 11 (Voluntary)** |
| **BASIC ENERGY SERVICES, INC.,** *et. al.,* [1] | **IMPORTANT:** No chapter 11 case has been commenced as of the date of distribution of this ballot.  This ballot is a prepetition solicitation of your vote on a prepackaged plan of reorganization. |
| **Debtors.** | If chapter 11 cases are commenced, the Debtors will request joint administration of such cases. |

### BALLOT FOR TERM LOAN CLAIM HOLDERS TO
### ACCEPT OR REJECT THE PLAN

### CLASS 4: TERM LOAN CLAIMS

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON NOVEMBER 29, 2016 (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS.**

       This ballot (the "*Ballot*") is provided to you to solicit your vote to accept or reject the Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and its Affiliated Debtors (the "*Plan*") for Basic Energy Services, Inc. ("*Basic Parent*") and certain other of its subsidiaries (such subsidiaries, together with Basic Parent, the "*Debtors*").  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined herein shall have the meanings given to them in the Plan.

       Please use this Ballot to cast your vote to accept or reject the Plan if you are, as of October 11, 2016 (the "*Voting Record Date*"), (i) a holder of a claim (a "*Holder*") against the Debtors arising under either (a) that certain Term Loan Agreement, dated as of February 17,

---

[1] The Debtors in these potential chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Basic Energy Services, Inc. (1194); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Basic ESA, Inc. (2279); Chaparral Service, Inc. (6424); SCH Disposal, L.L.C. (8335); Sledge Drilling Corp. (3140); Admiral Well Service, Inc. (4899); Basic Marine Services, Inc. (4888); JS Acquisition LLC (9500); Permian Plaza, LLC (3425); Maverick Coil Tubing Services, LLC (3281); First Energy Services Company (4993); JetStar Holdings, Inc. (4248); Xterra Fishing & Rental Tools Co. (7818); Maverick Solutions, LLC (2876); LeBus Oil Field Service Co. (3125); Acid Services, LLC (0455); Taylor Industries, LLC (7037); Maverick Stimulation Company, LLC (4572); Globe Well Service, Inc. (4275); JetStar Energy Services, Inc. (5237); Platinum Pressure Services, Inc. (8379); Maverick Thru-Tubing Services, LLC (1902); MCM Holdings, LLC (0949); MSM Leasing, LLC (9182); The Maverick Companies, LLC (4170). The Debtors' mailing address is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

**Term Loan Claim**

2016, by and among Basic Parent as Borrower, the guarantors named therein, U.S. Bank National Association as administrative agent, and the lenders party thereto, as amended, modified, or otherwise supplemented from time to time (the "***Term Loan Agreement***," and such claims against the Debtors arising under the Term Loan Agreement, the "***Term Loan Claims***"), and (ii) are also an "accredited investor" within the meaning of Rule 501 of the Securities Act of 1933, as amended (an "***Eligible Holder***").  Only Eligible Holders holding Term Loan Claims may vote to accept or reject the Plan using this Ballot.  If you hold one or more Term Loan Claims but you are not an Eligible Holder, you may not use this Ballot or any other ballot to vote to accept or reject the Plan.

The Plan is attached as **<u>Exhibit A</u>** to the Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and Its Affiliated Debtors (the "***Disclosure Statement***"), which accompanies this Ballot.  The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan.  If you do not have a Disclosure Statement, you may obtain a copy from Epiq Corporate Restructuring (the "***Voting Agent***") by visiting the Voting Agent's website at http://dm.epiq11.com/BasicEnergy, calling (646) 282-2500 or (866) 734-9393 (toll free), or sending an email to tabulation@epiqsystems.com with "Basic" in the subject line and requesting a copy be provided to you.  You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek independent legal advice concerning the Plan and your classification and treatment under the Plan.

The Debtors intend to commence voluntary cases under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***").  The Plan can thereafter be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds of the aggregate principal amount and more than one-half in number of the Claims voted in each Impaired Class, and if the Plan otherwise satisfies the applicable requirements of section 1129(a) under the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan.  To have your vote counted, you must complete, sign and return this Ballot to the Voting Agent by the Voting Deadline.

---

**IMPORTANT NOTICE REGARDING**
**TREATMENT FOR CLASS 4**

Claims in Class 4 (Term Loan Claims) consist solely of Claims arising under that certain Term Loan Agreement, dated as of February 17, 2016.

As described in more detail in the Disclosure Statement and Plan, if the Chapter 11 cases are commenced, the Plan is confirmed and the Effective Date occurs, the Term Loan Claims shall receive the following treatment: (i) each holder of an Allowed Term Loan Claim shall receive on account of the principal amount outstanding on such Claim, its Pro Rata share of the principal amount of the Amended and Restated Term Loan Facility subject to the terms set forth in the Amended and Restated Term Loan Agreement; (ii) amounts due as of the Effective Date to each holder of an Allowed Term Loan Claim on account of accrued and unpaid interest shall be deemed to be accrued and unpaid interest under the Amended and Restated Term Loan Agreement payable on the first interest payment date thereunder; and (iii) amounts due as of the Effective Date to each holder of an Allowed Term Loan Claim on account of fees, charges, or other amounts payable under the Term Loan Agreement shall be paid in Cash in full on the Effective Date, which, for the avoidance of doubt, shall not include payment of any Make-Whole Amount or the Applicable Premium (as such terms are defined in the Term Loan Agreement).

PLEASE READ THE DISCLOSURE STATEMENT AND PLAN FOR MORE DETAILS.

---

**PLEASE READ THE ATTACHED VOTING INFORMATION AND
INSTRUCTIONS BEFORE COMPLETING THIS BALLOT.**

---

PLEASE COMPLETE ALL APPLICABLE ITEMS BELOW.  PLEASE FILL IN ALL OF THE INFORMATION REQUESTED UNDER ITEM 4.  IF THIS BALLOT HAS NOT BEEN PROPERLY SIGNED IN THE SPACE PROVIDED, YOUR VOTE MAY NOT BE VALID OR COUNTED AS HAVING BEEN CAST.

---

**Item 1.  Principal Amount of Claim**.  The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder (or authorized signatory of such Holder) of a Term Loan Claim in the aggregate unpaid <u>principal</u> amount inserted into the box below, without regard to any accrued but unpaid interest.

$$\boxed{\phantom{xxxxx}\$\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxx}}$$

**Item 2.  Votes on Plan**.  Please vote either to accept or to reject the Plan with respect to your Claims in Class 4 below.  Any Ballot not marked either to accept or reject the Plan, or marked both to accept and to reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

---

**Prior to voting on the Plan, please note the following:**

**If you vote to accept the Plan, you shall be deemed to have consented to the release, injunction, and exculpation provisions set forth in sections 10.6, 10.7, and 10.8 of the Plan and attached hereto as <u>Exhibit 1</u>.**

**If you (i) do not vote either to accept or reject the Plan, or (ii) vote to reject the Plan and do not check the box in Item 3 below, you shall be deemed to have consented to the release provisions set forth in Section 10.7 of the Plan and attached hereto as <u>Exhibit 1</u>.**

**The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation.**

---

**Term Loan Claim Holder's Vote on Plan**.  The undersigned Holder of a Class 4 Term Loan Claim votes to (check <u>one</u> box):

☐ **Accept** the Plan          ☐ **Reject** the Plan

**[B]**                                          4                              **Term Loan Claims**

**Item 3.  Optional Release Election**.  If you voted to reject the Plan in Item 2 above, check this box if you elect <u>not</u> to grant the releases contained in Section 10.7 of the Plan.  Election to withhold consent is at your option.  If you submit your Ballot without this box checked, or you do not vote either to accept or reject the Plan, you will be deemed to consent to the releases contained in Section 10.7 of the Plan to the fullest extent permitted by applicable law.  If you voted to accept the Plan in Item 2 above, you will be deemed to consent to the releases contained in Section 10.7 of the Plan to the fullest extent permitted by applicable law.

    ☐    The undersigned has voted to reject the Plan in Item 2 and elects <u>not</u> to grant the releases contained in Section 10.7 of the Plan.

**Item 4.   Acknowledgments**. By signing this Ballot, the Holder (or authorized signatory of such Holder) acknowledges receipt of the Plan, the Disclosure Statement, and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Holder (or is entitled to vote on behalf of such Holder) of the Term Loan Claim described in Item 1 as of the Voting Record Date, (iii) it is an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act of 1933, as amended, (iv) it has not submitted any other Ballots for other Class 4 Term Loan Claims held in other accounts or other record names, or if it has submitted Ballots for other such Claims held in other accounts or other record names, then such Ballots indicate the <u>same</u> vote to accept or reject the Plan, and (v) all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.  The undersigned understands that an otherwise properly completed, executed, and timely returned Ballot failing to indicate either acceptance or rejection of the Plan, or indicating both acceptance and rejection of the Plan, will not be counted.

_____

Name of Holder

_____

Signature

_____

Name of Signatory and Title

_____

Name of Institution (if different than Holder)

_____

Street Address

_____

City, State, Zip Code

_____

Telephone Number

_____

Date Completed

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR COMPLETED BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE VOTING DEADLINE.  PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT PROMPTLY IN THE RETURN ENVELOPE PROVIDED OR AS FOLLOWS:**

---

**By First Class Mail, Overnight Courier or Personal Delivery:**

        **Epiq Corporate Restructuring**
        **777 Third Avenue, 12th Floor**
        **New York, New York 10017**
        **Attention: Basic Energy Processing**

---

**BALLOTS RECEIVED VIA EMAIL OR FACSIMILE WILL NOT BE COUNTED.**

**TELEPHONE: (646) 282-2500 or (866) 734-9393 (toll free)**

**THE VOTING DEADLINE IS 5:00 P.M., EASTERN TIME, ON NOVEMBER 29, 2016.**

WEIL:\95911591\1\22010.0003

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY CALLING (646) 282-2500 OR (866) 734-9393 (TOLL FREE) OR BY SENDING AN EMAIL TO TABULATION@EPIQSYSTEMS.COM WITH "BASIC" IN THE SUBJECT LINE.

**VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT**

1.  Complete the Ballot by providing all the information requested and sign, date, and return the Ballot in the envelope provided to the Voting Agent.  Any Ballot that is illegible, contains insufficient information to identify the holder, does not contain an original signature, or is unsigned will not be counted.

    **The Voting Agent will tabulate all properly completed Ballots received on or before the Voting Deadline.**  Ballots may not be submitted to the Voting Agent by facsimile or email.

2.  If neither the "accept" nor "reject" box is checked in Item 2, or the Ballot is otherwise not properly completed, executed, or timely returned, then the Ballot may not be counted.  If both the "accept" and "reject" box is checked in Item 2, the Ballot will not be counted.

3.  You must vote all your Class 4 Term Loan Claims under the Plan either to accept or reject the Plan.  Accordingly, if you return more than one Ballot voting different Term Loan Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

4.  If you voted to reject the Plan and elect <u>not</u> to grant the releases contained in Section 10.7 of the Plan, check the box in Item 3.  Election to withhold consent is at your option.  If you submit your Ballot without the box in Item 3 checked, you will be deemed to consent to the releases set forth in Section 10.7 of the Plan to the fullest extent permitted by applicable law.

5.  If you vote to accept the Plan by checking the "accept" box in Item 2, but you also check the box in Item 3, your election not to grant the releases will not be counted, as your vote in favor of the plan shall be deemed a consent to the releases set forth in Section 10.7 of the Plan to the fullest extent permitted by applicable law.

6.  The Ballot does not constitute, and shall not be deemed to be, a proof of claim or interest or an assertion or admission of a Claim or Interest.

7.  The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.

8.      If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the latest received, properly executed Ballot submitted to the Voting Agent will supersede any prior Ballot.

9.      In the event that (i) the Debtors revoke or withdraw the Plan, or (ii) the Confirmation Order is not entered or consummation of the Plan does not occur, this Ballot shall automatically be null and void and deemed withdrawn without any requirement of affirmative action by or notice to you.

10.     There may be changes made to the Plan that do not cause material adverse effects on an accepting Class.  If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

11.     NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT.

12.     PLEASE RETURN YOUR BALLOT PROMPTLY TO THE VOTING AGENT IN THE ENVELOPE PROVIDED.

13.     IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CALL THE VOTING AGENT AT (646) 282-2500 OR (866) 734-9393 (TOLL FREE) OR BY SENDING AN EMAIL TO TABULATION@EPIQSYSTEMS.COM WITH "BASIC" IN THE SUBJECT LINE. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

14.     THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR COMPLETED BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE VOTING DEADLINE AT THE FOLLOWING ADDRESS:**

---

**By First Class Mail, Overnight Courier or Personal Delivery:**

**Epiq Corporate Restructuring**
**777 Third Avenue, 12th Floor**
**New York, New York 10017**
**Attention: Basic Energy Processing**

---

**TELEPHONE: (646) 282-2500 or (866) 734-9393 (toll free)**

**THE VOTING DEADLINE IS 5:00 P.M., EASTERN TIME, ON NOVEMBER 29, 2016.**

## **Exhibit 1**

**Term Loan Claim**

### *Plan Injunction, Releases, and Exculpation*

If you vote to accept the Plan or you, directly or indirectly, receive and accept a distribution under the Plan, you shall be deemed to have consented to the injunction and exculpation provisions set forth in sections 10.6 and 10.8 of the Plan.  If you are entitled to vote on the Plan and you (i) vote to accept the Plan, (ii) do not vote to either accept or reject the Plan, or (iii) vote to reject the Plan and do not check the box in Item 3 above, you shall be deemed to have consented to the release provisions set forth in Section 10.7 of the Plan.  The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation.  Capitalized terms used in this Exhibit that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

### *10.6    Plan Injunction.*

**(a)    Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan; *provided, further*, that nothing contained herein shall enjoin any Restructuring Support Party from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.**

**(b)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically**

consented to be bound by the Plan, including, without limitation, the injunctions set forth in this section.

10.7    *Releases.*

(a)    <u>Releases by the Debtors</u>.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities who may purport to assert any Cause of Action derivatively, by or through the foregoing entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including, without limitation, the Term Loan Agreement, the 2019 Notes Indenture, and the 2022 Notes Indenture), the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, and the Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, transaction, agreement, event, or other occurrence, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.

(b)    <u>Releases by Holders of Claims and Interests</u>.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the (i) the holders of all Claims and Interests who vote to accept the Plan, (ii) holders of Claims or Interests that are Unimpaired under the Plan, (iii) holders of Claims or Interests whose

vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iv) holders of Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein, (v) Basic Parent (to the fullest extent permitted by applicable law), (vi) the Term Loan Agent, (vii) the 2019 Notes Indenture Trustee,(viii) the 2022 Notes Indenture Trustee, (ix) the ABL Facility Agent, and (x) the DIP Facility Agent from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, the Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

### 10.8    *Exculpation.*

To the extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Amended and Restated ABL Credit Agreement, the Amended and Restated Term Loan Agreement, the DIP Facility Loan Agreement, the New Convertible Notes Indenture, the New Shareholders Agreement, the Warrant Agreement, the New By-Laws, the Management Incentive Plan, the Backstop Agreement, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, and the Plan (including the Plan Documents), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the conducting of the Rights Offering; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for intentional fraud, gross negligence, or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code

WEIL:\95911591\1\22010.0003

**with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

**<u>Exhibit D-3</u>**

**Beneficial Holder Ballot for Unsecured Notes Claims**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**BASIC ENERGY SERVICES, INC.,** *et. al.,* [1]

Debtors.

**Chapter 11 (Voluntary)**

**IMPORTANT:** No chapter 11 case has been commenced as of the date of distribution of this ballot.  This ballot is a prepetition solicitation of your vote on a prepackaged plan of reorganization.
If chapter 11 cases are commenced, the Debtors will request joint administration of such cases.

## BALLOT FOR UNSECURED NOTES CLAIMS BENEFICIAL HOLDERS TO ACCEPT OR REJECT THE PLAN

### CLASS 5: UNSECURED NOTES CLAIMS

**Only Eligible Holders holding Unsecured Notes Claims may vote to accept or reject the Plan using this Ballot.**

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON NOVEMBER 29, 2016 (THE "VOTING DEADLINE")[2], UNLESS EXTENDED BY THE DEBTORS.   IF YOU ARE RETURNING YOUR BALLOT TO YOUR NOMINEE, YOU MUST RETURN IT BY THE DEADLINE PROVIDED BY YOUR NOMINEE OR OTHERWISE ALLOW SUFFICIENT TIME FOR YOUR VOTE TO BE INCLUDED ON A MASTER BALLOT AND**

---

[1] The Debtors in these potential chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Basic Energy Services, Inc. (1194); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Basic ESA, Inc. (2279); Chaparral Service, Inc. (6424); SCH Disposal, L.L.C. (8335); Sledge Drilling Corp. (3140); Admiral Well Service, Inc. (4899); Basic Marine Services, Inc. (4888); JS Acquisition LLC (9500); Permian Plaza, LLC (3425); Maverick Coil Tubing Services, LLC (3281); First Energy Services Company (4993); JetStar Holdings, Inc. (4248); Xterra Fishing & Rental Tools Co. (7818); Maverick Solutions, LLC (2876); LeBus Oil Field Service Co. (3125); Acid Services, LLC (0455); Taylor Industries, LLC (7037); Maverick Stimulation Company, LLC (4572); Globe Well Service, Inc. (4275); JetStar Energy Services, Inc. (5237); Platinum Pressure Services, Inc. (8379); Maverick Thru-Tubing Services, LLC (1902); MCM Holdings, LLC (0949); MSM Leasing, LLC (9182); The Maverick Companies, LLC (4170). The Debtors' mailing address is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

[2] The Debtors (as defined herein) have requested that Eligible Holders who are party to the Restructuring Support Agreement (the "Consenting Noteholders"), dated as of October 23, 2016, by and among the Debtors and the Consenting RSA Parties, to submit a ballot by October 25, 2016 to the extent reasonably practicable.

**A**

**Unsecured Notes Claim
[CUSIP No.]**

> **FORWARDED TO THE VOTING AGENT BY THE VOTING DEADLINE FOR YOUR VOTE TO BE COUNTED.**

This ballot (the "***Ballot***") is provided to you to solicit your vote to accept or reject the Joint Prepackaged Chapter 11 Plan of Basic Services, Inc. and its Affiliated Debtors (the "***Plan***") for Basic Energy Services, Inc. ("***Basic Parent***"), and certain other subsidiaries of Basic Parent (such subsidiaries, together with Basic Parent, the "***Debtors***").  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined herein shall have the meanings given to them in the Plan.

Please use this Ballot to cast your vote to accept or reject the Plan if you are, as of October 11, 2016 (the "***Voting Record Date***"), (i) a beneficial holder of a claim (a "***Beneficial Holder***") against the Debtors arising under either (a) that certain Indenture, dated as of February 15, 2011, by and among Basic Parent, as issuer, each of the guarantors named therein, and Wells Fargo Bank, N.A., as trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time) (the "***2019 Indenture***"), or (b) that certain Indenture, dated as of October 16, 2012, by and among Basic Parent, as issuer, each of the guarantors named therein, and Wells Fargo Bank, N.A., as trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time) (the "***2022 Indenture***," and such claims against the Debtors arising under the 2019 Indenture or the 2022 Indenture, the "***Unsecured Notes Claims***"), and (ii) are also an "accredited investor" within the meaning of Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (an "***Eligible Holder***").  The definition of "accredited investor" is attached hereto as **Exhibit 1**.  Only Eligible Holders holding Unsecured Notes Claims may vote to accept or reject the Plan using this Ballot. If you beneficially hold one or more Unsecured Notes Claims but you are not an Eligible Holder, you may not use this Ballot or any other ballot to vote to accept or reject the Plan.

The Plan is attached as **Exhibit A** to the Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and Its Affiliated Debtors (the "***Disclosure Statement***"), which accompanies this Ballot.  The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan.  If you do not have a Disclosure Statement, you may obtain one from Epiq Corporate Restructuring (the "***Voting Agent***") by visiting the Voting Agent's website at http://dm.epiq11.com/BasicServices, calling (646) 282-2500 or (866) 734-9393 (toll free), or sending an email to tabulation@epiqsystems.com with "Basic" in the subject line and requesting a copy be provided to you.  You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek independent legal advice concerning the Plan and your classification and treatment under the Plan.

The Debtors intend to commence voluntary cases under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***").  The Plan can thereafter be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds of the aggregate principal amount and more than one-half in number of the Claims voted in each Impaired Class, and if the Plan otherwise satisfies the applicable requirements of

section 1129(a) under the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan.  To have your vote counted, you must complete, sign and return this Ballot to your broker, dealer, commercial bank, trust company, or other agent or nominee ("***Nominee***") for return to the Voting Agent by the Voting Deadline, unless your Ballot has been pre-validated by your Nominee for direct return to the Voting Agent.

---

### IMPORTANT NOTICE REGARDING
### TREATMENT FOR CLASS 5

Claims in Class 5 (Unsecured Notes Claims) consist of solely of the Unsecured Notes Claims (as defined in the Plan).

As described in more detail in the Disclosure Statement and Plan, if the Chapter 11 cases are commenced, the Plan is confirmed and the Effective Date occurs, all of the Unsecured Notes shall be cancelled and discharged.  Each holder of an Allowed Unsecured Notes Claim shall receive, on account of its Allowed Unsecured Notes Claims, its Pro Rata share of  (i) New Common Shares representing, in the aggregate, 99.5% of the New Common Shares issued on the Effective Date (subject to dilution by the New Common Shares issued upon conversion of the New Convertible Notes, the Management Incentive Plan, and the New Common Shares issued upon exercise of the Warrants) and (ii) 100% of the Subscription Rights to acquire $125,000,000 in New Convertible Notes in accordance with the Rights Offering Procedures.  Upon conversion of the New Convertible Notes (assuming such conversion occurs 36 months after the Effective Date), the New Common Shares issued to holders of Unsecured Notes Claims under (i) will comprise 51.22% of the total outstanding New Common Shares (subject to dilution by the Management Incentive Plan and the New Common Shares issued upon exercise of the Warrants).

BALLOTS ARE ONLY BEING SOLICITED FROM HOLDERS AS OF THE VOTING RECORD DATE THAT ARE "ACCREDITED INVESTORS". IF YOU ARE NOT AN ACCREDITED INVESTOR, ANY VOTE IN ITEM 2 WILL NOT BE COUNTED.

PLEASE READ THE DISCLOSURE STATEMENT AND PLAN FOR MORE DETAILS.

**PLEASE READ THE ATTACHED VOTING INFORMATION AND
INSTRUCTIONS BEFORE COMPLETING THIS BALLOT.**

> PLEASE COMPLETE THE APPLICABLE ITEMS BELOW. PLEASE FILL IN ALL OF THE INFORMATION REQUESTED UNDER ITEM 6. IF THIS BALLOT HAS NOT BEEN PROPERLY SIGNED IN THE SPACE PROVIDED, YOUR VOTE MAY NOT BE VALID OR COUNTED AS HAVING BEEN CAST.

**Item 1. Principal Amount of Claim.** The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder (or authorized signatory of such Beneficial Holder) of an Unsecured Notes Claim in the aggregate unpaid <u>principal</u> amount inserted into the box below, without regard to any accrued but unpaid interest. If your Unsecured Notes Claim is held by a Nominee on your behalf and you do not know the principal amount of the Unsecured Notes Claim held, please contact your Nominee immediately to obtain the amount.

$

**Item 2. Votes on Plan.** Please vote either to accept or to reject the Plan with respect to your Claims in Class 5 below. Any Ballot not marked either to accept or reject the Plan, or marked both to accept and to reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

> **Prior to voting on the Plan, please note the following:**
>
> **If you vote to accept the Plan, you shall be deemed to have consented to the release, injunction, and exculpation provisions set forth in sections 10.6, 10.7, and 10.8 of the Plan and attached hereto as <u>Exhibit 2</u>.**
>
> **If you (i) do not vote either to accept or reject the Plan, or (ii) vote to reject the Plan and do not check the box in Item 3 below, you shall be deemed to have consented to the release provisions set forth in Section 10.7 of the Plan and attached hereto as <u>Exhibit 2</u>.**
>
> **The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation.**

**Unsecured Notes Claim Holder's Vote on Plan.** The undersigned Beneficial Holder of a Class 5 Unsecured Notes Claim votes to (check <u>one</u> box):

☐ **Accept** the Plan          ☐ **Reject** the Plan

**A**                                    4                      **Unsecured Notes Claims
                                                               [CUSIP No.]**

**Item 3.  Optional Release Election**.  If you voted to reject the Plan in Item 2 above, check this box if you elect <u>not</u> to grant the releases contained in Section 10.7 of the Plan.  Election to withhold consent is at your option.  If you submit your Ballot without this box checked, or you do not vote either to accept or reject the Plan, you will be deemed to consent to the releases contained in Section 10.7 of the Plan to the fullest extent permitted by applicable law.  If you voted to accept the Plan in Item 2 above, you will be deemed to consent to the releases contained in Section 10.7 of the Plan to the fullest extent permitted by applicable law.

☐  The undersigned has voted to reject the Plan in Item 2 and elects <u>not</u> to grant the releases contained in Section 10.7 of the Plan.

**Item 4.  Accredited Investor Status**.  Please check the below box only if you are an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933.  The definition of "accredited investor" is attached hereto as **<u>Exhibit 1</u>**.  Votes are only being solicited from holders of Class 5 Unsecured Notes Claims that are accredited investors. The vote of any holder of a Class 5 Unsecured Notes Claim that does not certify that it is an accredited investor will not be counted.

☐  YES, I am an ACCREDITED INVESTOR.

**Item 5.  Certification as to Class 5 Unsecured Notes Claims Held in Additional Accounts**.  The undersigned hereby certifies that either (i) it has not submitted any other Ballots for other Class 5 Unsecured Notes Claims held in other accounts or other record names, or (ii) if it has submitted Ballots for other such Claims held in other accounts or other record names, then such Ballots indicate the <u>same</u> vote to accept or reject the Plan.  If the undersigned has submitted Ballots for other such Claims, then the undersigned certifies the accuracy of the information provided below as to such other Claims.

| Account Number | Name of Beneficial Holder (Insert name of bank or broker if notes are held through a Nominee) | Amount of Other Unsecured Notes Claims Voted | CUSIP No. of Unsecured Notes Claim |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Item 6.    Acknowledgments**. By signing this Ballot, the Beneficial Holder (or authorized signatory of such Beneficial Holder) acknowledges receipt of the Plan, the Disclosure Statement, and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Beneficial Holder (or is entitled to vote on behalf of such Beneficial Holder) of the Unsecured Notes Claim described in Item 1 as of the Voting Record Date, and if it has submitted any other Ballots for other Class 5 Unsecured Notes Claims held in other accounts or other record names that it has provided the information requested above in Item 5, (iii) it is an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act of 1933, as amended, (iv) if delivered to a Nominee, such Beneficial Holder authorizes its Nominee to treat this Ballot as a direction to include its claim as a Class 5 Unsecured Notes Claim on the Master Ballot, and (v) all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.  The undersigned understands that an otherwise properly completed, executed, and timely returned Ballot failing to indicate either acceptance or rejection of the Plan or indicating both acceptance and rejection of the Plan will not be counted.  The undersigned also understands that if it has submitted Ballots for other Class 5 Unsecured Notes Claims, whether held in other accounts or other record names, and such Ballots indicate <u>different</u> votes to accept or reject the Plan, then all such Ballots will not be counted.

_____
Name of Beneficial Holder

_____
Signature

_____
Name of Signatory and Title

_____
Name of Institution (if different than Beneficial Holder)

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Date Completed

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON NOVEMBER 29, 2016.**

*IF YOU RECEIVED A RETURN BALLOT ADDRESSED TO THE VOTING AGENT (EPIQ CORPORATE RESTRUCTURING)*, **PLEASE COMPLETE, AND DATE THE BALLOT AND RETURN IT PROMPTLY WITH AN ORIGINAL SIGNED COPY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE.**

*IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE*, **PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE.  THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY CALLING (646) 282-2500 OR (866) 734-9393 (TOLL FREE) OR BY SENDING AN EMAIL TO TABULATION@EPIQSYSTEMS.COM WITH "BASIC" IN THE SUBJECT LINE.

**VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT**

1.    Complete the Ballot by providing all the information requested and sign, date, and return the Ballot in the envelope provided or as indicated by your Nominee.  Any Ballot that is illegible, contains insufficient information to identify the holder, does not contain an original signature, or is unsigned will not be counted.

   **The Voting Agent will tabulate all properly completed Ballots and Master Ballots received on or before the Voting Deadline.  IF YOU ARE RETURNING YOUR BALLOT TO YOUR NOMINEE, PLEASE RETURN IT BY THE DEADLINE PROVIDED BY YOUR NOMINEE OR OTHERWISE ALLOW SUFFICIENT TIME FOR YOUR VOTE TO BE INCLUDED ON A MASTER BALLOT AND FORWARDED TO THE VOTING AGENT BY THE VOTING DEADLINE.** Ballots and Master Ballots may not be submitted to the Voting Agent by facsimile or email.

2.    If neither the "accept" nor "reject" box is checked in Item 2, or the Ballot is otherwise not properly completed, executed, or timely returned, then the Ballot will not be counted.  If both the "accept" and "reject" box is checked in Item 2, the Ballot will not be counted.

3.    You must vote all your Class 5 Unsecured Notes Claims under the Plan either to accept or reject the Plan.  Accordingly, if you return more than one Ballot voting different Unsecured Notes Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  Except with respect to Master Ballots, an otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

4.    If you voted to reject the Plan and elect not to grant the releases contained in Section 10.7 of the Plan, check the box in Item 3.  Election to withhold consent is at your option.  If you submit your Ballot without the box in Item 3 checked, you will be deemed to consent to the releases set forth in Section 10.7 of the Plan to the fullest extent permitted by applicable law;

5.    If you vote to accept the Plan by checking the "accept" box in Item 2, but you also check the box in Item 3, your election not to grant the releases will not be counted, as your vote in favor of the plan shall be deemed a consent to the releases set forth in Section 10.7 of the Plan to the fullest extent permitted by applicable law;

6.    The Ballot does not constitute, and shall not be deemed to be, a proof of claim or interest or an assertion or admission of a Claim or Interest.

7.    The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.

8.    If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the latest received, properly executed Ballot submitted to the Voting Agent will supersede any prior Ballot.

9.    In the event that (i) the Debtors revoke or withdraw the Plan, or (ii) the Confirmation Order is not entered or consummation of the Plan does not occur, this Ballot shall automatically be null and void and deemed withdrawn without any requirement of affirmative action by or notice to you.

10.    There may be changes made to the Plan that do not cause material adverse effects on an accepting Class. If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

11.    NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT.

12.    PLEASE RETURN YOUR BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR AS OTHERWISE DIRECTED BY YOUR BANK, BROKER OR NOMINEE.

13.    IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CALL THE VOTING AGENT AT (646) 282-2500 OR (866) 734-9393 (TOLL FREE) OR BY SENDING AN EMAIL TO TABULATION@EPIQSYSTEMS.COM WITH "BASIC" IN THE SUBJECT LINE.

14.    THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**Exhibit 1**

**A**

**Unsecured Notes Claim
[CUSIP No.]**

### *"Accredited Investor"*

Rule 501(a) under Regulation D of the Securities Act of 1933, in relevant part, states that an "accredited investor" shall mean any person who comes within any of the below listed categories, or who the issuer reasonably believes comes within any of the below listed categories, at the time of the sale of the securities to that person.

(1) Any bank as defined in section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000, subject to the calculation of such net worth as set forth in such Rule;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

**A**

**Unsecured Notes Claim**
**[CUSIP No.]**

## Exhibit 2

**A**

**Unsecured Notes Claim**
**[CUSIP No.]**

### *Plan Injunction, Releases, and Exculpation*

If you vote to accept the Plan or you, directly or indirectly, receive and accept a distribution under the Plan, you shall be deemed to have consented to the injunction and exculpation provisions set forth in sections 10.6 and 10.8 of the Plan.  If you are entitled to vote on the Plan and you (i) vote to accept the Plan, (ii) do not vote to either accept or reject the Plan, or (iii) vote to reject the Plan and do not check the box in Item 3 above, you shall be deemed to have consented to the release provisions set forth in section 10.7 of the Plan.  The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation.  Capitalized terms used in this Exhibit that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

### *10.6    Plan Injunction.*

**(a)        Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan; *provided, further*, that nothing contained herein shall enjoin any Restructuring Support Party from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.**

**Unsecured Notes Claim**
**[CUSIP No.]**

(b)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this section.

**10.7    Releases.**

(a)    **Releases by the Debtors.**  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities who may purport to assert any Cause of Action derivatively, by or through the foregoing entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including, without limitation, the Term Loan Agreement, the 2019 Notes Indenture, and the 2022 Notes Indenture), the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, and the Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, transaction, agreement, event, or other occurrence, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.

(b)    **Releases by Holders of Claims and Interests.**  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the (i) the holders of all Claims and Interests who vote to accept the Plan, (ii) holders of Claims or Interests that are Unimpaired under the Plan, (iii) holders of Claims or Interests whose

[A]                                         2                    **Unsecured Notes Claims
[CUSIP No.]**

vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iv) holders of Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein, (v) Basic Parent (to the fullest extent permitted by applicable law), (vi) the Term Loan Agent, (vii) the 2019 Notes Indenture Trustee,(viii) the 2022 Notes Indenture Trustee, (ix) the ABL Facility Agent, and (x) the DIP Facility Agent from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, the Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

### 10.8    *Exculpation.*

To the extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Amended and Restated ABL Credit Agreement, the Amended and Restated Term Loan Agreement, the DIP Facility Loan Agreement, the New Convertible Notes Indenture, the New Shareholders Agreement, the Warrant Agreement, the New By-Laws, the Management Incentive Plan, the Backstop Agreement, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, and the Plan (including the Plan Documents), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the conducting of the Rights Offering; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for intentional fraud, gross negligence, or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and,

**therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**